## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| CMFG LIFE INSURANCE COMPANY, CUMIS INSURANCE SOCIETY, and MEMBERS LIFE INSURANCE COMPANY, <br><br>       Plaintiffs, <br><br>       vs. <br><br> J.P. MORGAN SECURITIES, LLC, BEAR, STEARNS & CO. (n/k/a J.P. MORGAN SECURITIES, LLC), WAMU CAPITAL CORP., and J.P. MORGAN CHASE BANK, N.A. (as successor-in-interest to WAMU CAPITAL CORP. and WASHINGTON MUTUAL BANK), <br><br>       Defendants. | Case No. 13-cv-580 <br><br> **JURY TRIAL DEMANDED** |

---

### FIRST AMENDED COMPLAINT

---

**Bauer & Bach, LLC**

Peggy A. Lautenschlager
123 East Main Street
Suite 300
Madison, Wisconsin 53703
(608) 260-0292

**Korein Tillery, LLC**

George A. Zelcs
205 North Michigan,
Suite 1950
Chicago, IL 60601
(312) 641-9750

Greg G. Gutzler
Michael E. Klenov
505 North 7th Street,
Suite 3600
St. Louis, MO 63101
(314) 241-4844

**Kellogg, Huber, Hansen, Todd, Evans & Figel, PLLC**

David C. Frederick
Silvija A. Strikis
Scott K. Attaway
1615 M Street, N.W.
Suite 400
Washington, DC 20036
(202) 326-7900

## TABLE OF CONTENTS

SUMMARY OF THE KEY ALLEGATIONS........................................................................1

    I.    The performance of and risk associated with RMBS depend on borrowers' ability to repay their loans and on the resale value of the mortgaged properties. ...............................................................2

    II.    Loan originators' underwriting standards are designed to ensure that borrowers are willing and able to repay their loans and that the mortgaged properties have sufficient market value to recoup the loan balance in the event of default...............................................2

    III.    Investment banks like Defendants underwrite RMBS and re-underwrite the underlying loans to the originators' underwriting standards. .........................................3

    IV.    CUNA Mutual relied on Defendants' expertise in underwriting RMBS and re-underwriting the loan pools...............................................5

    V.    Between 2005 and 2007, Defendants induced CUNA Mutual to purchase eleven RMBS certificates by falsely representing that the loans backing the RMBS had been issued in compliance with the relevant originators' underwriting standards. ...............................................7

    VI.    Defendants also induced CUNA Mutual's purchases by misrepresenting the quantitative characteristics of the loan pools backing the RMBS...............................................11

    VII.    CUNA Mutual's reliance on Defendants' material misrepresentations was justifiable. ...............................................14

    VIII.    After the value of the eleven RMBS certificates collapsed, CUNA Mutual discovered that Defendants' representations about the loans backing those certificates were false at the time they were made...............................................16

    IX.    Defendants' false data led to artificially inflated credit ratings. ...............................................21

    X.    The nature of CUNA Mutual's claims. ...............................................22

PARTIES ...............................................23

JURISDICTION AND VENUE ...............................................26

ADDITIONAL ALLEGATIONS...............................................26

    I.    The securitization of residential mortgages. ...............................................26

    II.    RMBS credit ratings and credit enhancement. ...............................................29

III.   The J.P. Morgan transactions at issue in this case. ...................................................32

    A.   J.P. Morgan's material misrepresentations related to CUNA Mutual's purchases, on which CUNA Mutual relied. ...........................................34

    1.   J.P. Morgan's misrepresentations about CWALT 2005-46CB. ..................36

    2.   J.P. Morgan's misrepresentations about CHASE 2005-S3. ........................40

    3.   J.P. Morgan's misrepresentations about CWALT 2005-57CB. ..................44

    4.   J.P. Morgan's misrepresentations about JPALT 2005-S1. ..........................48

    5.   J.P. Morgan's misrepresentations about JPALT 2006-S1. ..........................53

IV.   The Bear Stearns transactions at issue in this case. ...............................................57

    A.   Bear Stearns's material misrepresentations related to CUNA Mutual's purchases, on which CUNA Mutual relied. ...........................................59

    1.   Bear Stearns's misrepresentations about SACO 2005-WM1. ....................60

    2.   Bear Stearns's misrepresentations about STALT 2006-1F. ........................65

    3.   Bear Stearns's misrepresentations about RALI 2006-QS14. ......................69

V.   The WaMu Capital transactions at issue in this case. .............................................73

    A.   WaMu Capital's material misrepresentations related to CUNA Mutual's purchases, on which CUNA Mutual relied. ........................................75

    1.   WaMu Capital's misrepresentations about WAMU 2005-AR15. ...............76

    2.   WaMu Capital's misrepresentations about WMALT 2006-7. ....................81

VI.   CUNA Mutual's forensic analysis revealed Defendants' misrepresentations about the quantitative characteristics of the loan pools backing each of the ten RBMS at issue. .......................................................85

VII.   Defendants' false LTV, CLTV, and owner-occupancy statistics necessarily mean that Defendants' representations that the Originators complied with their underwriting guidelines were also false. ...........................99

VIII.   CUNA Mutual's forensic analysis findings are consistent with information that has become publicly available after the financial collapse. .........................................................................................................101

iii

IX.   Defendants' due-diligence process failed to keep improperly underwritten and materially defective loans out of the loan pools. ...............................137

X.   Defendants likewise misrepresented credit ratings. ...........................................139

XI.   CUNA Mutual's RMBS have suffered significant credit rating downgrades. ..............................................................................................143

XII.   CUNA Mutual reliance on Defendants' misrepresentations was justifiable. .................................................................................................145

XIII.   Liability of JPM Chase Bank for WaMu Capital's misrepresentations. ...........................146

CAUSES OF ACTION ........................................................................................................ 150

## SUMMARY OF THE KEY ALLEGATIONS

1.      Plaintiff CUNA Mutual[1] brings this lawsuit to rescind its purchase of eleven certificates in ten separate residential mortgage-backed securities offerings ("RMBS"). Defendants J.P. Morgan Securities, LLC, Bear, Stearns & Co. (n/k/a J.P. Morgan Securities, LLC), and WaMu Capital Corp. induced CUNA Mutual to purchase those certificates by misrepresenting the fundamental attributes of, and thus the credit risk associated with, the pools of mortgage loans collateralizing the RMBS. After CUNA Mutual made its purchases, the mortgage loans in the pools began to default at high rates consistent with their true attributes, causing CUNA Mutual to suffer millions of dollars in losses. Under Wisconsin law, Defendants' misrepresentations of material fact justify CUNA Mutual's rescission of these purchases, regardless of whether Defendants made those misrepresentations intentionally, recklessly, negligently, or even innocently.

2.      Rescission is also appropriate because CUNA Mutual was mistaken about a basic assumption and expectation underlying these RMBS transactions: that the loans in the pools were issued in compliance with the originators' underwriting standards (as Defendants represented them to be). Representations of originator compliance with underwriting standards were ubiquitous in the RMBS industry. Thus, absent an explicit disclosure to the contrary, the public offering of RMBS represented to investors that the loans in the pools were underwritten in accordance with the relevant originators' underwriting standards. Under Wisconsin law, rescission based on mistake is appropriate regardless of whether Defendants were also mistaken about the originators' compliance with their underwriting standards, or whether Defendants instead misrepresented the originators' compliance intentionally, recklessly, or negligently.

---

[1] "CUNA Mutual" refers collectively to the three affiliated Plaintiffs: CMFG Life Insurance Company, CUMIS Insurance Society, Inc., and MEMBERS Life Insurance Company.

1

3.      In the alternative to a rescission remedy, CUNA Mutual seeks to disgorge the benefit that it conferred upon Defendants through its purchases. Defendants have retained that benefit unjustly because they failed to perform adequate due diligence on the loans they selected for securitization, and thus allowed thousands of materially defective loans into the collateral pools backing the RMBS they later sold to CUNA Mutual.

**I.      The performance of and risk associated with RMBS depend on borrowers' ability to repay their loans and on the resale value of the mortgaged properties.**

4.      RMBS are fixed-income securities that are collateralized, or "backed," by pools of residential mortgage loans.

5.      RMBS generate ongoing income for investors by aggregating individual borrowers' monthly principal and interest payments and distributing those payments according to a defined structure or "waterfall."

6.      If individual borrowers default on their loans, RMBS investors are supposed to be protected by the resale or foreclosure value of the mortgaged properties because the proceeds of any such sale—up to the outstanding balance of the loan—are distributed to investors.

7.      Accordingly, the performance of and risk associated with RMBS depend principally on two characteristics of the mortgage loans in the collateral pools: (1) the borrowers' willingness and ability to make monthly principal and interest payments on their loans; and (2) the market value of the mortgaged properties compared to the principal amount of the corresponding loans— typically expressed as a loan-to-value ("LTV") or combined loan-to-value ("CLTV") ratio.

**II.      Loan originators' underwriting standards are designed to ensure that borrowers are willing and able to repay their loans and that the mortgaged properties have sufficient market value to recoup the loan balance in the event of default.**

8.      In order to ensure that a mortgage loan to a particular borrower represents an appropriate credit risk, the entity that issues the loan—the "originator"—is supposed to comply

2

with underwriting standards designed to ensure both that (1) the borrower is willing and able to make the monthly mortgage payments, and that (2) the market value of the mortgaged property is sufficient to recover the balance on the loan in the event of default.

9. The first factor—willingness and ability to pay—is determined through a variety of underwriting metrics such as income, debt, assets, credit history, FICO score, job security, and the borrower's intent to use the mortgaged property as a primary residence. The borrower must typically provide detailed supporting documentation for each of these metrics.

10. The second factor—market value of the mortgaged property—is typically determined through one or both of two valuation methods: appraisals and automated valuation models (AVMs). A key component of both valuation methods involves cross-checking recent sales prices of comparable properties in the same area as the mortgaged property, which are considered reliable indicators of the true market value of the mortgaged property.

11. If an individual loan does not meet the ability-to-pay and market-value metrics outlined in the originator's applicable underwriting standards, then the loan does not represent an appropriate credit risk for that type of loan and should not be issued.

**III. Investment banks like Defendants underwrite RMBS and re-underwrite the underlying loans to the originators' underwriting standards.**

12. Although originators issue the loans that end up backing RMBS, investment banks like Defendants are the entities that actually create, structure, and market RMBS.

13. Because RMBS are publicly offered securities subject to state and federal securities laws, Defendants are required to conduct thorough due diligence on both the originators of the loans and the actual loans that back the RMBS before offering certificates for sale to investors like CUNA Mutual.

14.     In their capacity as an underwriter of RMBS, Defendants thus also act as secondary underwriters of the loans issued by the originators.

15.     In their capacity as the secondary underwriter of loans, Defendants and their co-underwriters took a sample of loans from the pools backing a proposed RMBS and re-underwrote them—ostensibly to ensure that the loans in the loan pools were issued in compliance with the relevant originators' underwriting standards.

16.     If the re-underwriting revealed defects in the way that loans were originally underwritten, Defendants were required under the securities laws to either remove the defective loans they identified through re-underwriting or to inform investors about those defects in its marketing materials in conspicuous language.

17.     After completing their due diligence on originators and their loan pools, Defendants created the marketing materials that they used to solicit investors like CUNA Mutual to purchase certificates in RMBS. RMBS marketing materials included some or all of the following: prospectuses, term sheets, free writing prospectuses, preliminary prospectus supplements, and final prospectus supplements (collectively, the "Offering Documents").

18.     State and federal securities laws required Defendants to provide prospective investors with all of the material information about an RMBS offering before the investors could commit to purchasing certificates in the RMBS. Defendants were required to deliver that information via Offering Documents.

19.     In order to comply with state and federal securities laws, Defendants were required to verify that the information in their Offering Documents was complete and accurate in all material respects: the securities laws impose virtually strict liability on underwriters for any material misrepresentations, misleading statements, or omissions in Offering Documents.

20.     Because Defendants were ultimately liable for any misrepresentations in or omissions from the Offering Documents, Defendants and their lawyers in fact authored, reviewed, or edited the Offering Documents and exercised final authority over their contents.

**IV.    CUNA Mutual relied on Defendants' expertise in underwriting RMBS and re-underwriting the loan pools.**

21.     CUNA Mutual frequently interacted with Defendants J.P. Morgan and Bear Stearns about RMBS transactions—and less frequently with Defendant WaMu Capital—and purchased over a dozen RMBS certificates from Defendants both in the first-issue and secondary markets.

22.     Defendants marketed themselves to CUNA Mutual and the world as experts in securitizing residential mortgages, including loan acquisition, structuring, modeling, pricing, due diligence, and re-underwriting.

23.     In a number of in-person and telephone conferences, meetings, and presentations, Defendants assured CUNA Mutual that they employed a thorough due-diligence process on the RMBS they brought to market as underwriters.

24.     More specifically, Defendants represented that, consistent with industry-standard practice for underwriters of RMBS, their due diligence involved vetting the originators that issued the loans that Defendants securitized, as well as re-underwriting a statistically significant sample of the loans backing each RMBS sufficient to ensure that the loans in the loan pools complied with the originators' underwriting standards.

25.     In addition, Defendants represented that if their re-underwriting efforts uncovered material underwriting defects in the loan pools, they would replace the offending loans and increase the scope of their re-underwriting to protect investors.

26.     To the extent that Defendants could not cure the defects they identified through their due-diligence processes, Defendants were required by state and federal securities laws to

conspicuously inform prospective investors about any remaining defects in the loan pools through the Offering Documents before investors could commit to purchase RMBS backed by those loan pools.

27.     Defendants' due-diligence-related representations were consistent with what CUNA Mutual understood their obligations to be under the securities laws.

28.     Moreover, the regulations governing Defendants' activities as a federally registered broker-dealer mandated that Defendants could not sell any security to an institutional-investor client unless they had reasonable grounds for believing that the security was a suitable investment for that specific client.

29.     In other words, every offer to sell a security to an institutional-investor client like CUNA Mutual was regarded—both by Defendants and by CUNA Mutual—as a representation by Defendants of the suitability of that security. RMBS backed by loans that were largely underwritten in violation of applicable underwriting standards would not be suitable for any institutional investor.

30.     In entering into any RMBS transaction with Defendants—including every transaction at issue in this case—CUNA Mutual thus relied on Defendants' representations and the industry-custom expectation that (1) they performed due diligence on the RMBS that they offered for sale, (2) they re-underwrote a sufficient sample of the loans in the underlying loan pools to ensure that the loans in the pools had been issued in compliance with the originators' underwriting standards, and (3) they cured any defects identified through re-underwriting.

31.     In entering into any RMBS transaction with Defendants—including every transaction at issue in this case—CUNA Mutual also relied on the expectation that Defendants had provided it with all material information necessary to evaluate the RMBS, which Defendants explicitly confirmed through their Offering Documents.

6

**V.     Between 2005 and 2007, Defendants induced CUNA Mutual to purchase eleven RMBS certificates by falsely representing that the loans backing the RMBS had been issued in compliance with the relevant originators' underwriting standards.**

32.     Between 2005 and 2007, Defendants induced CUNA Mutual to purchase eleven certificates in ten separate RMBS through Offering Documents which represented that the loans backing those RMBS were issued in compliance with the underwriting standards of the relevant originators (the "Originators").

33.     Defendants' Offering Documents represented that to the extent any loans in the underlying loan pools deviated from those underwriting standards, the deviations were supported by sufficient "compensating factors" to make the loans an appropriate credit risk for investors.

34.      Defendants made these representations about underwriting standards both before and after re-underwriting a sample of loans from the loan pools, ostensibly to confirm that all of the loans in the pools in fact complied with the Originators' applicable underwriting standards.

35.     Indeed, the representation that loans backing a publicly offered RMBS were underwritten in compliance with the relevant originators' underwriting standards was ubiquitous in the industry and was a basic assumption underlying each RMBS transaction.

36.     The only exception to this uniform industry practice was when an RMBS was backed by "scratch-and-dent" loan pools, meaning that the loans were known to be defective in some way and were thus precluded from being in the pools backing a typical publicly offered RMBS.

37.     "Scratch-and-dent" RMBS were clearly and explicitly identified as such; were generally offered only through "private placements" to sophisticated investors rather than through public offerings; and were thus in an entirely separate category from typical publicly offered RMBS.

38.     To draw an analogy: "scratch-and-dent" RMBS are comparable to salvage vehicles sold at a junk yard, while typical RMBS are comparable to new cars on the lot of a reputable dealer. Just like car buyers could never be confused about whether they are buying a salvage vehicle at a

7

junk yard or a new car at a reputable car dealer, RMBS investors likewise could never be confused about whether they were buying "scratch-and-dent" RMBS or RMBS backed by loans originated in compliance with the originators' underwriting standards. None of the RMBS at issue here were scratch-and-dent RMBS.

39.     In order for any entity to issue publicly offered securities, it must first file a registration statement with the Securities and Exchange Commission ("SEC") describing its business and the types of securities it intends to offer.

40.     The SEC requires every entity that files a shelf registration statement (Form S-3) to also file a base prospectus pursuant to which all future securitization offerings will be made by that issuer, as well as a "form of prospectus supplement" that the issuer will use as the template for all final prospectus supplements. Both documents are incorporated into the registration statement.

41.     The SEC requires issuers of asset-backed securities to include in the base prospectus certain information that it deems material to investors, including a description of the types of assets that will be included in future securitizations. The form of prospectus supplement tracks the information included in the base prospectus.

42.     One of the features included in the asset-description portion of the base prospectus for RMBS is a representation that the future RMBS offerings will be backed by loans originated in compliance with the originators' underwriting standards.

43.     The form of prospectus supplement that acts as the template for future prospectus supplements contains the same representation of originator compliance with underwriting standards.

44.     All of the RMBS that CUNA Mutual purchased from Defendants were issued pursuant to base prospectuses that explicitly represented that all future RMBS offerings by the issuer from that shelf would be backed by loans that were originated in compliance with the originators' underwriting standards.

45.     While issuers and their underwriters could—and were required to—create and disseminate additional Offering Documents specific to particular securitizations, the information in those Offering Documents (including final prospectus supplements) was not supposed to contradict the information in the base prospectus and the form of prospectus supplement filed with the SEC.

46.     CUNA Mutual, like other investors in RMBS, knew that underwriters of RMBS had to make this underwriting-standard-compliance representation in order to get investment-grade credit ratings on RMBS certificates and to make those certificates marketable to institutional investors like insurance companies and pension funds.

47.     When transferring loans to Defendants or directly to an RMBS trust, the originators of the loans uniformly made a standard set of representations and warranties; principal among them was the representation and warranty that the originators had complied with their underwriting standards when issuing the loans.

48.     Indeed, the Pooling and Servicing Agreements ("PSAs") for virtually all RMBS securitizations stated that the originators made those representations and warranties. Thus, representations and warranties about underwriting-standard compliance were also fundamental to every RMBS transaction.

49.      Defendants required originators to make that representation when they were purchasing or securitizing their loans. Credit rating agencies also viewed those representations as an essential safeguard built into the RMBS structure. And investors likewise understood the representation to be a critical component of a high-credit-quality investment backed by loans originated by distant third parties.

50.     Thus, that RMBS were backed by loans originated in substantial compliance with the originators' underwriting standards was a fundamental assumption underlying every RMBS offering.

9

51.     That RMBS were backed by loans originated in substantial compliance with the originators' underwriting standards was likewise a fundamental assumption underlying CUNA Mutual's decision to purchase each of the RMBS certificates at issue in this case.

52.      Defendants knew and understood that CUNA Mutual entered into the transactions based on that understanding and expectation.

53.     Defendants' due diligence—specifically their re-underwriting of the loans in the loan pools backing the RMBS they brought to market—was ostensibly designed to confirm that this fundamental assumption was in fact accurate. If it was not, Defendants (like all underwriters of publicly offered RMBS) were required to inform investors of that material fact before soliciting their purchase of certificates in its RMBS.

54.     In light of this uniform industry practice, by soliciting CUNA Mutual's purchase of certificates in its publicly offered RMBS, Defendants represented both that the loans backing the RMBS were originated in compliance with the relevant originators' underwriting standards and that Defendants' due diligence had confirmed that fact.

55.     In every RMBS transaction that CUNA Mutual entered into with Defendants, that implicit representation was accompanied by an explicit representation in the Offering Documents that the relevant originators had complied with their underwriting standards in issuing the collateral loans.

56.     The Offering Documents making that representation were delivered either at the time of solicitation or before the transaction was finalized (or both), but they were always delivered and they always confirmed the basic expectation of underwriting-standard compliance (as they had to in order to conform to the base prospectus and the form of prospectus supplement).

57.     As explained above, the two principal functions of underwriting standards are (1) to ensure that the borrowers are willing and able to make their monthly mortgage payments, and (2) to

10

verify the sufficiency of the mortgaged properties' resale value to recoup the loans' balance in the event of default.

58.    Consequently, loans that are issued in compliance with underwriting standards are less likely to default and less likely to result in a loss to the investor upon default than loans issued in disregard of underwriting standards.

59.    Similarly, loans that are technically outside the thresholds set by the underwriting standards but are supported by sufficient and legitimate compensating factors are less likely to default and result in a loss than loans not supported by such compensating factors.

60.    Defendants' representations that the relevant Originators complied with their underwriting standards were material to CUNA Mutual because they indicated that the credit risk associated with the loan pools in the RMBS was appropriate for the types of loans covered by the applicable underwriting standards (Alt-A, subprime, second-lien, etc.), and also that the RMBS structure (e.g., credit enhancement) appropriately accounted for the true credit risk of the loan pools.

61.    CUNA Mutual relied on these representations about adherence to underwriting standards when deciding to purchase all eleven certificates in the ten RMBS at issue.

## VI.    Defendants also induced CUNA Mutual's purchases by misrepresenting the quantitative characteristics of the loan pools backing the RMBS.

62.     Defendants' Offering Documents also made very detailed representations about various quantitative characteristics of the underlying loans that were tied directly to the two principal functions of underwriting standards.

63.     Defendants' collateral analysts calculated and compiled these quantitative characteristics after verifying that the data was accurately transcribed from the underlying loan

documents; the characteristics represented in the Offering Documents were not generated by the Originators.

64.     One of the key quantitative characteristics that Defendants disclosed in their Offering Documents was the mortgaged properties' LTV and CLTV ratios, which compared the loan amounts to the mortgaged properties' values. The LTV ratio is calculated by taking the loan amount and dividing it by the market value of the property as determined by an appraisal, an AVM, or both. The CLTV ratio is calculated by taking the outstanding principal balance of all loans on the property, including second liens, and dividing it by the market value of the property.

65.     As part of its due diligence, Defendants reviewed and sought to verify the listed appraised values of the properties backing the RMBS that Defendants were underwriting and marketing to investors. The methods Defendants used to verify appraised values included AVMs, drive-by appraisals, and broker price opinions (BPOs).

66.     If Defendants discovered that an appraised value was incorrectly transcribed or that the LTV or CLTV ratio associated with that property was not accurately calculated based on the information in the loan file, then they were supposed to change the corresponding LTV or CLTV ratio and recalculate the aggregate quantitative characteristics for the loan pools backing its RMBS.

67.     Another key quantitative characteristic that Defendants disclosed in their Offering Documents was the mortgaged properties' owner-occupancy rates, which identified the number and percentage of those properties that would serve as the borrowers' primary residences, vacation homes, or investment properties.

68.     As part of their re-underwriting process, Defendants also reviewed loans to confirm that the stated owner-occupancy status of the property was supported (and not contradicted) by the documentation in the loan files.

12

69.     For CUNA Mutual, these quantitative loan characteristics were material because they too were an indicator of anticipated default rates in the loan pools and anticipated foreclosure recoveries on defaulted loans.

70.     If borrowers have a sufficiently high amount of equity in a property—corresponding to a lower LTV or CLTV ratio—they are less likely to default on the loan and risk losing their equity.

71.     Similarly, borrowers who use the mortgaged property as their primary residence are less likely to default and walk away from their loan than borrowers using a property as a vacation home or an investment property.

72.     Loans with low LTV ratios also increase the cushion investors have to recoup the loan balance if housing prices decline or if a sale of a property through foreclosure yields less than the fair market value of the property—thus decreasing the potential "loss severity" associated with a default.

73.     The projected default and loss-severity metrics derived from Defendants' quantitative loan-characteristic representations were critical to CUNA Mutual's analysis of the adequacy of Defendants' proposed RMBS structures and the appropriate risk-adjusted value of specific certificates within those structures, including the eleven certificates at issue.

74.     Indeed, the accuracy of the collateral characteristics that Defendants provided, as well as the default and loss-severity assumptions associated with them, were particularly important to CUNA Mutual because it did not always purchase the highest-rated tranches in RMBS.

75.     Because CUNA Mutual frequently purchased certificates that were not in the senior-most tranche of the securitization structure, CUNA Mutual was especially reliant on the accuracy of Defendants' quantitative representations and the sufficiency of Defendants' due diligence because its

certificates had less insurance in the form of credit enhancement and would thus experience losses before certificates in more-senior tranches.

76.     Accordingly, CUNA Mutual carefully analyzed and relied on Defendants' quantitative representations when deciding to purchase eleven certificates in the ten RMBS offerings at issue in this case.

77.     CUNA Mutual relied on the accuracy of the quantitative representations in running different interest rate, prepayment, default, and loss severity scenarios in industry-standard RMBS modeling software called Intex. As part of its pre-purchase due diligence, CUNA Mutual also relied on the accuracy of the quantitative representations in seeking out RMBS with similar quantitative characteristics to gauge the recent performance of older vintages of loans issued by the same originators or underwritten by Defendants.

78.     CUNA Mutual's analysis of the collateral characteristics of the loan pools backing the RMBS at issue was critical to its evaluation of the optimal risk-adjusted value within the RMBS structures and thus to its decision to purchase certificates with non-senior payment priorities within those structures. CUNA Mutual only purchased certificates from Defendants when it was comfortable that the securitization structure was appropriate for the represented collateral and the price offered by Defendants.

## VII.   CUNA Mutual's reliance on Defendants' material misrepresentations was justifiable.

79.     CUNA Mutual's reliance Defendants' representations about the loans backing the ten RMBS was justifiable because Defendants marketed themselves as experts in RMBS that gave investors accurate information, as the securities laws required.

80.     CUNA Mutual's reliance was also justifiable because Defendants assured investors like CUNA Mutual that they performed due diligence on the RMBS that they offered to investors (as they were required by law to do), and that they re-underwrote a statistically significant portion of

14

the loan pools sufficient to ensure that the loans in those pools were issued in compliance with the Originators' underwriting standards.

81.     Importantly, CUNA Mutual and other investors had no choice but to rely on Defendants and their due diligence because Defendants had access to the Originators and the underlying "loan files," while investors did not.

82.     A loan file is the complete record of all documentary evidence supporting a borrower's mortgage loan application and includes documents like credit reports, FICO scores, pay stubs, W-2s, bank statements, job histories, and debt and asset statements.

83.     The Originators made the initial decision to issue the loans backing the ten RMBS purportedly based on the contents of the corresponding loan files in conjunction with the Originators' applicable underwriting standards.

84.     Purportedly after performing re-underwriting on loan files to verify that the loans in the loan pools had in fact been issued in compliance with those underwriting standards, Defendants then made the decision to include those loans in the pools backing the RMBS that CUNA Mutual purchased.

85.     Applicable privacy laws prohibited Defendants from sharing loan files with investors even if the investors wanted to, had time to, or knew how to re-underwrite them. The custom in the RMBS industry, therefore, was that investors did not have access to loan files before making purchase decisions.

86.     Similarly, applicable securities laws prohibited Defendants from sharing the results of their due diligence and re-underwriting with individual investors because such information constituted material non-public information.

15

87. If Defendants wanted to make any representations about the results of their due diligence on RMBS, they were required to make those representations to all investors through Offering Documents.

88. State and federal securities law prohibitions on making material misrepresentations and omissions likewise required Defendants to provide accurate information about the marketed securities and the loans backing them. If Defendants identified defects in the loan pools that they could not cure, then they had to adjust the risk disclosures in the Offering Documents to inform investors of those defects.

89. Defendants did not reveal the detailed results of their due diligence in the Offering Documents for the ten RMBS at issue; nor did they inform investors about specific underwriting defects in the underlying loan pools.

90. Defendants' silence on their due-diligence results—coupled with their explicit representation that the Originators complied with their underwriting standards—represented to CUNA Mutual that Defendants either found no such material defects through their re-underwriting, or that they had cured them.

**VIII. After the value of the eleven RMBS certificates collapsed, CUNA Mutual discovered that Defendants' representations about the loans backing those certificates were false at the time they were made.**

91. At various times after CUNA Mutual purchased the eleven RMBS certificates from Defendants, the loans backing the RMBS began to default at inordinately high rates and the foreclosure recoveries on the defaulted loans proved grossly insufficient to recoup the underlying loan amounts.

92. As a consequence, all eleven RMBS either drastically underperformed or collapsed altogether. The value of the certificates CUNA Mutual purchased cratered, causing CUNA Mutual

to book as a total loss the overwhelming majority of the nearly $110,000,000 it paid for these investment-grade bonds.

93.     Before deciding to file this lawsuit, CUNA Mutual commissioned a forensic investigation of the loan pools backing the ten RMBS to test the accuracy of Defendants' representations. The tools necessary for this forensic investigation were not available to investors at the time CUNA Mutual purchased the RMBS at issue, and they did not become available until recently.

94.     CUNA Mutual forensically analyzed loans from each RMBS transaction. For each of these loans, CUNA Mutual conducted a retroactive valuation using an industry-leading AVM and historical data to test Defendants' representations about the loans' LTV and CLTV ratios. CUNA Mutual was able to identify and retroactively value over 70% of all of the loans backing the certificates it purchased.

95.     CUNA Mutual also analyzed public records to test Defendants' representations about owner-occupancy rates. CUNA Mutual was able to identify and cross-check county tax records for well over 70% of all of the loans backing the certificates it purchased.

96.     The results of CUNA Mutual's forensic investigation revealed that Defendants' representations in the Offering Documents of all ten RMBS were false at the time they were made.

97.     Specifically, Defendants dramatically understated the LTV ratios of the loan pools backing CUNA Mutual's certificates. On average, the actual weighted average LTV ratio across the ten RMBS was over 39% higher than what Defendants represented.

98.      Defendants also falsely represented that not a single loan in the pools had an LTV or CLTV ratio (depending on whether the loan pools consisted of first- or second-lien loans) above 100%. In fact, on average, over 55% of the tested loans had LTV or CLTV ratios above 100%—

17

meaning the outstanding loans on the mortgaged properties exceeded the resale value of the properties at the time of loan origination.

99.     Finally, Defendants dramatically overstated the percentage of the properties in the underlying loan pools that were owner-occupied. On average, each of the ten RMBS overstated owner-occupancy rates by over 11%.

100.    The actual quantitative characteristics of the loan pools backing the ten RMBS at issue made those pools much more likely to experience high default rates and high loss severities in foreclosure sales than the data Defendants provided to investors indicated.

101.    The performance of the ten RMBS was consistent with the actual quantitative characteristics revealed by CUNA Mutual's forensic analysis, rather than the false characteristics that Defendants used to induce CUNA Mutual's purchases.

102.    For the same reasons, the quantitative analysis performed by CUNA Mutual reveals that Defendants' representations about the Originators' compliance with their underwriting standards were false.

103.    As explained above, LTV or CLTV ratios and owner-occupancy rates are critical components of the two principal functions of underwriting standards: (1) ensuring that borrowers are able and willing to make their monthly mortgage payments; and (2) ensuring that the market values of the mortgaged properties are sufficient to recoup the loans' outstanding balance.

104.    In fact, all other loan characteristics being equal, increasing a loan's LTV or CLTV ratio could take a loan outside the Originators' underwriting standards and thus prevent it from being issued altogether.

105.    In order for a borrower to qualify for a loan with a higher LTV or CLTV ratio under the Originators' underwriting standards, he or she would need to demonstrate increased ability to pay through a higher FICO score, greater assets, reduced debt, higher income, etc.

18

106.    Under all Originators' underwriting standards, loans with LTV ratios above 80% were required to be accompanied by primary mortgage insurance designed to protect RMBS investors from loss. In truth, there were many more loans with LTV ratios above 80% than Defendants represented, meaning the loans violated the applicable underwriting standards because they were not properly insured.

107.    Increasing a loan's LTV or CLTV ratio to above 100 percent—as turned out to be the case with a significant percentage of loans backing CUNA Mutual's RMBS—would render the loan automatically impermissible under any Originator's underwriting standards.

108.    Similarly, all other loan characteristics being equal, changing a mortgaged property's status from owner-occupied to non-owner-occupied could take a loan outside the Originators' underwriting standards and thus prevent it from being issued.

109.    To offset the additional risk of default associated with investment and vacation properties, the Originators' underwriting standards would require a borrower to demonstrate ability and commitment to pay through one or a combination of a lower LTV or CLTV ratio, higher income, higher assets, lower debt, higher FICO scores, etc.

110.    Changing either of these characteristics could also change the interest rate that the Originators would charge on the loan. Because the Originators utilized risk-based pricing, even if the changes to LTV or CLTV and owner-occupancy would not prevent the loan from being issued altogether, the increased risk profile associated with the changes would warrant a higher interest rate on the loan, which would have been passed on to investors or otherwise incorporated into the RMBS structure through increased credit enhancement.

111.    In sum, the actual quantitative characteristics of the loan pools backing the ten RMBS at issue would have placed many of the loans with artificially low LTV or CLTV ratios and misstated owner-occupancy statuses outside the Originators' underwriting standards. As a

19

consequence, had the true characteristics been used in the underwriting or re-underwriting process, a material percentage of the loans backing the RMBS CUNA Mutual purchased would not have been issued in the first place, or would have been removed from the RMBS loan pools during Defendants' due diligence.

112.    Contrary to Defendants' assurances that the Originators had complied with their underwriting standards when issuing the loans backing the RMBS that CUNA Mutual purchased, the truth is that the Originators had systematically abandoned their underwriting standards during the relevant time period.

113.    The systematic abandonment of underwriting standards by the principal Originators of the loans in the ten RMBS has been the subject of regulatory, judicial, and media scrutiny following the collapse of the RMBS market.

114.    When CUNA Mutual received the results of its forensic analysis, it learned that the loans backing the specific RMBS that it purchased from Defendants were largely underwritten without adherence to underwriting standards.

115.    As a result, CUNA Mutual's RMBS certificates were significantly riskier than Defendants represented: a material percentage of the borrowers whose mortgages backed the RMBS were all but certain to become delinquent or default after origination. In other words, CUNA Mutual's certificates were destined from inception to perform poorly.

116.    The results of CUNA Mutual's forensic analysis reveal the Originators' abandonment of their underwriting standards and the dramatic failure of Defendants' due diligence process to detect or remove improperly underwritten loans from the pools backing the RMBS they sold to CUNA Mutual.

117.    CUNA Mutual was able to uncover misrepresentations about LTV ratios and owner-occupancy rates using forensic tools outside of the information in the loan files themselves, but

20

many other factors are relevant to the integrity of the Originators' underwriting process: e.g., borrowers' assets, debt, income, employment verification, and the purported compensating factors that warranted exceptions to applicable underwriting standards.

118.   The Originators' purported compliance with their underwriting standards can thus be definitively tested only by obtaining the actual loan files in discovery and re-underwriting those loan files using the Originators' underwriting standards (sometimes referred to as "guidelines"). CUNA Mutual has no access to the loan files for the loans backing its RMBS absent the subpoena power that accompanies this lawsuit.

## IX.   Defendants' false data led to artificially inflated credit ratings.

119.   In addition to misrepresenting the credit quality of the loans backing the ten RMBS at issue, Defendants also used inflated credit ratings to induce CUNA Mutual's purchase of the eleven certificates.

120.   Institutional investors like CUNA Mutual predominantly invest in relatively low-risk, "investment grade" RMBS.

121.   Defendants gave the rating agencies the same false quantitative data about loan characteristics and made the same representations about adherence to underwriting standards that they made to CUNA Mutual. The rating agencies then projected the performance of the RMBS based on these false assumptions.

122.   Because the inputs into the rating-agency models understated the credit risk of the underlying loan pools, the rating agencies assigned inflated credit ratings to the certificates CUNA Mutual purchased.

123.   Moreover, Defendants caused the rating agencies to assign higher credit ratings to certain certificates in the ten RMBS at issue than the rating agencies would have assigned based on their most-current models.

124.     Defendants chose which rating agencies rated which certificates in the RMBS.

125.     Defendants paid the rating agencies only if they ultimately chose to have a rating agency rate an RMBS offering.

126.     Defendants used this financial leverage and the threat of losing future business to influence the credit rating agencies into assigning inflated credit ratings and expanding the size of the more highly rated tranches in the RMBS structure, which Defendants could market at a higher price and lower yield, thus increasing their profit.

127.     Defendants then used the inflated ratings to market the certificates to CUNA Mutual while falsely representing that the inflated ratings were an accurate and independently derived measure of the certificates' credit quality.

128.     Since CUNA Mutual initially purchased the certificates from Defendants, the credit ratings of those certificates have largely been downgraded to "junk" status—consistent with the loan pools' true quantitative characteristics and the Originators' disregard of underwriting standards.

## X.     The nature of CUNA Mutual's claims.

129.     CUNA Mutual is not specifically alleging that Defendants committed fraud. Although it is likely that Defendants knew or suspected that the representations in their own Offering Documents were inaccurate—Defendants certainly had reason to know that these representations were false because they re-underwrote the loans backing the RMBS—Defendants' misrepresentations are actionable even if negligently or innocently made.

130.     Further, CUNA Mutual's purchase of each of the RMBS certificates at issue was predicated on a mistaken belief (and expectation) about a basic assumption underlying each transaction: that the loans backing the RMBS were issued in compliance with the Originators' applicable underwriting standards. If, after completing their due diligence on the loan pools backing the RMBS, Defendants believed that the loans in fact complied with the Originators' underwriting

22

standards (as they represented to investors), then Defendants were likewise mistaken about this basic assumption. If, on the other hand, Defendants' due diligence informed them or gave them reason to suspect that this fundamental assumption was inaccurate, then they were obligated to inform CUNA Mutual of that fact and correct CUNA Mutual's mistaken belief. In either case, each of CUNA Mutual's purchases of the certificates at issue was predicated on either a unilateral or a mutual mistake and is therefore subject to rescission.

## PARTIES

131.    Plaintiff CMFG Life Insurance Company ("CMFG"), formerly known as CUNA Mutual Insurance Society ("CMIS"), is a diversified financial services firm that offers insurance, investment, and retirement products and services to credit unions and their members in the U.S. and throughout the world. It is an intermediate parent of a network of other companies—generally referred to as the CUNA Mutual Group—that offer similar products and services. CMFG is an Iowa mutual life and disability insurance company with its headquarters at 5910 Mineral Point Road, Madison, WI 53705. CMFG is the successor by merger to CUNA Mutual Life Insurance Company ("CMLIC")—which was an Iowa life and health insurance company with its headquarters in Waverly, IA. Both CMFG and CMLIC purchased portions of the certificates at issue. *See* Tables 2-4 below. As a result of the 2007 merger of the two companies, CMFG now owns CMLIC's portions.

132.    Plaintiff CUMIS Insurance Society, Inc. ("CUMIS") is an Iowa property and casualty insurance company with its headquarters at 5910 Mineral Point Road, Madison, WI 53705. CUMIS is an indirect, wholly-owned subsidiary of CMFG, and is part of the CUNA Mutual Group. CUMIS also purchased and owns portions of the certificates at issue. *See* Tables 2-4 below.

133.    Plaintiff MEMBERS Life Insurance Company ("MLIC") is an Iowa life and disability insurance company with its headquarters at 5910 Mineral Point Road, Madison, WI 53705. MLIC is

an indirect, wholly-owned subsidiary of CMFG, and is part of the CUNA Mutual Group. MLIC also purchased and owns portions of the certificates at issue. *See* Tables 2-4 below.

134. Non-party MEMBERS Capital Advisors, Inc. ("MEMBERS Capital") is an Iowa registered investment adviser with its headquarters at 5910 Mineral Point Road, Madison, WI 53705. MEMBERS Capital is an indirect, wholly-owned subsidiary of CMFG, and is part of the CUNA Mutual Group. Pursuant to an Investment Advisory Agreement, MEMBERS Capital acts as the exclusive investment portfolio manager for CUNA Mutual. During the relevant time period, MEMBERS Capital was expressly authorized to act as an agent for CUNA Mutual in purchasing RMBS. In its capacity as agent for the Plaintiffs, MEMBERS Capital reviewed the relevant Offering Documents, relied on the representations in those Offering Documents, and made the decision to purchase the certificates at issue on behalf of CUNA Mutual. All references to acts by CUNA Mutual in this complaint should be interpreted to include acts by MEMBERS Capital in its capacity as agent of CUNA Mutual.

135. Defendant J.P. Morgan Securities, LLC ("J.P. Morgan") is a Delaware limited liability company with its principal place of business in New York.  J.P. Morgan has one member, J.P. Morgan Broker-Dealer Holdings Inc., a Delaware corporation with its principal place of business in New York.  J.P. Morgan is an SEC-registered broker-dealer. J.P. Morgan underwrote some of the RMBS at issue and sold them to CUNA Mutual.

136. Defendant Bear, Stearns & Co. was an SEC-registered broker-dealer and a subsidiary of The Bear Stearns Companies, Inc. ("Bear Parent"). In October 2008, following a merger between Bear Parent and a wholly owned subsidiary of J.P. Morgan Chase & Co., Defendant Bear Stearns merged with and into an existing J.P. Morgan Chase & Co. subsidiary named J.P. Morgan Securities, Inc. In September 2010, J.P. Morgan Securities, Inc. was converted to a limited liability company called J.P. Morgan Securities, LLC. Accordingly, J.P. Morgan Securities, LLC is Defendant Bear

24

Stearns's legal successor, and all allegations against Bear Stearns are made against J.P. Morgan Securities, LLC. Bear Stearns underwrote some of the RMBS at issue and sold them to CUNA Mutual.

137.    Defendant WaMu Capital Corp. was an SEC-registered broker-dealer. WaMu Capital is a Washington corporation with its principal place of business in Washington State. WaMu Capital underwrote some of the RMBS at issue and sold them to CUNA Mutual.

138.    At all relevant times, non-party WaMu Bank was a federal savings (or thrift) association that provided financial services to consumer and commercial clients. At the time of the offerings, WaMu Capital was a wholly-owned subsidiary of WaMu Bank. WaMu Bank directly participated in and exercised dominion and control over the business operations of WaMu Capital.

139.    Defendant JPM Chase Bank is a national banking association and is a wholly-owned bank subsidiary of non-party J.P. Morgan Chase & Co. JPM Chase Bank's main office is located in Columbus, Ohio. JPM Chase Bank is a commercial bank that is chartered, and its business is subject to examination and regulation by, the Office of the Comptroller of Currency ("OCC"). It is a member of the Federal Reserve System and its deposits are insured by the Federal Deposit Insurance Corporation ("FDIC").

140.    On September 25, 2008, JPM Chase Bank entered into a Purchase and Assumption Agreement (the "PAA") with the FDIC, under which JPM Chase Bank agreed to assume substantially all of WaMu Bank's liabilities and purchase substantially all of WaMu Bank's assets, including its subsidiaries at the time of receivership, which included WaMu Capital. By virtue of the PAA, JPM Chase Bank assumed liability for the legal claims arising out of WaMu Capital's sale of RMBS. The transaction also constituted a de facto merger of JPM Chase Bank and WaMu Bank. This action is thus brought against JPM Chase Bank as the successor-in-interest to WaMu Capital.

## JURISDICTION AND VENUE

141.     This Court has jurisdiction over CUNA Mutual's claims under 28 U.S.C. § 1332(a). This Court has jurisdiction over Defendants because they transact continuous and substantial business in the State of Wisconsin and in Dane County.

142.     The Western District of Wisconsin is the proper venue for CUNA Mutual's action because Defendants' misrepresentations were directed to CUNA Mutual in Dane County, CUNA Mutual relied on those misrepresentations in Dane County, and the sale of the RMBS certificates at issue occurred in Dane County. As a consequence, CUNA Mutual's claims arose within the Western District of Wisconsin.

## ADDITIONAL ALLEGATIONS

### I.     The securitization of residential mortgages.

143.     Historically, originators made mortgage loans to borrowers and held the loans on their own books for the duration of the loan. Originators profited as they collected monthly principal and interest payments directly from the borrower. Originators also retained the risk that the borrower would default on the loan.

144.     This changed in the 1970s when the Government National Mortgage Association ("Ginnie Mae"), the Federal National Mortgage Association ("Fannie Mae"), and the Federal Home Loan Mortgage Corporation ("Freddie Mac") began purchasing "conforming loans" (loans underwritten in accordance with Fannie Mae and Freddie Mac underwriting guidelines) from originators and securitizing them for resale to investors as RMBS.

145.     More recently, investment banks, working with originators, began securitizing "non-conforming loans." Non-conforming loans (loans not written in compliance with Fannie Mae or Freddie Mac guidelines) are also known as "nonprime" or "private label" loans and include "Alt-A" and "subprime" loans. Despite the non-conforming nature of the underlying mortgages, the

securitizers of such RMBS were able to obtain investment grade credit ratings by using "credit enhancement" (explained below) during the securitization process.

146.    The issuance of RMBS collateralized by non-conforming loans peaked in 2006. The securitization process shifted the originators' focus from ensuring the ability of borrowers to repay their mortgages to ensuring that the originator could process (and obtain fees from) an ever-larger loan volume for distribution to securitizers. This practice is known as "originate-to-distribute" ("OTD").

147.    The securitization process begins with a "sponsor" who purchases loans in bulk from one or more originators.

148.    The sponsor transfers title of the loans to an entity called the "depositor."

149.    The depositor transfers the loans to a trust called the "issuing entity."

150.    The issuing entity issues "notes" or "certificates" representing an ownership interest in the cash flow from the mortgage pool underlying the securities: the principal and interest received as borrowers make monthly payments on the mortgages in the pool.

151.    One or more "underwriters" like J.P. Morgan then sell the notes or certificates to investors.

152.    A loan "servicer" collects payments from borrowers on individual mortgages as part of a pool of mortgages, and the issuing entity allocates and distributes the income stream generated from the mortgage loan payments to the RMBS investors. Figure 1 below depicts a typical securitization process.

**Figure 1**
**Illustration of the Securitization Process**



**II.     RMBS credit ratings and credit enhancement.**

153.    RMBS offerings are generally divided into slices or "tranches," each of which represents a different level of payment priority within the RMBS structure. RMBS certificates denote ownership of particular tranches of the security purchased by the investor.

154.    The credit rating for an RMBS is supposed to reflect an independent assessment of the creditworthiness of that RMBS and indicates the level of risk associated with both the pools of mortgage loans backing that RMBS and the payment priority of specific certificates within the RMBS structure. Standard & Poor's ("S&P"), Moody's Investors Service, Inc. ("Moody's"), and Fitch Ratings, Inc. ("Fitch") are the credit ratings agencies that assigned credit ratings to the RMBS in this case.

155.    The credit rating agencies use letter-grade rating systems as shown in Table 1 below.

**Table 1**
**Credit Rating System**

| Moody's | S&P | Fitch | Definitions | Grade Type |
|---|---|---|---|---|
| Aaa | AAA | AAA | **Prime (Maximum Safety)** | |
| Aa1<br>Aa2<br>Aa3 | AA+<br>AA<br>AA- | AA+<br>AA<br>AA- | **High Grade, High Quality** | **INVESTMENT GRADE** |
| A1<br>A2<br>A3 | A+<br>A<br>A- | A+<br>A<br>A- | **Upper Medium Grade** | |
| Baa1<br>Baa2<br>Baa3 | BBB+<br>BBB<br>BBB- | BBB+<br>BBB<br>BBB- | **Medium Grade** | |
| Ba1<br>Ba2<br>Ba3 | BB+<br>BB<br>BB- | BB+<br>BB<br>BB- | **Non-Investment Grade, or Speculative** | |
| B1<br>B2<br>B3 | B+<br>B<br>B- | B+<br>B<br>B- | **Highly Speculative, or Substantial Risk** | |
| Caa1<br>Caa2<br>Caa3 | CCC+<br>CCC<br>CCC- | CCC | **In Poor Standing** | **SPECULATIVE GRADE** |
| Ca | CC | CC | **Extremely Speculative** | |
| C | C | C | **May be in Default** | |
| - | D | RD/D | **Default** | |

156.    In general, AAA ratings are at the top of the credit rating scale and are intended to designate the safest investments. C and D ratings are at the bottom of the scale and refer to investments that are currently in default and exhibit little or no prospect for recovery.

157.    Before the housing crisis, investments with AAA ratings historically experienced an expected loss rate of less than .05 percent. Investments with BBB ratings historically experienced an expected loss rate of less than 1 percent. As a result, RMBS certificates with credit ratings between AAA and BBB- were generally referred to as "investment grade"—in other words, relatively safe.

158.    In fact, Defendants could not sell their RMBS unless they received one of the higher investment-grade ratings on most tranches from one or more of the credit rating agencies. That is

30

because the primary purchasers of RMBS are institutional investors like CUNA Mutual, which are limited by investment policies and guidelines to buying securities predominantly with investment grade credit ratings.

159.     Although the pools of mortgages underlying the non-conforming RMBS may not have been sufficient to warrant investment-grade credit ratings standing alone, various forms of "credit enhancement" were used to obtain investment grade ratings on the higher tranches of RMBS.

160.     One form of credit enhancement is "structural subordination." The tranches, and their risk characteristics relative to each other, are often analogized to a waterfall. Investors in the higher or "senior" tranches are the first to be paid as income is generated when borrowers make their monthly payments. After investors in the most senior tranche are paid, investors in the next subordinate or "junior" tranche are paid, and so on down to the most subordinate or lowest tranche.

161.     In the event mortgages in the pool default, the resulting loss is absorbed by the subordinate tranches first.

162.     Another form of credit enhancement is overcollateralization. Overcollateralization is the inclusion of a higher dollar amount of mortgages in the pool than the par value of the security. The spread between the value of the pool and the par value of the security acts as a cushion in the event of a shortfall in expected cash flow.

163.     Other forms of credit enhancement include "excess spread," monoline insurance, obtaining a letter of credit, and "cross-collateralization."

164.     "Excess spread" involves increasing the interest rate paid to the purchasers of the RMBS relative to the interest rate received on the cash flow from the underlying mortgages.

165.     Monoline insurance, also known as "wrapping" the deal, involves purchasing insurance to cover losses from any defaults.

31

166.     Finally, some RMBS are "cross-collateralized," *i.e.*, when a tranche in an RMBS experiences rapid prepayments or disproportionately high realized losses, principal and interest collected from another tranche is applied to pay principal or interest, or both, to the senior certificates in the loan group experiencing rapid prepayment or disproportionate losses.

167.     When originators comply with underwriting standards, these various forms of credit enhancement make RMBS collateralized by higher-risk Alt-A and subprime loans as safe as RMBS collateralized by traditional prime loans, which have much lower credit enhancement.

## III.     The J.P. Morgan transactions at issue in this case.

168.     CUNA Mutual brings this lawsuit to rescind its purchase of six certificates in five separate RMBS underwritten and sold by J.P. Morgan. The transactions at issue are set out in Table 2, below.

**Table 2**
**J.P. Morgan Purchases CUNA Mutual Is Seeking to Rescind**

| CUSIP[2] | SECURITIZATION | TRADE DATE | PRICE PAID | PURCHASING ENTITY |
|---|---|---|---|---|
| 12667G7M9 | CWALT 2005-46CB | 10/25/05 | $17,285,473 | CMIS, CMLIC, MLIC, CUMIS |
| 16162WNP0 | CHASE 2005-S3 | 11/9/05 | $17,203,187 | CMIS, MLIC, CUMIS |
| 12668AZE8 | CWALT 2005-57CB | 11/15/05 | $12,129,548 | CMIS, CMLIC, MLIC, CUMIS |

---

[2] "CUSIP" stands for "Committee on Uniform Securities Identification Procedures." A CUSIP number is used to identify most securities, including certificates of RMBS. *See* CUSIP Number, http://www.sec.gov/answers/cusip.htm.

| CUSIP[2] | SECURITIZATION | TRADE DATE | PRICE PAID | PURCHASING ENTITY |
|---|---|---|---|---|
| 46627MBJ5 | JPALT 2005-S1 | 2/17/06 | $12,512,833 | CMIS, MLIC |
| 46627MFE2 | JPALT 2006-S1 | 3/2/06 | $5,367,436 | CMLIC, MLIC |
| 46627MFF9 | JPALT 2006-S1 | 3/2/06 | $2,185,830 | CMLIC, MLIC |

169.    For three of the five RMBS at issue, J.P. Morgan affiliates and alter-egos Chase Mortgage Finance Corporation and J.P. Morgan Alternative Loan Trust ("JPALT") acted as the depositors and SEC-registered issuers of the publicly offered securities.

170.    When these affiliates acted as the depositor, J.P. Morgan actually purchased the loans that went into the loan pools through whole-loan purchases from the Originators, before the RMBS were ever created. Typically, another J.P. Morgan affiliate would aggregate loans purchased from other originators and transfer them to one of the depositor affiliates for securitization.

171.    Both J.P. Morgan depositor affiliates are merely shell entities with no employees. Employees of J.P. Morgan worked directly with the Originators to negotiate the purchase of pools of whole loans that J.P. Morgan would then securitize through its affiliates and alter-egos.

172.    Before J.P. Morgan actually executed the whole-loan purchases, it conducted due diligence on the Originators and their business operations; it also re-underwrote a random, statistically significant portion of the whole-loan pools, ostensibly in order to ensure that the loans were underwritten in compliance with the Originators' applicable underwriting standards.

173.    After J.P. Morgan purchased whole loans from the relevant Originators, those loans sat on its "shelf"—a repository of loans available to be securitized whenever J.P. Morgan wished.

174.     J.P. Morgan acquired whole loans for the express purpose of securitizing them and selling the corresponding RMBS certificates to investors like CUNA Mutual.

175.     J.P. Morgan, and J.P. Morgan alone, decided whether, when, and how the whole loans from its shelf would be combined to create an RMBS.

176.     Once J.P. Morgan chose to create an RMBS, it would bundle loans from its shelf, create the RMBS structure, create loan tapes and collateral term sheets, perform additional due diligence and re-underwriting (if it felt them necessary), create the Offering Documents, and market RMBS certificates to investors like CUNA Mutual.

177.     J.P. Morgan employees, purportedly acting as employees and officers of its affiliates, signed statements filed with the SEC attesting to the accuracy of the SEC-filed Offering Documents.

178.     In short, for the "proprietary" RMBS that J.P. Morgan induced CUNA Mutual to purchase through its misrepresentations, J.P. Morgan entirely controlled the securitization process.

179.     For two of the five RMBS at issue, J.P. Morgan acted as a co-lead underwriter for another depositor/issuer—Countrywide affiliate CWALT. In its role as underwriter, J.P. Morgan performed due diligence on the Originators and the loan pools backing the proposed RMBS; created Offering documents such as term sheets, free writing prospectuses, and prospectus supplements; negotiated ratings with the ratings agencies; and marketed and sold RMBS certificates to investors like CUNA Mutual.

**A.     J.P. Morgan's material misrepresentations related to CUNA Mutual's purchases, on which CUNA Mutual relied.**

180.     J.P. Morgan solicited CUNA Mutual to purchase all six certificates at issue either by phone or through email or both. J.P. Morgan salesman Bill McClain—based in J.P. Morgan's Chicago sales office—was the person who solicited CUNA Mutual employee Mark Prusha to

34

purchase each of the certificates.[3] McClain and Prusha had frequent communications by phone and email throughout the 2005-2007 period.

181.   Each of the transactions described below was informed by Prusha's extensive experience as an investor in RMBS. Prusha had purchased RMBS since at least the early 1990s and thus had nearly fifteen years of experience in the market when he made the first purchase at issue in this case. Each of the transactions was also informed by Prusha's course of dealing with J.P. Morgan—which encompassed dozens of actual and potential transactions throughout the 2000s.

182.   Prusha regularly attended multi-day, industry-sponsored conferences such as the American Securitization Forum ("ASF") and ABS-East and ABS-West, held annually or semi-annually in various parts of the country. At these conferences, Prusha routinely interacted with employees of various investment banks that securitized and sold RMBS, including McClain and other employees of J.P. Morgan. At these conferences and others, both live and over the telephone, J.P. Morgan marketed itself and its RMBS products and experience to Prusha and other institutional investors.

183.   In the course of his fifteen years of experience in the industry, Prusha had looked at hundreds, if not thousands, of RMBS offerings and had thus reviewed Offering Documents for dozens of originators, issuers, and underwriters of RMBS. Similarly, he had done business with J.P. Morgan since at least the early 2000s and was thus familiar with both J.P. Morgan's securitization vehicles and J.P. Morgan's approach to underwriting RMBS.

---

[3] In the context of the RMBS purchases at issue in this case, Mark Prusha is synonymous with CUNA Mutual.

1.     **J.P. Morgan's misrepresentations about CWALT 2005-46CB.**

184.    In the days leading up to October 25, 2005, J.P. Morgan (through McClain) contacted Prusha both by phone and through email to discuss certificates in the CWALT 2005-46CB securitization, which J.P. Morgan had brought to market in August 2005.

185.    CWALT 2005-46CB was a proprietary securitization vehicle for loan originator Countrywide. Countrywide securitized its loans through its depositor affiliate CWALT, Inc.

186.    CWALT was a seasoned issuer of RMBS and issued multiple securitizations, including CWALT 2005-46CB, pursuant to the same base prospectus. That base prospectus was required to be attached to CWALT's initial registration statement and had to describe certain information that the SEC deemed to be material to investors.

187.    Like all base prospectuses, the base prospectus applicable to CWALT 2005-46CB informed investors that the loans backing any RMBS issued pursuant to the prospectus would be originated in compliance with the applicable originators' underwriting standards:

- Mortgage loans acquired by the depositor will have been originated in accordance with the underwriting criteria specified below under "Mortgage Loan Program - Underwriting Standards" or as otherwise described in a related prospectus supplement. (At 23.)

- The mortgage loans will have been purchased by the depositor, either directly or through affiliates, from one or more mortgage loan sellers. The applicable prospectus supplement will specify the underwriting criteria pursuant to which the mortgage loans were originated or will indicate that the mortgage loans were originated pursuant to the underwriting criteria specified under "Underwriting Process." (*Id.*)

- Underwriting standards are applied by or on behalf of a lender to evaluate the borrower's credit standing and repayment ability, and the value and adequacy of the mortgaged property as collateral. (*Id.*)

188.    Similarly, the form of prospectus supplement, which was to be used as the template for all prospectus supplements for RMBS issued from the CWALT "shelf," represented that the loans in the loan pools backing any future-issued RMBS would be originated in compliance with the applicable originators' underwriting guidelines:

36

- All of the mortgage loans in the trust fund will have been originated or acquired by [Countrywide Home Loans] in accordance with its credit, appraisal and underwriting standards. [Countrywide Home Loans]' underwriting standards are applied in accordance with applicable federal and state laws and regulations. Except as otherwise provided in this prospectus supplement, the underwriting procedures are consistent with those identified under "Mortgage Loan Program -- Underwriting Process" in the prospectus. (At S-18-19.)

- [Countrywide Home Loans]' underwriting standards are applied by or on behalf of [Countrywide Home Loans] to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral. (At S-19.)

189.     As noted above, the base prospectus and form of prospectus supplement applicable to CWALT 2005-46CB merely articulated the uniform industry practice and expectation that all publicly offered RMBS will be backed by loans originated in compliance with underwriting guidelines, and that the originators of those loans will make representations and warranties to that effect. Those representations and warranties are later assigned to the securitization trustee for the benefit of investors.

190.     Between October 21 and 25, 2005, J.P. Morgan delivered to Prusha a term sheet and a prospectus supplement for CWALT 2005-46CB. J.P. Morgan's prospectus supplement for CWALT 2005-46CB was dated August 29, 2005. Both the term sheet and the prospectus supplement were created by J.P. Morgan and bore the J.P. Morgan name and logo.

191.     J.P. Morgan created both the term sheet and the prospectus supplement for CWALT 2005-46CB after it had ostensibly conducted its due diligence on the relevant originators and on the loan pools backing the proposed CWALT 2005-46CB securitization. Consistent with its own policies and its obligations under the securities laws, J.P. Morgan should have verified that the collateral information accurately reflected the information in the loan files for the loans that would be included in the loan pools. Similarly, J.P. Morgan should have re-underwritten a portion of the loan pools backing the securitization sufficient to ensure that all of the loans in the pools were

originated in compliance with the relevant originators' underwriting guidelines, as the base prospectus, the form of prospectus supplement, and the final prospectus supplement represented.

192.    J.P. Morgan's prospectus supplement for CWALT 2005-46CB disclosed the following (among many) collateral characteristics for the loan groups backing the certificate CUNA Mutual was considering purchasing, on which Prusha relied: Weighted average LTV (71.79); Maximum LTV (100); Number of loans with LTV > 80 (451, or 7.5% of total); Number of loans with LTV > 90 (158, or 2.6% of total); Number of owner-occupied properties (4,966, or 82.4% of total). These collateral characteristics were materially identical to those disclosed in J.P. Morgan's term sheet for CWALT 2005-46CB.

193.    In addition, the prospectus supplement made the following representations about the relevant originators' compliance with underwriting guidelines:

- All of the mortgage loans in the trust fund will have been originated or acquired by Countrywide Home Loans in accordance with its credit, appraisal and underwriting standards. Countrywide Home Loans' underwriting standards are applied in accordance with applicable federal and state laws and regulations. Except as otherwise provided in this prospectus supplement, the underwriting procedures are consistent with those identified under "Mortgage Loan Program -- Underwriting Process" in the prospectus. (At S-27.)

- Countrywide Home Loans' underwriting standards are applied by or on behalf of Countrywide Home Loans to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral. (At S-28.)

- Exceptions to Countrywide Home Loans' underwriting guidelines may be made if compensating factors are demonstrated by a prospective borrower. (*Id.*)

194.    In other words, the prospectus supplement for CWALT 2005-46CB confirmed that the loans backing the securitization were originated in accordance with the relevant originators' underwriting guidelines and that any deviations from those guidelines were supported by sufficient compensating factors. This representation appeared in the prospectus supplement for every RMBS and was a basic and fundamental assumption underlying every RMBS transaction.

195.    On or in the days leading up to October 25, 2005, Prusha reviewed the information in J.P. Morgan's term sheet and prospectus supplement and relied on it in deciding whether to purchase certificates within the CWALT 2005-46CB securitization, and if so, at what price. Prusha relied on the accuracy of J.P. Morgan's quantitative representations in modeling performance of the certificates under different interest rate, prepayment, default, and loss severity scenarios using the Intex modeling system, which informed his assessment of the potential risk of loss and loss severities associated with the certificates.

196.    Prusha also relied on J.P. Morgan's representation that the loans backing CWALT 2005-46CB were originated in accordance with the listed originators' underwriting guidelines.

197.    First, because every publicly offered RMBS was accompanied by the representation that the originators of the loans backing the RMBS complied with their underwriting guidelines, J.P. Morgan made the same representation merely by soliciting CUNA Mutual's purchase of certificates in the CWALT 2005-46CB securitization.

198.    Second, J.P. Morgan had performed due diligence to confirm the originators' compliance with their underwriting guidelines when issuing the loans in the CWALT 2005-46CB loan pools. By soliciting CUNA Mutual's purchase of certificates in that securitization and not informing CUNA Mutual of any defects it had discovered in its due diligence process, J.P. Morgan again represented that the loans in the CWALT 2005-46CB loan pools were originated in compliance with the relevant originators' underwriting guidelines.

199.    Third, J.P. Morgan expressly stated in the final prospectus and prospectus supplement that the loans backing CWALT 2005-46CB were originated in compliance with the relevant originators' underwriting guidelines.

200.    J.P. Morgan knew that CUNA Mutual, like all other investors, relied on originator compliance with underwriting guidelines as a basic and fundamental assumption of every RMBS

39

transaction, including CWALT 2005-46CB. If J.P. Morgan had any information inconsistent with that basic assumption, J.P. Morgan was required to disclose it to CUNA Mutual and other investors.

201.    CUNA Mutual placed its trade for one certificate in the CWALT 2005-46CB securitization on October 25, 2005.

### 2.    J.P. Morgan's misrepresentations about CHASE 2005-S3.

202.    On or in the days leading up to November 9, 2005, J.P. Morgan (through McClain) contacted Prusha by phone or email to discuss certificates in the CHASE 2005-S3 securitization, which J.P. Morgan had brought to market in October 2005.

203.    CHASE 2005-S3 was a proprietary securitization vehicle for J.P. Morgan. As explained above, proprietary securitizations were ones where J.P. Morgan independently acquired pools of loans from various originators through whole-loan purchases and kept them in its own inventory.

204.    J.P. Morgan did not purchase whole loans directly, but instead purchased them through its affiliate and agent/alter-ego Chase Mortgage Finance Corporation. Chase Mortgage Finance also acted as the issuer/depositor affiliate for J.P. Morgan.

205.    Chase Mortgage Finance was a seasoned issuer of RMBS and issued multiple securitizations, including CHASE 2005-S3, pursuant to the same base prospectus. That base prospectus was required to be attached to Chase Mortgage Finance's initial registration statement and had to describe certain information that the SEC deemed to be material to investors.

206.    Like all base prospectuses, the base prospectus applicable to CHASE 2005-S3 informed investors that the loans backing any RMBS issued pursuant to the prospectus would be originated in compliance with the applicable originators' underwriting standards:

- Except as otherwise set forth in the related Prospectus Supplement, the Seller expects that the originator of a Mortgage Loan will have applied, in a standard procedure which complies with applicable federal and state laws and regulations, underwriting standards which are

intended to evaluate the mortgagor's credit standing and repayment ability and the value and adequacy of the Mortgaged Property as collateral. (At 32.)

- The Seller will obtain representations and warranties from the seller of the Mortgage Loan (which may or may not be the originator) that the Mortgage Loan was originated in accordance with the underwriting guidelines described above or such other policies as the Seller may require from time to time. Any Mortgage Loan must be repurchased or substituted for by the seller, unless such Mortgage Loan is otherwise demonstrated to be includible in the Mortgage Pool to the satisfaction of the Seller. (At 33.)

207.    Similarly, the form of prospectus supplement, which was to be used as the template for all prospectus supplements for RMBS issued from the Chase Mortgage Finance "shelf," likewise represented that the loans in the loan pools backing any future-issued RMBS would be originated in compliance with the applicable originators' underwriting guidelines:

- Underwriting Policies. The following is a description of the underwriting policies customarily employed by Chase Manhattan Mortgage with respect to residential mortgage loans which it originated during the period of origination of the Mortgage Loans. Chase Manhattan Mortgage has represented to the Seller that the Mortgage Loans were originated generally in accordance with such policies. (At S-32.)

- The Mortgage Loans were originated in a manner generally consistent, except as to loan amounts, with Fannie Mae or Freddie Mac published underwriting guidelines. Chase Manhattan Mortgage believes that each Mortgage Loan originated in such a manner generally meets the credit, appraisal and underwriting standards described in such published underwriting guidelines, except for the original principal balances of such Mortgage Loans. (At S-33.)

208.    As noted above, the base prospectus and form of prospectus supplement applicable to CHASE 2005-S3 merely articulated the uniform industry practice and expectation that all publicly offered RMBS will be backed by loans originated in compliance with underwriting guidelines, and that the originators of those loans will make representations and warranties to that effect.

209.    On or in the days leading up to November 9, 2005, J.P. Morgan delivered to Prusha a term sheet and a prospectus supplement for CHASE 2005-S3. J.P. Morgan's prospectus supplement for CHASE 2005-S3 was dated October 20, 2005. Both the term sheet and the prospectus supplement were created by J.P. Morgan and bore the J.P. Morgan name and logo.

41

210. J.P. Morgan created both documents after it had ostensibly conducted its due diligence on the relevant originators and on the loan pools backing the proposed CHASE 2005-S3 securitization. Consistent with its own policies and its obligations under the securities laws, J.P. Morgan should have verified that the collateral information accurately reflected the information in the loan files for the loans that would be included in the loan pools. Similarly, J.P. Morgan should have re-underwritten a portion of the loan pools backing the securitization sufficient to ensure that all of the loans in the pools were originated in compliance with the relevant originators' underwriting guidelines, as the base prospectus, the form of prospectus supplement, and the final prospectus supplement represented.

211. J.P. Morgan's prospectus supplement for CHASE 2005-S3 disclosed the following (among many) collateral characteristics for the loan groups backing the certificate CUNA Mutual was considering purchasing, on which Prusha relied: Weighted average LTV (68.11); Maximum LTV (95); Number of loans with LTV > 80 (43, or 3% of total); Number of loans with LTV > 90 (18, or 1.2% of total); Number of owner-occupied properties (1,356, or 93.3% of total). The term sheet disclosed materially identical collateral information.

212. In addition, the prospectus supplement made the following representations about the relevant originators' compliance with underwriting guidelines:

- The following is a description of the underwriting policies customarily employed by CHF with respect to residential mortgage loans which it originated during the period of origination of the Mortgage Loans. … The Mortgage Loans were originated in a manner generally consistent, except as to loan amounts, with Fannie Mae or Freddie Mac published underwriting guidelines. CHF believes that each Mortgage Loan originated in such a manner generally meets the credit, appraisal and underwriting standards described in such published underwriting guidelines, except for the original principal balances of such Mortgage Loans. (At S-39.)

- From time to time, exceptions and/or variances to CHF's underwriting policies may be made. Such exceptions and/or variances may be made only if specifically approved on a loan-by-loan basis by certain credit and underwriting personnel of CHF who have the authority to make such exceptions and/or variances. Exceptions and/or variances may be

made only after careful consideration of certain mitigating factors such as borrower capacity, liquidity, employment and residential stability and local economic conditions. (At S-40.)

213.    In other words, the prospectus supplement for CHASE 2005-S3 confirmed that the loans backing the securitization were originated in accordance with the relevant originators' underwriting guidelines and that any deviations from those guidelines were supported by sufficient compensating factors. This representation appeared in the prospectus supplement for every RMBS and was a basic and fundamental assumption underlying every RMBS transaction.

214.    On or in the days leading up to November 9, 2005, Prusha reviewed the information in J.P. Morgan's prospectus supplement and relied on it in deciding whether to purchase certificates within the CHASE 2005-S3securitization, and if so, at what price. Prusha relied on the accuracy of J.P. Morgan's quantitative representations in modeling performance of the certificates under different interest rate, prepayment, default, and loss severity scenarios using the Intex modeling system, which informed his assessment of the potential risk of loss and loss severities associated with the certificates.

215.    Prusha also relied on J.P. Morgan's representation that the loans backing CHASE 2005-S3 were originated in accordance with the listed originators' underwriting guidelines.

216.    First, because every publicly offered RMBS was accompanied by the representation that the originators of the loans backing the RMBS complied with their underwriting guidelines, J.P. Morgan made the same representation merely by soliciting CUNA Mutual's purchase of certificates in the CHASE 2005-S3 securitization.

217.    Second, J.P. Morgan had performed due diligence to confirm the originators' compliance with their underwriting guidelines when issuing the loans in the CHASE 2005-S3 loan pools. By soliciting CUNA Mutual's purchase of certificates in that securitization and not informing CUNA Mutual of any defects it had discovered in its due diligence process, J.P. Morgan again

43

represented that the loans in the CHASE 2005-S3 loan pools were originated in compliance with the relevant originators' underwriting guidelines.

218.    Third, J.P. Morgan expressly stated in the final prospectus and prospectus supplement that the loans backing CHASE 2005-S3 were originated in compliance with the relevant originators' underwriting guidelines.

219.    J.P. Morgan knew that CUNA Mutual, like all other investors, relied on originator compliance with underwriting guidelines as a basic and fundamental assumption of every RMBS transaction, including CHASE 2005-S3. If J.P. Morgan had any information inconsistent with that basic assumption, J.P. Morgan was required to disclose it to CUNA Mutual and other investors.

220.    CUNA Mutual placed its trade for one certificate in the CHASE 2005-S3 securitization on November 9, 2005.

### 3.    J.P. Morgan's misrepresentations about CWALT 2005-57CB.

221.    In the days leading up to November 15, 2005, J.P. Morgan (through McClain) contacted Prusha by phone or through email to discuss certificates in the CWALT 2005-57CB securitization, which J.P. Morgan had brought to market in October 2005.

222.    CWALT 2005-57CB was a proprietary securitization vehicle for loan originator Countrywide. Countrywide securitized its loans through its depositor affiliate CWALT, Inc.

223.    CWALT was a seasoned issuer of RMBS and issued multiple securitizations, including CWALT 2005-57CB, pursuant to the same base prospectus. That base prospectus was required to be attached to CWALT's initial registration statement and had to describe certain information that the SEC deemed to be material to investors.

224.    Like all base prospectuses, the base prospectus applicable to CWALT 2005-57CB informed investors that the loans backing any RMBS issued pursuant to the prospectus would be originated in compliance with the applicable originators' underwriting standards:

- Mortgage loans acquired by the depositor will have been originated in accordance with the underwriting criteria specified below under "Mortgage Loan Program - Underwriting Standards" or as otherwise described in a related prospectus supplement. (At 12.)

- The mortgage loans will have been purchased by the depositor, either directly or through affiliates, from one or more mortgage loan sellers. The applicable prospectus supplement will specify the underwriting criteria pursuant to which the mortgage loans were originated or will indicate that the mortgage loans were originated pursuant to the underwriting criteria specified under "Underwriting Process." (At 23.)

- Underwriting standards are applied by or on behalf of a lender to evaluate the borrower's credit standing and repayment ability, and the value and adequacy of the mortgaged property as collateral. (*Id.*)

225.    Similarly, the form of prospectus supplement, which was to be used as the template for all prospectus supplements for RMBS issued from the CWALT "shelf," represented that the loans in the loan pools backing any future-issued RMBS would be originated in compliance with the applicable originators' underwriting guidelines:

- All of the mortgage loans in the trust fund will have been originated or acquired by [Countrywide Home Loans] in accordance with its credit, appraisal and underwriting standards. [Countrywide Home Loans]' underwriting standards are applied in accordance with applicable federal and state laws and regulations. Except as otherwise provided in this prospectus supplement, the underwriting procedures are consistent with those identified under "Mortgage Loan Program -- Underwriting Process" in the prospectus. (At S-18-19.)

- [Countrywide Home Loans]' underwriting standards are applied by or on behalf of [Countrywide Home Loans] to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral. (At S-19.)

226.    As noted above, the base prospectus and form of prospectus supplement applicable to CWALT 2005-57CB merely articulated the uniform industry practice and expectation that all publicly offered RMBS will be backed by loans originated in compliance with underwriting guidelines, and that the originators of those loans will make representations and warranties to that effect. Those representations and warranties are later assigned to the securitization trustee for the benefit of investors.

227.     On or before November 15, 2005, J.P. Morgan delivered to Prusha a term sheet and a prospectus supplement for CWALT 2005-57CB. J.P. Morgan's prospectus supplement for CWALT 2005-57CB was dated August 29, 2005. The prospectus supplement was co-created by J.P. Morgan and bore the J.P. Morgan name and logo.

228.     J.P. Morgan co-created the prospectus supplement for CWALT 2005-57CB after it had ostensibly conducted its due diligence on the relevant originators and on the loan pools backing the proposed CWALT 2005-46CB securitization. Consistent with its own policies and its obligations under the securities laws, J.P. Morgan should have verified that the collateral information accurately reflected the information in the loan files for the loans that would be included in the loan pools. Similarly, J.P. Morgan should have re-underwritten a portion of the loan pools backing the securitization sufficient to ensure that all of the loans in the pools were originated in compliance with the relevant originators' underwriting guidelines, as the base prospectus, the form of prospectus supplement, and the final prospectus supplement represented.

229.     J.P. Morgan's prospectus supplement for CWALT 2005-57CB disclosed the following (among many) collateral characteristics for the loan groups backing the certificate CUNA Mutual was considering purchasing, on which Prusha relied: Weighted average LTV (73.16%); Maximum LTV (100); Number of loans with LTV > 80 (371, or 8.8% of total); Number of loans with LTV > 90 (166, or 3.9% of total); Number of owner-occupied properties (3755, or 88.64% of total). These collateral characteristics were materially identical to those disclosed in J.P. Morgan's term sheet for CWALT 2005-57CB.

230.     In addition, the prospectus supplement made the following representations about the relevant originators' compliance with underwriting guidelines:

- All of the mortgage loans in the trust fund will have been originated or acquired by Countrywide Home Loans in accordance with its credit, appraisal and underwriting standards. Countrywide Home Loans' underwriting standards are applied in accordance with

46

applicable federal and state laws and regulations. Except as otherwise provided in this prospectus supplement, the underwriting procedures are consistent with those identified under "Mortgage Loan Program -- Underwriting Process" in the prospectus. (At S-43.)

- Countrywide Home Loans' underwriting standards are applied by or on behalf of Countrywide Home Loans to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral. (At S-44.)

- Exceptions to Countrywide Home Loans' underwriting guidelines may be made if compensating factors are demonstrated by a prospective borrower. (*Id.*)

231.    In other words, the prospectus supplement for CWALT 2005-57CB confirmed that the loans backing the securitization were originated in accordance with the relevant originators' underwriting guidelines and that any deviations from those guidelines were supported by sufficient compensating factors. This representation appeared in the prospectus supplement for every RMBS and was a basic and fundamental assumption underlying every RMBS transaction.

232.    On or in the days leading up to November 15, 2005, Prusha reviewed the information in J.P. Morgan's term sheet and prospectus supplement and relied on it in deciding whether to purchase certificates within the CWALT 2005-57CB securitization, and if so, at what price. Prusha relied on the accuracy of J.P. Morgan's quantitative representations in modeling performance of the certificates under different interest rate, prepayment, default, and loss severity scenarios using the Intex modeling system, which informed his assessment of the potential risk of loss and loss severities associated with the certificates.

233.    Prusha also relied on J.P. Morgan's representation that the loans backing CWALT 2005-57CB were originated in accordance with the listed originators' underwriting guidelines.

234.    First, because every publicly offered RMBS was accompanied by the representation that the originators of the loans backing the RMBS complied with their underwriting guidelines, J.P. Morgan made the same representation merely by soliciting CUNA Mutual's purchase of certificates in the CWALT 2005-57CB securitization.

47

235.   Second, J.P. Morgan had performed due diligence to confirm the originators' compliance with their underwriting guidelines when issuing the loans in the CWALT 2005-57CB loan pools. By soliciting CUNA Mutual's purchase of certificates in that securitization and not informing CUNA Mutual of any defects it had discovered in its due diligence process, J.P. Morgan again represented that the loans in the CWALT 2005-57CB loan pools were originated in compliance with the relevant originators' underwriting guidelines.

236.   Third, J.P. Morgan expressly stated in the final prospectus and prospectus supplement that the loans backing CWALT 2005-57CB were originated in compliance with the relevant originators' underwriting guidelines.

237.   J.P. Morgan knew that CUNA Mutual, like all other investors, relied on originator compliance with underwriting guidelines as a basic and fundamental assumption of every RMBS transaction, including CWALT 2005-57CB. If J.P. Morgan had any information inconsistent with that basic assumption, J.P. Morgan was required to disclose it to CUNA Mutual and other investors.

238.   CUNA Mutual placed its trade for one certificate in the CWALT 2005-57CB securitization on November 15, 2005.

**4.    J.P. Morgan's misrepresentations about JPALT 2005-S1.**

239.   On or in the days leading up to February 17, 2006, J.P. Morgan (through McClain) contacted Prusha by phone or email to discuss certificates in the JPALT 2005-S1 securitization, which J.P. Morgan had brought to market in November 2005.

240.   JPALT 2005-S1 was a proprietary securitization vehicle for J.P. Morgan. As explained above, proprietary securitizations were ones where J.P. Morgan independently acquired pools of loans from various originators through whole-loan purchases and kept them in its own inventory. "JPALT" was the name of J.P. Morgan's Alt-A "shelf," and was synonymous in the investor community with J.P. Morgan.

241. J.P. Morgan did not purchase Alt-A whole loans directly, but instead purchased them through its affiliate and agent/alter-ego J.P. Morgan Mortgage Acquisition Corp. J.P. Morgan securitized the Alt-A loans on its shelf through an affiliate and agent/alter-ego J.P. Morgan Acceptance Corporation ("JPMAC"), which acted as the depositor for J.P. Morgan's Alt-A securitizations.

242. JPMAC was a seasoned issuer of RMBS and issued multiple securitizations, including JPALT 2005-S1, pursuant to the same base prospectus. That base prospectus, as well as the form of prospectus supplement that was to act as the template prospectus supplement for all securitizations off the JPMAC shelf, was required to be attached to JPMAC's initial registration statement and had to describe certain information that the SEC deemed to be material to investors.

243. Like all base prospectuses, the base prospectus applicable to JPALT 2005-S1 informed investors that the loans backing any RMBS issued pursuant to the prospectus would be originated in compliance with the applicable originators' underwriting standards:

- The loans will be acquired by the depositor, either directly or through affiliates, from the sellers. The depositor does not originate loans and has not identified specific originators or sellers of loans from whom the depositor, either directly or through affiliates, will purchase the loans to be included in a trust fund. The underwriting standards for loans of a particular series will be described in the related prospectus supplement. Each seller or originator will represent and warrant that all loans originated and/or sold by it to the depositor or one of its affiliates will have been underwritten in accordance with standards consistent with those utilized by lenders generally during the period of origination for similar types of loans.

- Underwriting standards are applied by or on behalf of a lender to evaluate the borrower's credit standing and repayment ability, and the value and adequacy of the related mortgaged property, home improvements or manufactured home, as applicable, as collateral.

244. Similarly, the form of prospectus supplement, which was to be used as the template for all prospectus supplements for RMBS issued from the JPMAC "shelf," likewise represented that the loans in the loan pools backing any future-issued RMBS would be originated in compliance with the applicable originators' underwriting guidelines:

49

- The Mortgage Loans have been acquired by the Seller from the Originator in the ordinary course of its business pursuant to an agreement. All of the Mortgage Loans were underwritten by the Originator substantially in accordance with the underwriting criteria specified herein.

- Underwriting standards are applied by or on behalf of a lender to evaluate a borrower's credit standing and repayment ability, and the value and adequacy of the related Mortgaged Property as collateral.

- From time to time, exceptions to a lender's underwriting policies may be made. Such exceptions may be made on a loan-by-loan basis at the discretion of the lender's underwriter. Exceptions may be made after careful consideration of certain mitigating factors such as borrower liquidity, employment and residential stability and local economic conditions.

245.    As noted above, the base prospectus and form of prospectus supplement applicable to JPALT 2005-S1 merely articulated the uniform industry practice and expectation that all publicly offered RMBS will be backed by loans originated in compliance with underwriting guidelines, and that the originators of those loans will make representations and warranties to that effect.

246.    On or in the days leading up to February 17, 2006, J.P. Morgan delivered to Prusha a term sheet and prospectus supplement for JPALT 2005-S1. J.P. Morgan's prospectus supplement for JPALT 2005-S1 was dated November 23, 2005. Both the term sheet and the prospectus supplement were created by J.P. Morgan and bore the J.P. Morgan name and logo.

247.    J.P. Morgan created the term sheet and prospectus supplement for JPALT 2005-S1 after it had ostensibly conducted its due diligence on the relevant originators and on the loan pools backing the proposed JPALT 2005-S1 securitization. Consistent with its own policies and its obligations under the securities laws, J.P. Morgan should have verified that the collateral information accurately reflected the information in the loan files for the loans that would be included in the loan pools. Similarly, J.P. Morgan should have re-underwritten a portion of the loan pools backing the securitization sufficient to ensure that all of the loans in the pools were originated in compliance with the relevant originators' underwriting guidelines, as the base prospectus, the form of prospectus supplement, and the final prospectus supplement represented.

50

248.     J.P. Morgan's prospectus supplement for JPALT 2005-S1 disclosed the following (among many) collateral characteristics for the loan groups backing the certificate CUNA Mutual was considering purchasing, on which Prusha relied: Weighted average LTV (73.47); Maximum LTV (100); Number of loans with LTV > 80 (578, or 12% of total); Number of loans with LTV > 90 (247, or 5.1% of total); Number of owner-occupied properties (3,494, or 72% of total). J.P. Morgan's term sheet disclosed materially identical collateral characteristics.

249.     In addition, the prospectus supplement made the following representations about the relevant originators' compliance with underwriting guidelines:

- The Chase Originator Mortgage Loans, PHH Mortgage Loans, GreenPoint Mortgage Loans and SunTrust Mortgage Loans were underwritten substantially in accordance with the related underwriting criteria specified herein and substantially in accordance with the underwriting criteria described herein under "Underwriting Standards — General" and generally in accordance with the underwriting criteria of Freddie Mac (except with respect to original principal balances). See "—Underwriting Standards" below. (At S-25.)

- Underwriting standards are applied by or on behalf of a lender to evaluate a borrower's credit standing and repayment ability, and the value and adequacy of the related Mortgaged Property as collateral. (At S-33.)

- From time to time, exceptions to a lender's underwriting policies may be made. Such exceptions may be made on a loan-by-loan basis at the discretion of the lender's underwriter. Exceptions may be made after careful consideration of certain mitigating factors such as borrower liquidity, employment and residential stability and local economic conditions. (*Id.*)

250.     In other words, the prospectus supplement for JPALT 2005-S1 confirmed that the loans backing the securitization were originated in accordance with the relevant originators' underwriting guidelines and that any deviations from those guidelines were supported by sufficient compensating factors. This representation appeared in the prospectus supplement for every RMBS and was a basic and fundamental assumption underlying every RMBS transaction.

251.     On or in the days leading up to February 17, 2006, Prusha reviewed the information in J.P. Morgan's term sheet and prospectus supplement and relied on it in deciding whether to purchase certificates within the JPALT 2005-S1 securitization, and if so, at what price. Prusha relied

on the accuracy of J.P. Morgan's quantitative representations in modeling performance of the certificates under different interest rate, prepayment, default, and loss severity scenarios using the Intex modeling system, which informed his assessment of the potential risk of loss and loss severities associated with the certificates.

252.     Prusha also relied on J.P. Morgan's representation that the loans backing JPALT 2005-S1 were originated in accordance with the listed originators' underwriting guidelines.

253.     First, because every publicly offered RMBS was accompanied by the representation that the originators of the loans backing the RMBS complied with their underwriting guidelines, J.P. Morgan made the same representation merely by soliciting CUNA Mutual's purchase of certificates in the JPALT 2005-S1 securitization.

254.     Second, J.P. Morgan had performed due diligence to confirm the originators' compliance with their underwriting guidelines when issuing the loans in the JPALT 2005-S1 loan pools. By soliciting CUNA Mutual's purchase of certificates in that securitization and not informing CUNA Mutual of any defects it had discovered in its due diligence process, J.P. Morgan again represented that the loans in the JPALT 2005-S1 loan pools were originated in compliance with the relevant originators' underwriting guidelines.

255.     Third, J.P. Morgan expressly stated in the final prospectus and prospectus supplement that the loans backing JPALT 2005-S1 were originated in compliance with the relevant originators' underwriting guidelines.

256.     J.P. Morgan knew that CUNA Mutual, like all other investors, relied on originator compliance with underwriting guidelines as a basic and fundamental assumption of every RMBS transaction, including JPALT 2005-S1. If J.P. Morgan had any information inconsistent with that basic assumption, J.P. Morgan was required to disclose it to CUNA Mutual and other investors.

52

257.    CUNA Mutual placed its trade for one certificate in the JPALT 2005-S1 securitization on February 17, 2006.

### 5.    J.P. Morgan's misrepresentations about JPALT 2006-S1.

258.    On February 1, 2006, J.P. Morgan (through McClain) contacted Prusha by phone and email to discuss certificates in the JPALT 2006-S1 securitization, which J.P. Morgan was in the process of bringing to market.

259.    JPALT 2006-S1 was a proprietary securitization vehicle for J.P. Morgan, for which affiliate JPMAC acted as the depositor.

260.    JPMAC was a seasoned issuer of RMBS and issued multiple securitizations, including JPALT 2006-S1, pursuant to the same base prospectus. That base prospectus, as well as the form of prospectus supplement that was to act as the template prospectus supplement for all securitizations off the JPMAC shelf, was required to be attached to JPMAC's initial registration statement and had to describe certain information that the SEC deemed to be material to investors.

261.    Like all base prospectuses, the base prospectus applicable to JPALT 2006-S1 informed investors that the loans backing any RMBS issued pursuant to the prospectus would be originated in compliance with the applicable originators' underwriting standards:

- The loans will be acquired by the depositor, either directly or through affiliates, from the sellers. The depositor does not originate loans and has not identified specific originators or sellers of loans from whom the depositor, either directly or through affiliates, will purchase the loans to be included in a trust fund. The underwriting standards for loans of a particular series will be described in the related prospectus supplement. Each seller or originator will represent and warrant that all loans originated and/or sold by it to the depositor or one of its affiliates will have been underwritten in accordance with standards consistent with those utilized by lenders generally during the period of origination for similar types of loans.

- Underwriting standards are applied by or on behalf of a lender to evaluate the borrower's credit standing and repayment ability, and the value and adequacy of the related mortgaged property, home improvements or manufactured home, as applicable, as collateral.

262.     Similarly, the form of prospectus supplement, which was to be used as the template for all prospectus supplements for RMBS issued from the JPMAC "shelf," likewise represented that the loans in the loan pools backing any future-issued RMBS would be originated in compliance with the applicable originators' underwriting guidelines:

- The Mortgage Loans have been acquired by the Seller from the Originator in the ordinary course of its business pursuant to an agreement. All of the Mortgage Loans were underwritten by the Originator substantially in accordance with the underwriting criteria specified herein.

- Underwriting standards are applied by or on behalf of a lender to evaluate a borrower's credit standing and repayment ability, and the value and adequacy of the related Mortgaged Property as collateral.

- From time to time, exceptions to a lender's underwriting policies may be made. Such exceptions may be made on a loan-by-loan basis at the discretion of the lender's underwriter. Exceptions may be made after careful consideration of certain mitigating factors such as borrower liquidity, employment and residential stability and local economic conditions.

263.     As noted above, the base prospectus and form of prospectus supplement applicable to JPALT 2006-S1 merely articulated the uniform industry practice and expectation that all publicly offered RMBS will be backed by loans originated in compliance with underwriting guidelines, and that the originators of those loans will make representations and warranties to that effect.

264.     On or around February 24, 2006, J.P. Morgan delivered to Prusha a term sheet and a prospectus supplement for JPALT 2006-S1. Both the term sheet and the prospectus supplement were created by J.P. Morgan and bore the J.P. Morgan name and logo.

265.     J.P. Morgan created the term sheet and prospectus supplement for JPALT 2006-S1 after it had ostensibly conducted its due diligence on the relevant originators and on the loan pools backing the proposed JPALT 2006-S1 securitization. Consistent with its own policies and its obligations under the securities laws, J.P. Morgan should have verified that the collateral information accurately reflected the information in the loan files for the loans that would be included in the loan pools. Similarly, J.P. Morgan should have re-underwritten a portion of the loan pools backing the

54

securitization sufficient to ensure that all of the loans in the pools were originated in compliance with the relevant originators' underwriting guidelines, as the base prospectus, the form of prospectus supplement, and the final prospectus supplement represented.

266. J.P. Morgan's prospectus supplement for JPALT 2006-S1 disclosed the following (among many) collateral characteristics for the loan group (Pool 3) backing the certificates CUNA Mutual was considering purchasing, on which Prusha relied: Weighted average LTV (78.1); Maximum LTV (100); Number of loans with LTV > 80 (357, or 15.7% of total); Number of loans with LTV > 90 (159, or 7% of total); Number of owner-occupied properties (1,500, or 65.9% of total). J.P. Morgan's term sheet disclosed materially identical collateral characteristics.

267. In addition, the prospectus supplement made the following representations about the relevant originators' compliance with underwriting guidelines:

- The Chase Originator Mortgage Loans and the SunTrust Mortgage Loans were underwritten substantially in accordance with the underwriting criteria specified in this section for such Originator. All other Mortgage Loans were underwritten substantially in accordance with the underwriting criteria described below under "—General Underwriting Guidelines". (At S-37.)

- Underwriting standards are applied by or on behalf of a lender to evaluate a borrower's credit standing and repayment ability, and the value and adequacy of the related Mortgaged Property as collateral. (*Id.*)

- From time to time, exceptions to a lender's underwriting policies may be made. Such exceptions may be made on a loan-by-loan basis at the discretion of the lender's underwriter. Exceptions may be made after careful consideration of certain mitigating factors such as borrower liquidity, employment and residential stability and local economic conditions. (At S-38.)

268. In other words, the prospectus supplement for JPALT 2006-S1 confirmed that the loans backing the securitization were originated in accordance with the relevant originators' underwriting guidelines and that any deviations from those guidelines were supported by sufficient compensating factors. This representation appeared in the prospectus supplement for every RMBS and was a basic and fundamental assumption underlying every RMBS transaction.

269.    In the days leading up to March 2, 2006, Prusha reviewed the information in J.P. Morgan's term sheet and prospectus supplement and relied on it in deciding whether to purchase certificates within the JPALT 2006-S1 securitization, and if so, at what price. Prusha relied on the accuracy of J.P. Morgan's quantitative representations in modeling performance of the certificates under different interest rate, prepayment, default, and loss severity scenarios using the Intex modeling system, which informed his assessment of the potential risk of loss and loss severities associated with the certificates.

270.    Prusha also relied on J.P. Morgan's representation that the loans backing JPALT 2006-S1 were originated in accordance with the listed originators' underwriting guidelines.

271.    First, because every publicly offered RMBS was accompanied by the representation that the originators of the loans backing the RMBS complied with their underwriting guidelines, J.P. Morgan made the same representation merely by soliciting CUNA Mutual's purchase of certificates in the JPALT 2006-S1 securitization.

272.    Second, J.P. Morgan had performed due diligence to confirm the originators' compliance with their underwriting guidelines when issuing the loans in the JPALT 2006-S1 loan pools. By soliciting CUNA Mutual's purchase of certificates in that securitization and not informing CUNA Mutual of any defects it had discovered in its due diligence process, J.P. Morgan again represented that the loans in the JPALT 2006-S1 loan pools were originated in compliance with the relevant originators' underwriting guidelines.

273.    Third, J.P. Morgan expressly stated in the final prospectus and prospectus supplement that the loans backing JPALT 2006-S1 were originated in compliance with the relevant originators' underwriting guidelines.

274.    J.P. Morgan knew that CUNA Mutual, like all other investors, relied on originator compliance with underwriting guidelines as a basic and fundamental assumption of every RMBS

56

transaction, including JPALT 2006-S1. If J.P. Morgan had any information inconsistent with that basic assumption, J.P. Morgan was required to disclose it to CUNA Mutual and other investors.

275.    CUNA Mutual placed its trade for two certificates in the JPALT 2006-S1 securitization on March 2, 2006.

**IV.    The Bear Stearns transactions at issue in this case.**

276.    CUNA Mutual brings this lawsuit to rescind its purchase of three certificates in three separate RMBS underwritten and sold by Bear Stearns. The transactions at issue are set out in Table 3, below.

**Table 3**
**Bear Stearns Purchases CUNA Mutual Is Seeking to Rescind**

| CUSIP | SECURITIZATION | TRADE DATE | PRICE PAID | PURCHASING ENTITY |
|-------|----------------|------------|------------|-------------------|
| 785778JB8 | SACO 2005-WM1 | 11/3/05 | $9,761,831 | CMIS, CMLIC, MLIC, CUMIS |
| 86800RAM3 | STALT 2006-1F | 5/30/06 | $6,332,115 | CMLIC, MLIC |
| 74922GBM5 | RALI 2006-QS14 | 12/19/06 | $7,965,670 | CMLIC |

277.    For two of the three RMBS at issue, Bear Stearns affiliate and alter-ego Bear Stearns Asset Backed Securities ("BSABS") acted as the depositor and SEC-registered issuer of the publicly offered securities.

278.    When BSABS acted as the depositor, it actually purchased the loans that went into the loan pools through whole-loan purchases from the Originators, before the RMBS were ever created. Typically, another Bear Stearns affiliate, EMC Mortgage Corporation, would aggregate loans purchased from other originators and transfer them to BSABS for securitization.

279.    BSABS is merely a shell entity with no employees. Employees of Bear Stearns worked directly with the Originators to negotiate the purchase of pools of whole loans that Bear Stearns would then securitize through its affiliates and alter-egos.

280.    Before Bear Stearns actually executed the whole-loan purchases, it conducted due diligence on the Originators and their business operations; it also re-underwrote a random, statistically significant portion of the whole-loan pools, ostensibly in order to ensure that the loans were underwritten in compliance with the Originators' applicable underwriting standards.

281.    After Bear Stearns purchased whole loans from the relevant Originators, those loans sat on its "shelf"—a repository of loans available to be securitized whenever Bear Stearns wished.

282.    Bear Stearns acquired whole loans for the express purpose of securitizing them and selling the corresponding RMBS certificates to investors like CUNA Mutual.

283.    Bear Stearns, and Bear Stearns alone, decided whether, when, and how the whole loans from its shelf would be combined to create an RMBS.

284.    Once Bear Stearns chose to create an RMBS, it would bundle loans from its shelf, create the RMBS structure, create loan tapes and collateral term sheets, perform additional due diligence and re-underwriting (if it felt them necessary), create the Offering Documents, and market RMBS certificates to investors like CUNA Mutual.

285.    Bear Stearns employees, purportedly acting as employees and officers of its affiliates, signed statements filed with the SEC attesting to the accuracy of the SEC-filed Offering Documents.

286.    In short, for the two "proprietary" RMBS that Bear Stearns induced CUNA Mutual to purchase through its misrepresentations, Bear Stearns entirely controlled the securitization process.

58

287.    For the other RMBS at issue, Bear Stearns acted as a co-lead underwriter for another depositor/issuer. In its role as underwriter, Bear Stearns performed due diligence on the Originators and the loan pools backing the proposed RMBS; created Offering documents such as term sheets, free writing prospectuses, and prospectus supplements; negotiated ratings with the ratings agencies; and marketed and sold RMBS certificates to investors like CUNA Mutual.

### A.    Bear Stearns's material misrepresentations related to CUNA Mutual's purchases, on which CUNA Mutual relied.

288.    Bear Stearns solicited CUNA Mutual to purchase all three certificates at issue either by phone or through email or both. Bear Stearns salesman Jim Young—based in Bear Stearns's Chicago sales office—was the person who solicited CUNA Mutual employee Mark Prusha to purchase each of the certificates. Young and Prusha had frequent communications by phone and email throughout the 2005-2007 period.

289.    Each of the transactions described below was informed by Prusha's extensive experience as an investor in RMBS. Prusha had purchased RMBS since at least the early 1990s and thus had nearly fifteen years of experience in the market when he made the first purchase at issue in this case. Each of the transactions was also informed by Prusha's course of dealing with Bear Stearns—which encompassed dozens of actual and potential transactions throughout the 2000s.

290.    Prusha regularly attended multi-day, industry-sponsored conferences such as the American Securitization Forum ("ASF") and ABS-East and ABS-West, held annually or semi-annually in various parts of the country. At these conferences, Prusha routinely interacted with employees of various investment banks that securitized and sold RMBS, including Young and other employees of Bear Stearns. At these conferences and others, both live and over the telephone, Bear Stearns marketed itself and its RMBS products and experience to Prusha and other institutional investors.

59

291.     Bear Stearns was one of the banks with which Prusha did the most business, thus he had particular familiarity with Bear Stearns's RMBS business, including its due-diligence process. In several face-to-face meetings, employees of Bear Stearns described to Prusha the thoroughness of their due diligence on RMBS, including re-underwriting. Bear Stearns employees informed Prusha that for every RMBS, Bear Stearns took both a random and an adverse sample from the loans pools to determine whether the loans conformed to the applicable originators' underwriting guidelines and whether they generally represented an appropriate credit risk. Indeed, Bear Stearns represented that for RMBS backed by generally lower-credit-quality loan products, such as subprime, Bear Stearns's practice was to re-underwrite 100% of the loan pools. Bear Stearns made these representations to Prusha in order to gain his confidence and his business. In entering into any RMBS transaction with Bear Stearns—including each of the transactions at issue—Prusha relied on Bear Stearns's representations regarding the thoroughness of its due-diligence procedures.

292.     Moreover, in the course of his fifteen years of experience in the industry, Prusha had looked at hundreds, if not thousands, of RMBS offerings and had thus reviewed Offering Documents for dozens of originators, issuers, and underwriters of RMBS. Similarly, he had done business with Bear Stearns since at least the early 2000s and was thus familiar with both Bear Stearns's securitization vehicles and Bear Stearns's approach to underwriting RMBS.

### 1.    Bear Stearns's misrepresentations about SACO 2005-WM1.

293.     On or in the days leading up to November 3, 2005, Bear Stearns (through Young) contacted Prusha by phone or email to discuss certificates in the SACO 2005-WM1 securitization, which Bear Stearns had brought to market in August 2005.

294.     SACO 2005-WM1 was a proprietary securitization vehicle for Bear Stearns. As explained above, proprietary securitizations were ones where Bear Stearns independently acquired

pools of loans from various originators through whole-loan purchases and kept them in its own inventory.

295.    Bear Stearns did not purchase whole loans directly, but instead purchased them through its affiliate EMC Mortgage Corporation. Another Bear Stearns affiliate and agent/alter-ego, BSABS, acted as the SEC-registered issuer/depositor for SACO 2005-WM1.

296.    BSABS was a seasoned issuer of RMBS and issued multiple securitizations, including SACO 2005-WM1, pursuant to the same base prospectus. That base prospectus was required to be attached to BSABS's initial registration statement and had to describe certain information that the SEC deemed to be material to investors.

297.    Like all base prospectuses, the base prospectus applicable to SACO 2005-WM1 informed investors that the loans backing any RMBS issued pursuant to the prospectus would be originated in compliance with the applicable originators' underwriting standards:

- The loans [in the trust] will have been originated in accordance with the underwriting criteria specified in the related prospectus supplement.

298.    Similarly, the form of prospectus supplement, which was to be used as the template for all prospectus supplements for RMBS issued from the BSABS "shelf," likewise represented that the loans in the loan pools backing any future-issued RMBS would be originated in compliance with the applicable originators' underwriting guidelines:

- The seller's underwriting process, which is centralized at its corporate headquarters, is intended to assess the applicant's credit standing and repayment ability and the value and adequacy of the related mortgaged property as collateral for the proposed loan.

- Based on the information obtained from the applicant, the loan officer advises the applicant of the loan program for which the applicant qualifies. Upon gaining the agreement of the applicant, the loan officer submits the application to the underwriting department for further review. An underwriter will then evaluate the submission in accordance with certain established guidelines. The underwriter will either approve, reject or amend the loan request based on the information submitted in the application.

- Any exceptions to the underwriting policies must be approved by the manager of the underwriting department. The factors considered when determining if an exception to the general underwriting standards should be made include the quality of the property, how long the borrower has owned the property, the amount of disposable income, the type and length of employment, the credit history, the current and pending debt obligations, the payment habits and the status of past and currently existing mortgages.

299.   As noted above, the base prospectus and form of prospectus supplement applicable to SACO 2005-WM1 merely articulated the uniform industry practice and expectation that all publicly offered RMBS will be backed by loans originated in compliance with underwriting guidelines, and that the originators of those loans will make representations and warranties to that effect.

300.   On or in the days leading up to November 3, 2005, Bear Stearns delivered to Prusha a term sheet and a prospectus supplement for SACO 2005-WM1. Bear Stearns's prospectus supplement for SACO 2005-WM1 was dated August 26, 2005. Both the term sheet and the prospectus supplement were created by Bear Stearns and bore the Bear Stearns name and logo.

301.   Bear Stearns created the term sheet and prospectus supplement for SACO 2005-WM1 after it had ostensibly conducted its due diligence on the relevant originators and on the loan pools backing the proposed SACO 2005-WM1 securitization. Consistent with its own policies and its obligations under the securities laws, Bear Stearns should have verified that the collateral information accurately reflected the information in the loan files for the loans that would be included in the loan pools. Similarly, Bear Stearns should have re-underwritten a portion of the loan pools backing the securitization sufficient to ensure that all of the loans in the pools were originated in compliance with the relevant originators' underwriting guidelines, as the base prospectus, the form of prospectus supplement, and the final prospectus supplement represented.

302.   Bear Stearns's prospectus supplement for SACO 2005-WM1 disclosed the following (among many) collateral characteristics for the loan groups backing the certificate CUNA Mutual

was considering purchasing, on which Prusha relied: Weighted average CLTV (99.73); Maximum CLTV (100); Number of loans with CLTV > 100 (0); Number of owner-occupied properties (9,133, or 99.9% of total). The collateral characteristics disclosed in Bear Stearns's term sheet were materially identical.

303.     In addition, the prospectus supplement made the following representations about the relevant originator's (Long Beach Mortgage Company's) compliance with underwriting guidelines:

- The mortgage loans originated by Long Beach Mortgage Company were originated in accordance with the underwriting guidelines summarized below. (At S-24.)

- Long Beach originates mortgage loans based on its underwriting guidelines and does not determine whether such mortgage loans would be acceptable for purchase by Fannie Mae or Freddie Mac. (*Id.*)

- The mortgage loans are originated or re-underwritten, in the case of mortgage loans acquired by Long Beach from WMB or Washington Mutual Bank fsb ("WMB fsb") (the "WAMU Loans"), generally in accordance with guidelines established by Long Beach under its Full Documentation ("Full Doc"), Limited Documentation ("Limited Doc") or Stated Income Documentation ("Stated Income") residential loan programs. Long Beach's underwriting guidelines are primarily intended to evaluate the mortgagor's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral. On a case-by-case basis and only with the approval of a lending officer with appropriate risk level authority, Long Beach may determine that, based upon compensating factors, a prospective mortgagor not strictly qualifying under its underwriting risk category guidelines warrants an underwriting exception. (At S-25.)

304.     In other words, the prospectus supplement for SACO 2005-WM1 confirmed that the loans backing the securitization were originated in accordance with the relevant originators' underwriting guidelines and that any deviations from those guidelines were supported by sufficient compensating factors. This representation appeared in the prospectus supplement for every RMBS and was a basic and fundamental assumption underlying every RMBS transaction.

305.     On or in the days leading up to November 3, 2005, Prusha reviewed the information in Bear Stearns's term sheet and prospectus supplement and relied on it in deciding whether to purchase certificates within the SACO 2005-WM1 securitization, and if so, at what price. Prusha

relied on the accuracy of Bear Stearns's quantitative representations in modeling performance of the certificates under different interest rate, prepayment, default, and loss severity scenarios using the Intex modeling system, which informed his assessment of the potential risk of loss and loss severities associated with the certificates.

306.    Prusha also relied on Bear Stearns's representation that the loans backing SACO 2005-WM1 were originated in accordance with the listed originators' underwriting guidelines.

307.    First, because every publicly offered RMBS was accompanied by the representation that the originators of the loans backing the RMBS complied with their underwriting guidelines, Bear Stearns made the same representation merely by soliciting CUNA Mutual's purchase of certificates in the SACO 2005-WM1 securitization.

308.    Second, Bear Stearns had performed due diligence to confirm the originators' compliance with their underwriting guidelines when issuing the loans in the SACO 2005-WM1 loan pools. By soliciting CUNA Mutual's purchase of certificates in that securitization and not informing CUNA Mutual of any defects it had discovered in its due diligence process, Bear Stearns again represented that the loans in the SACO 2005-WM1 loan pools were originated in compliance with the relevant originators' underwriting guidelines.

309.    Third, Bear Stearns expressly stated in the final prospectus and prospectus supplement that the loans backing SACO 2005-WM1 were originated in compliance with the relevant originators' underwriting guidelines.

310.    Bear Stearns knew that CUNA Mutual, like all other investors, relied on originator compliance with underwriting guidelines as a basic and fundamental assumption of every RMBS transaction, including SACO 2005-WM1. If Bear Stearns had any information inconsistent with that basic assumption, Bear Stearns was required to disclose it to CUNA Mutual and other investors.

311.    CUNA Mutual placed its trade for one certificate in the SACO 2005-WM1 securitization on November 3, 2005.

### 2.    Bear Stearns's misrepresentations about STALT 2006-1F.

312.    Starting on at least May 15 and continuing through May 30, 2006, Bear Stearns (through Young) contacted Prusha by phone and email to discuss certificates in the STALT 2006-1F securitization, which Bear Stearns was in the process of bringing to market.

313.    STALT 2006-1F was a proprietary securitization vehicle for Bear Stearns. BSABS acted as the SEC-registered issuer/depositor for STALT 2006-1F.

314.    BSABS was a seasoned issuer of RMBS and issued multiple securitizations, including STALT 2006-1F, pursuant to the same base prospectus. That base prospectus was required to be attached to BSABS's initial registration statement and had to describe certain information that the SEC deemed to be material to investors.

315.    Like all base prospectuses, the base prospectus applicable to STALT 2006-1F informed investors that the loans backing any RMBS issued pursuant to the prospectus would be originated in compliance with the applicable originators' underwriting standards:

- The loans [in the trust] will have been originated in accordance with the underwriting criteria specified in the related prospectus supplement.

- Performing loans purchased will have been originated pursuant to the sponsor's underwriting guidelines or the originator's underwriting guidelines that are acceptable to the sponsor.

316.    Similarly, the form of prospectus supplement, which was to be used as the template for all prospectus supplements for RMBS issued from the BSABS "shelf," likewise represented that the loans in the loan pools backing any future-issued RMBS would be originated in compliance with the applicable originators' underwriting guidelines:

- The underwriting guidelines are primarily intended to assess the borrower's ability to repay the mortgage loan, to assess the value of the mortgaged property and to evaluate the adequacy of the mortgaged property as collateral for the mortgage loan.

- The mortgage loans will have been originated in accordance with the underwriting guidelines. On a case-by-case basis, exceptions to the underwriting guidelines are made where compensating factors exist.

317.    As noted above, the base prospectus and form of prospectus supplement applicable to STALT 2006-1F merely articulated the uniform industry practice and expectation that all publicly offered RMBS will be backed by loans originated in compliance with underwriting guidelines, and that the originators of those loans will make representations and warranties to that effect.

318.    On or in the days leading up to May 30, 2006, Bear Stearns delivered to Prusha a term sheet and a free writing prospectus for STALT 2006-1F. Bear Stearns's free writing prospectus for STALT 2006-1F was dated May 23, 2006. Both the term sheet and the free writing prospectus were created by Bear Stearns and bore the Bear Stearns name and logo.

319.    Both the term sheet and free writing prospectus provided as follows: "Our obligation to sell securities to you is conditioned on the mortgage loans and securities having the characteristics described in this free writing prospectus. If for any reason we do not deliver such securities, we will notify you, and neither the issuer nor any underwriter will have any obligation to you to deliver all or any portion of the securities which you have committed to purchase, and none of the issuer nor any underwriter will be liable for any costs or damages whatsoever arising from or related to such non-delivery."

320.    Bear Stearns created the term sheet and free writing prospectus for STALT 2006-1F after it had ostensibly conducted its due diligence on the relevant originators and on the loan pools backing the proposed STALT 2006-1F securitization. Consistent with its own policies and its obligations under the securities laws, Bear Stearns should have verified that the collateral information accurately reflected the information in the loan files for the loans that would be

66

included in the loan pools. Similarly, Bear Stearns should have re-underwritten a portion of the loan pools backing the securitization sufficient to ensure that all of the loans in the pools were originated in compliance with the relevant originators' underwriting guidelines, as the base prospectus, the form of prospectus supplement, and the free writing prospectus represented.

321.    Bear Stearns's free writing prospectus for STALT 2006-1F disclosed the following (among many) collateral characteristics for the loan groups backing the certificate CUNA Mutual was considering purchasing, on which Prusha relied: Weighted average LTV (77.44); Maximum LTV (95); Number of loans with LTV > 80 (114, or 4.7% of total); Number of loans with LTV > 90 (43, or 1.8% of total); Number of owner-occupied properties (1,204, or 50% of total). The collateral characteristics disclosed in Bear Stearns's term sheet, and prospectus supplement were materially identical.

322.    In addition, the free writing prospectus made the following representations about the relevant originator's (SunTrust Mortgage's) compliance with underwriting guidelines:

- SunTrust underwriting guidelines for the EZ Option mortgage loan program are generally designed to evaluate the borrower's capacity to repay the loan, to evaluate the credit history of the borrower, to verify the availability of funds required for closing and cash reserves for fully documented loans, and to evaluate the acceptability and marketability of the property to be used as collateral. SunTrust may consider a loan to have met underwriting guidelines where specific criteria or documentation are not met if, upon analyzing the overall qualitative evaluation of the loan package, there are acceptable compensating factors that can be used. (At S-34.)

- The loans will have been originated in accordance with the underwriting criteria specified in the related prospectus supplement. (At 26.)

323.    In other words, the free writing prospectus for STALT 2006-1F confirmed that the loans backing the securitization were originated in accordance with the relevant originators' underwriting guidelines and that any deviations from those guidelines were supported by sufficient compensating factors. This free writing prospectus also acted as the prospectus supplement for STALT 2006-1F.

324.     In the days leading up to May 30, 2006, Prusha reviewed the information in Bear Stearns's term sheet and free writing prospectus and relied on it in deciding whether to purchase certificates within the STALT 2006-1F securitization, and if so, at what price. Prusha relied on the accuracy of Bear Stearns's quantitative representations in modeling performance of the certificates under different interest rate, prepayment, default, and loss severity scenarios using the Intex modeling system, which informed his assessment of the potential risk of loss and loss severities associated with the certificates.

325.     Prusha also relied on Bear Stearns's representation that the loans backing STALT 2006-1F were originated in accordance with the listed originators' underwriting guidelines.

326.     First, because every publicly offered RMBS was accompanied by the representation that the originators of the loans backing the RMBS complied with their underwriting guidelines, Bear Stearns made the same representation merely by soliciting CUNA Mutual's purchase of certificates in the STALT 2006-1F securitization.

327.     Second, Bear Stearns had performed due diligence to confirm the originators' compliance with their underwriting guidelines when issuing the loans in the STALT 2006-1F loan pools. By soliciting CUNA Mutual's purchase of certificates in that securitization and not informing CUNA Mutual of any defects it had discovered in its due diligence process, Bear Stearns again represented that the loans in the STALT 2006-1F loan pools were originated in compliance with the relevant originators' underwriting guidelines.

328.     Third, Bear Stearns expressly stated in the final prospectus and free writing prospectus that the loans backing STALT 2006-1F were originated in compliance with the relevant originators' underwriting guidelines.

329.      Bear Stearns knew that CUNA Mutual, like all other investors, relied on originator compliance with underwriting guidelines as a basic and fundamental assumption of every RMBS

transaction, including STALT 2006-1F. If Bear Stearns had any information inconsistent with that basic assumption, Bear Stearns was required to disclose it to CUNA Mutual and other investors.

330.   CUNA Mutual placed its trade for one certificate in the STALT 2006-1F securitization on May 30, 2006.

### 3.   Bear Stearns's misrepresentations about RALI 2006-QS14.

331.   Starting on at least December 15 and continuing through December 19, 2006, Bear Stearns (through Young) contacted Prusha by phone or email to discuss certificates in the RALI 2006-QS14 securitization, which Bear Stearns had brought to market in October 2006.

332.   Bear Stearns acted as a lead underwriter for RALI 2006-QS14 on behalf of depositor Residential Accredit Loans, Inc. ("RALI"), which was an agent and alter ego of mortgage originator Residential Funding Corporation. Residential Funding originated or purchased through its affiliate program all of the loans that were in the collateral pools backing RALI 2006-QS14. Homecomings Financial Network, Inc., a wholly-owned subsidiary of Residential Funding, originated a substantial percentage of the loans backing RALI 2006-QS14.

333.   RALI was a seasoned issuer of RMBS and issued multiple securitizations, including RALI 2006-QS14, pursuant to the same base prospectus. That base prospectus was required to be attached to RALI's initial registration statement and had to describe certain information that the SEC deemed to be material to investors.

334.   Like all base prospectuses, the base prospectus applicable to RALI 2006-QS14 informed investors that the loans backing any RMBS issued pursuant to the prospectus would be originated in compliance with Residential Funding's (or any other applicable originators') underwriting standards:

- The depositor [RALI] expects that the originator of each of the mortgage loans will have applied, consistent with applicable federal and state laws and regulations, underwriting

procedures intended to evaluate the borrower's credit standing and repayment ability and/or the value and adequacy of the related property as collateral. (At 13.)

- Residential Funding Corporation, on behalf of the depositor [RALI], typically will review a sample of the mortgage loans purchased by Residential Funding Corporation for conformity with the applicable underwriting standards and to assess the likelihood of repayment of the mortgage loan from the various sources for such repayment, including the mortgagor, the mortgaged property, and primary mortgage insurance, if any. (At 14.)

- [A] mortgage loan may be considered to comply with a set of underwriting standards, even if one or more specific criteria included in the underwriting standards were not satisfied, if other factors compensated for the criteria that were not satisfied or if the mortgage loan is considered to be in substantial compliance with the underwriting standards. (At 15.)

335.    Similarly, the form of prospectus supplement, which was to be used as the template for all prospectus supplements for RMBS issued from the RALI "shelf," likewise represented that the loans in the loan pools backing any future-issued RMBS would be originated in compliance with Residential Funding's (or any other applicable originators') underwriting guidelines:

- All of the mortgage loans in the mortgage pool were originated in accordance with the underwriting criteria of Residential Funding described under "—The Program" in this prospectus supplement. Residential Funding will review each mortgage loan for compliance with its underwriting standards prior to purchase … . (At S-44.)

- The applicable underwriting standards include a set of specific criteria by which the underwriting evaluation is made. … [A] mortgage loan will be considered to be originated in accordance with the underwriting standards described above if, based on an overall qualitative evaluation, the loan is in substantial compliance with the underwriting standards. For example, a mortgage loan may be considered to comply with the underwriting standards described above, even if one or more specific criteria included in the underwriting standards were not satisfied, if other factors positively compensated for the criteria that were not satisfied. (*Id.*)

336.    As noted above, the base prospectus and form of prospectus supplement applicable to RALI 2006-QS14 merely articulated the uniform industry practice and expectation that all publicly offered RMBS will be backed by loans originated in compliance with underwriting guidelines, and that the originators of those loans will make representations and warranties to that effect.

337.    When Bear Stearns agreed to act as an underwriter for the RALI 2006-QS14 securitization on behalf of RALI, it was well aware of this uniform industry practice and expectation, as well as that the registration statement, base prospectus, and form of prospectus supplement applicable to RALI 2006-QS14 contained representations that the loans backing any RMBS issued pursuant to them would be originated in compliance with underwriting guidelines.

338.    On or around December 15, 2006, Bear Stearns delivered to Prusha both a term sheet and a final prospectus supplement for RALI 2006-QS14. Both the term sheet and the prospectus supplement were created or co-created by Bear Stearns and bore the Bear Stearns logo.

339.    Bear Stearns created the term sheet and prospectus supplement for RALI 2006-QS14 after it had conducted its due diligence on Residential Funding and on the loan pools backing the proposed RALI 2006-QS14 securitization. Consistent with its own policies and its obligations under the securities laws, Bear Stearns should have verified that the collateral information accurately reflected the information in the loan files for the loans that would be included in the loan pools. Similarly, Bear Stearns should have re-underwritten a portion of the loan pools backing the securitization sufficient to ensure that all of the loans in the pools were originated in compliance with Residential Funding's underwriting guidelines, as the base prospectus, the form of prospectus supplement, and later the final prospectus supplement represented.

340.    Bear Stearns's prospectus supplement for the RALI 2006-QS14 securitization was dated October 27, 2006 and disclosed the following (among many) collateral characteristics: Weighted average LTV (74.46); Maximum LTV (100); Number of loans with LTV > 80 (323, or 10.7% of total); Number of loans with LTV > 90 (132, or 4.4% of total); Number of owner-occupied properties (2,210, or 73% of total). Consistent with industry custom, all of these figures were materially identical to the quantitative characteristics represented in Bear Stearns's term sheet.

341.    In addition, the prospectus supplement made the following representations about Residential Funding's compliance with underwriting guidelines:

- All of the mortgage loans in the mortgage pool were originated in accordance with the underwriting criteria of Residential Funding described under "—The Program" in this prospectus supplement. Residential Funding will review each mortgage loan for compliance with its underwriting standards prior to purchase … . (S-46.)

- The applicable underwriting standards include a set of specific criteria by which the underwriting evaluation is made. … [A] mortgage loan will be considered to be originated in accordance with the underwriting standards described above if, based on an overall qualitative evaluation, the loan is in substantial compliance with the underwriting standards. For example, a mortgage loan may be considered to comply with the underwriting standards described above, even if one or more specific criteria included in the underwriting standards were not satisfied, if other factors positively compensated for the criteria that were not satisfied. (*Id.*)

342.    In other words, the prospectus supplement for RALI 2006-QS14 confirmed that the loans backing the securitization were originated in accordance with the relevant originators' underwriting guidelines and that any deviations from those guidelines were supported by sufficient compensating factors. This representation appeared in the prospectus supplement for every RMBS and was a basic and fundamental assumption underlying every RMBS transaction.

343.    In the days leading up to December 19, 2006, Prusha reviewed the information in Bear Stearns's term sheet and prospectus supplement and relied on it in deciding whether to bid to purchase certificates within the RALI 2006-QS14 securitization, and if so, at what price. Prusha relied on the accuracy of Bear Stearns's quantitative representations in modeling performance of the certificates under different interest rate, prepayment, default, and loss severity scenarios using the Intex modeling system, which informed his assessment of the potential risk of loss and loss severities associated with the certificates.

344.    Prusha also relied on Bear Stearns's representation that the loans backing RALI 2006-QS14 were originated in accordance with Residential Funding's underwriting guidelines.

345.   First, because every publicly offered RMBS was accompanied by the representation that the originators of the loans backing the RMBS complied with their underwriting guidelines, Bear Stearns made the same representation merely by soliciting CUNA Mutual's purchase of certificates in the RALI 2006-QS14 securitization.

346.   Second, Bear Stearns had performed due diligence to confirm the originators' compliance with Residential Funding's underwriting guidelines when issuing the loans in the RALI 2006-QS14 loan pools. By soliciting CUNA Mutual's purchase of certificates in that securitization and not informing CUNA Mutual of any defects it had discovered in its due diligence process, Bear Stearns again represented that the loans in the RALI 2006-QS14 loan pools were originated in compliance with Residential Funding's underwriting guidelines.

347.   Third, Bear Stearns expressly stated in the final prospectus and prospectus supplement that the loans backing RALI 2006-QS14 were originated in compliance with Residential Funding's underwriting guidelines. Bear Stearns helped create those documents and exercised authority over their contents in its role as underwriter.

348.   Bear Stearns knew that CUNA Mutual, like all other investors, relied on originator compliance with underwriting guidelines as a basic and fundamental assumption of every RMBS transaction, including RALI 2006-QS14. If Bear Stearns had any information inconsistent with that basic assumption, it was required to disclose it to CUNA Mutual and other investors.

349.   CUNA Mutual placed its trade for one certificate in the RALI 2006-QS14 securitization on December 19, 2006.

## V.   The WaMu Capital transactions at issue in this case.

350.   CUNA Mutual brings this lawsuit to rescind its purchase of two certificates in two separate RMBS underwritten and sold by WaMu Capital. The transactions at issue are set out in Table 4, below.

**Table 4**
**WaMu Capital Purchases CUNA Mutual Is Seeking to Rescind**

| CUSIP | SECURITIZATION | TRADE DATE | PRICE PAID | PURCHASING ENTITY |
|-------|----------------|------------|------------|-------------------|
| 92922F6K9 | WAMU 2005-AR15 | 11/2/05 | $10,213,960 | CMIS, MLIC, CUMIS |
| 93935HAH0 | WMALT 2006-7 | 1/24/07 | $7,136,578 | CMIS |

351.    For both of RMBS at issue, WaMu Capital affiliate and alter-ego WaMu Asset Acceptance Corp. ("WAAC") acted as the depositor and SEC-registered issuer of the publicly offered securities.

352.    When WAAC acted as the depositor, it actually purchased the loans that went into the loan pools through whole-loan purchases from the Originators, before the RMBS were ever created. Typically, another WaMu Capital affiliate would aggregate loans purchased from other originators and transfer them to WAAC for securitization.

353.     WAAC is merely a shell entity with no employees. Employees of WaMu Capital worked directly with the Originators to negotiate the purchase of pools of whole loans that WaMu Capital would then securitize through its affiliates and alter-egos.

354.    Before WaMu Capital actually executed the whole-loan purchases, it conducted due diligence on the Originators and their business operations; it also re-underwrote a random, statistically significant portion of the whole-loan pools, ostensibly in order to ensure that the loans were underwritten in compliance with the Originators' applicable underwriting standards.

355.    After WaMu Capital purchased whole loans from the relevant Originators, those loans sat on its "shelf"—a repository of loans available to be securitized whenever WaMu Capital wished.

356.    WaMu Capital acquired whole loans for the express purpose of securitizing them and selling the corresponding RMBS certificates to investors like CUNA Mutual.

357.    WaMu Capital, and WaMu Capital alone, decided whether, when, and how the whole loans from its shelf would be combined to create an RMBS.

358.    Once WaMu Capital chose to create an RMBS, it would bundle loans from its shelf, create the RMBS structure, create loan tapes and collateral term sheets, perform additional due diligence and re-underwriting (if it felt them necessary), create the Offering Documents, and market RMBS certificates to investors like CUNA Mutual.

359.    WaMu Capital employees, purportedly acting as employees and officers of its affiliates, signed statements filed with the SEC attesting to the accuracy of the SEC-filed Offering Documents.

360.    In short, for these "proprietary" RMBS that WaMu Capital induced CUNA Mutual to purchase through its misrepresentations, WaMu Capital entirely controlled the securitization process.

A.    **WaMu Capital's material misrepresentations related to CUNA Mutual's purchases, on which CUNA Mutual relied.**

361.    WaMu Capital solicited CUNA Mutual to purchase both certificates at issue either by phone or through email or both. WaMu Capital salesman Carl Schref—based in WaMu Capital's Chicago sales office—was the person who solicited CUNA Mutual employee Mark Prusha to purchase each of the certificates.

362.    Each of the transactions described below was informed by Prusha's extensive experience as an investor in RMBS. Prusha had purchased RMBS since at least the early 1990s and thus had nearly fifteen years of experience in the market when he made the first purchase at issue in

this case. Each of the transactions was also informed by Prusha's course of dealing with WaMu Capital—which encompassed a number of actual and potential transactions throughout the 2000s.

363.    Prusha regularly attended multi-day, industry-sponsored conferences such as the American Securitization Forum, and ABS-East and ABS-West, held annually or semi-annually in various parts of the country. At these conferences, Prusha routinely interacted with employees of various investment banks that securitized and sold RMBS. At these conferences and others, both live and over the telephone, WaMu Capital marketed itself and its RMBS products and experience to Prusha and other institutional investors.

364.    In the course of his fifteen years of experience in the industry, Prusha had looked at hundreds, if not thousands, of RMBS offerings and had thus reviewed Offering Documents for dozens of originators, issuers, and underwriters of RMBS, including WaMu Capital.

### 1.    WaMu Capital's misrepresentations about WAMU 2005-AR15.

365.    Starting on at least October 26 and continuing through November 2, 2005, WaMu Capital (through Schref) contacted Prusha by phone or email to discuss certificates in the WAMU 2005-AR15 securitization, which WaMu Capital was in the process of bringing to market.

366.    WAMU 2005-AR15 was a proprietary securitization vehicle for WaMu Capital. As explained above, proprietary securitizations were ones where WaMu Capital independently acquired pools of loans from various originators through whole-loan purchases and kept them in its own inventory. WaMu Capital affiliate and agent/alter-ego WAAC acted as the SEC-registered issuer/depositor for WAMU 2005-AR15.

367.    WAAC was a seasoned issuer of RMBS and issued multiple securitizations, including WAMU 2005-AR15, pursuant to the same base prospectus. That base prospectus was required to be attached to WAAC's initial registration statement and had to describe certain information that the SEC deemed to be material to investors.

368.   Like all base prospectuses, the base prospectus applicable to WAMU 2005-AR15 informed investors that the loans backing any RMBS issued pursuant to the prospectus would be originated in compliance with the applicable originators' underwriting standards:

- The mortgage assets acquired by the depositor will have been originated in accordance with the underlying criteria described in this prospectus under 'The Depositor's Mortgage Loan Purchase Program -- Underwriting Standards' or in the prospectus supplement. (At 11.)

- The mortgage loans to be included in each trust fund will be subject to the various credit, appraisal and underwriting standards described herein and in the prospectus supplement. The depositor expects that the originator of each of the loans will have applied, consistent with applicable federal and state laws and regulations, underwriting procedures intended to evaluate the borrower's credit standing and repayment ability and/or the value and adequacy of the related property as collateral. (At 27.)

- [A] loan may be considered to comply with a set of underwriting standards, even if one or more specific criteria included in the underwriting standards were not satisfied, if other factors compensated for the criteria that were not satisfied or if the loan is considered to be in substantial compliance with the underwriting standards. (*Id.*)

369.   As noted above, the base prospectus applicable to WAMU 2005-AR15 merely articulated the uniform industry practice and expectation that all publicly offered RMBS will be backed by loans originated in compliance with underwriting guidelines, and that the originators of those loans will make representations and warranties to that effect.

370.   On or in the days leading up to November 2, 2005, WaMu Capital delivered to Prusha a term sheet for WAMU 2005-AR15. The term sheet was created by WaMu Capital, bore the WaMu Capital logo, and stated that "[t]his information has been prepared and furnished to you by WaMu Capital Corp."

371.   WaMu's term sheet disclosed the following (among many) quantitative characteristics of the loan pools backing WAMU 2005-AR15, on which Prusha relied: Weighted average LTV (71.5); Maximum LTV (95); Number of loans with LTV > 80 (26, or 0.6% of total); Number of loans with LTV > 90 (20, or 0.5% of total); Number of owner-occupied properties (3,714, or 90.2% of total).

372.    WaMu Capital created the term sheet for WAMU 2005-AR15 after it had ostensibly conducted its due diligence on the relevant originators and on the loan pools backing the proposed WAMU 2005-AR15 securitization. Consistent with its own policies and its obligations under the securities laws, WaMu Capital should have verified that the collateral information accurately reflected the information in the loan files for the loans that would be included in the loan pools. Similarly, WaMu Capital should have re-underwritten a portion of the loan pools backing the securitization sufficient to ensure that all of the loans in the pools were originated in compliance with the relevant originators' underwriting guidelines, as the base prospectus, the form of prospectus supplement, and the final prospectus supplement represented.

373.    On or in the days leading up to November 2, 2005, Prusha reviewed the information in WaMu Capital's term sheet and relied on it in deciding whether to purchase certificates within the WAMU 2005-AR15 securitization, and if so, at what price. Prusha relied on the accuracy of WaMu Capital's quantitative representations in modeling performance of the certificates under different interest rate, prepayment, default, and loss severity scenarios using the Intex modeling system, which informed his assessment of the potential risk of loss and loss severities associated with the certificates.

374.    Prusha also relied on WaMu Capital's representation that the loans backing WAMU 2005-AR15 were originated in accordance with the listed originators' underwriting guidelines.

375.     First, because every publicly offered RMBS was accompanied by the representation that the originators of the loans backing the RMBS complied with their underwriting guidelines, WaMu Capital made the same representation merely by soliciting CUNA Mutual's purchase of certificates in the WAMU 2005-AR15 securitization.

376.    Second, WaMu Capital had performed due diligence to confirm the originators' compliance with their underwriting guidelines when issuing the loans in the WAMU 2005-AR15

78

loan pools. By soliciting CUNA Mutual's purchase of certificates in that securitization and not informing CUNA Mutual of any defects it had discovered in its due diligence process, WaMu Capital again represented that the loans in the WAMU 2005-AR15 loan pools were originated in compliance with the relevant originators' underwriting guidelines.

377.   Third, WaMu Capital expressly stated in its base prospectus and later in its final prospectus supplement that the loans backing WAMU 2005-AR15 were originated in compliance with the relevant originators' underwriting guidelines.

378.   WaMu Capital knew that CUNA Mutual, like all other investors, relied on originator compliance with underwriting guidelines as a basic and fundamental assumption of every RMBS transaction, including WAMU 2005-AR15. If WaMu Capital had any information inconsistent with that basic assumption, WaMu Capital was required to disclose it to CUNA Mutual and other investors.

379.   CUNA Mutual placed its trade for one certificate in the WAMU 2005-AR15 securitization on November 2, 2005. The trade represented an initial commitment to purchase based on the information that had been provided to date. The scheduled settlement date for the trade— the date the trade actually went through and money was transferred—was November 22, 2005.

380.   CUNA Mutual could cancel, or "break," the trade up until the settlement date because WaMu Capital could not "officially" make the offering of the certificates until a prospectus supplement was issued and delivered to CUNA Mutual. The securities laws required WaMu Capital to deliver a prospectus supplement before it could solicit a firm commitment to purchase an RMBS certificate.

381.   If the prospectus supplement contained any information that was different from or inconsistent with information provided in the base prospectus, the term sheet, or any other preliminary Offering Documents, WaMu Capital was required to conspicuously inform CUNA

79

Mutual of that fact and allow it the opportunity to cancel the trade. The industry custom was that information would not change materially between the time the term sheet was distributed and the time the prospectus supplement was delivered; if it did change materially, the industry custom was that banks would contact the clients who made an initial commitment, inform them of the change, and confirm whether they wanted to proceed with settling the trade.

382. Both before and after CUNA Mutual's trade date, WaMu Capital continued to work on putting together the final loan pools for WAMU 2005-AR15 and on drafting and finalizing the prospectus supplement for that securitization. WaMu Capital's collateral analysts created the quantitative collateral representations in the prospectus supplement and WaMu Capital's investment bankers and lawyers drafted, edited, or approved the remaining sections.

383. The prospectus supplement for WAMU 2005-AR15 was issued on November 18, 2005 and delivered to CUNA Mutual before the settlement date. WaMu Capital was legally obligated to deliver the prospectus supplement to CUNA Mutual before the trade settled.

384. Consistent with industry custom, WaMu Capital's prospectus supplement for WAMU 2005-AR15 disclosed substantially identical collateral characteristics to those disclosed in WaMu Capital's term sheet; any deviations in quantitative credit characteristics virtually always improved (however slightly) the overall credit characteristics of the collateral pools.

385. In addition, the final prospectus supplement and the attached final prospectus, which was incorporated by reference into the prospectus supplement, made the following representations about the relevant originators' compliance with underwriting guidelines:

- The mortgage assets acquired by the depositor will have been originated in accordance with the underlying criteria described in this prospectus under 'The Depositor's Mortgage Loan Purchase Program -- Underwriting Standards' or in the prospectus supplement. (At 14.)

- The mortgage loans to be transferred to each trust fund will be subject to the various credit, appraisal and underwriting standards described herein and in the prospectus supplement. The depositor expects that the originator of each of the loans will have applied, consistent

80

with applicable federal and state laws and regulations, underwriting procedures intended to evaluate the borrower's credit standing and repayment ability and/or the value and adequacy of the related property as collateral. (At 30.)

- [A] loan may be considered to comply with a set of underwriting standards, even if one or more specific criteria included in the underwriting standards were not satisfied, if other factors compensated for the criteria that were not satisfied or if the loan is considered to be in substantial compliance with the underwriting standards. (*Id.*)

386.    In other words, the prospectus supplement for WAMU 2005-AR15 confirmed that the loans backing the securitization were originated in accordance with the relevant originators' underwriting guidelines and that any deviations from those guidelines were supported by sufficient compensating factors. This representation appeared in the prospectus supplement for every RMBS and was a basic and fundamental assumption underlying every RMBS transaction.

387.    Because the relevant information did not change between the preliminary Offering Documents and the final prospectus supplement, WaMu Capital did not inform CUNA Mutual of any additional or inconsistent information contained in the prospectus supplement for WAMU 2005-AR15.

388.    In allowing the trade for WAMU 2005-AR15 to settle on November 22, 2005, Prusha relied on the quantitative characteristics and the underwriting-guideline-compliance representations contained in the final prospectus supplement for WAMU 2005-AR15.

### 2.    WaMu Capital's misrepresentations about WMALT 2006-7.

389.    On or in the days leading up to January 24, 2007, WaMu Capital (through Schref) contacted Prusha by phone or email to discuss certificates in the WMALT 2006-7 securitization, which WaMu Capital brought to market in August 2006.

390.    WMALT 2006-7 was a proprietary securitization vehicle for WaMu Capital. WAAC acted as the SEC-registered issuer/depositor for WMALT 2006-7.

391.     WAAC was a seasoned issuer of RMBS and issued multiple securitizations, including WMALT 2006-7, pursuant to the same base prospectus. That base prospectus was required to be attached to WAAC's initial registration statement and had to describe certain information that the SEC deemed to be material to investors.

392.     Like all base prospectuses, the base prospectus applicable to WMALT 2006-7 informed investors that the loans backing any RMBS issued pursuant to the prospectus would be originated in compliance with the applicable originators' underwriting standards:

- The mortgage assets acquired by the depositor will have been originated in accordance with the underlying criteria described in this prospectus under 'The Depositor's Mortgage Loan Purchase Program -- Underwriting Standards' or in the prospectus supplement. (At 29.)

- The mortgage loans to be transferred to each trust will be subject to the various credit, appraisal and underwriting standards described herein and in the prospectus supplement. The depositor expects that the originator of each of the loans will have applied, consistent with applicable federal and state laws and regulations, underwriting procedures intended to evaluate the borrower's credit standing and repayment ability and/or the value and adequacy of the related property as collateral. (At 43.)

- [A] loan may be considered to comply with a set of underwriting standards, even if one or more specific criteria included in the underwriting standards were not satisfied, if other factors compensated for the criteria that were not satisfied or if the loan is considered to be in substantial compliance with the underwriting standards. (*Id.*)

393.     As noted above, the base prospectus applicable to WMALT 2006-7 merely articulated the uniform industry practice and expectation that all publicly offered RMBS will be backed by loans originated in compliance with underwriting guidelines, and that the originators of those loans will make representations and warranties to that effect.

394.     On or in the days leading up to January 24, 2007, WaMu Capital delivered to Prusha a term sheet and a prospectus supplement for WMALT 2006-7. WaMu Capital's prospectus supplement for WMALT 2006-7 was dated August 28, 2006. Both the term sheet and the prospectus supplement were created by WaMu Capital and bore the WaMu Capital name and logo.

395.    WaMu Capital created the term sheet and prospectus supplement for WMALT 2006-7 after it had ostensibly conducted its due diligence on the relevant originators and on the loan pools backing the proposed WMALT 2006-7 securitization. Consistent with its own policies and its obligations under the securities laws, WaMu Capital should have verified that the collateral information accurately reflected the information in the loan files for the loans that would be included in the loan pools. Similarly, WaMu Capital should have re-underwritten a portion of the loan pools backing the securitization sufficient to ensure that all of the loans in the pools were originated in compliance with the relevant originators' underwriting guidelines, as the base prospectus, the form of prospectus supplement, and the prospectus supplement represented.

396.    WaMu Capital's prospectus supplement for WMALT 2006-7 disclosed the following (among many) collateral characteristics for the loan groups backing the certificate CUNA Mutual was considering purchasing, on which Prusha relied: Weighted average LTV (72.8); Maximum LTV (100); Number of loans with LTV > 80 (92, or 4.0% of total); Number of loans with LTV > 90 (21, or 0.9% of total); Number of owner-occupied properties (1,659, or 71.3% of total). The collateral characteristics disclosed in WaMu Capital's term sheet were materially identical.

397.    In addition, the free writing prospectus made the following representations about the relevant originators' (American Home Mortgage Corp., GreenPoint Mortgage Funding) compliance with underwriting guidelines:

- All of the mortgage loans owned by the Trust have been originated in accordance with the underwriting standards of the sponsor or the underwriting guidelines of Washington Mutual Bank as described in this section. (At S-26.)

- The sponsor's underwriting standards and Washington Mutual Bank's underwriting guidelines generally are intended to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral. Some mortgage loans are manually underwritten, in which case an underwriter reviews a loan application and supporting documentation, if required, and a credit report of the borrower, and based on that review determines whether to originate a loan in the amount and with the terms stated in the loan application. Some mortgage loans may be underwritten through an

83

automated underwriting system, including Washington Mutual Bank's automated underwriting system, described below. (*Id.*)

- Exceptions to the underwriting standards described above may be made on a case-by-case basis if compensating factors are present. In those cases, the basis for the exception is documented. Compensating factors may include, but are not limited to, low loan-to-value ratio, low debt-to-income ratio, good credit standing, the availability of other liquid assets, stable employment and time in residence at the prospective borrower's current address. (At S-28.)

398.     In other words, the prospectus supplement for WMALT 2006-7 confirmed that the loans backing the securitization were originated in accordance with the relevant originators' underwriting guidelines and that any deviations from those guidelines were supported by sufficient compensating factors.

399.     In the days leading up to January 24, 2007, Prusha reviewed the information in WaMu Capital's term sheet and prospectus supplement and relied on it in deciding whether to purchase certificates within the WMALT 2006-7 securitization, and if so, at what price. Prusha relied on the accuracy of WaMu Capital's quantitative representations in modeling performance of the certificates under different interest rate, prepayment, default, and loss severity scenarios using the Intex modeling system, which informed his assessment of the potential risk of loss and loss severities associated with the certificates.

400.     Prusha also relied on WaMu Capital's representation that the loans backing WMALT 2006-7 were originated in accordance with the listed originators' underwriting guidelines.

401.     First, because every publicly offered RMBS was accompanied by the representation that the originators of the loans backing the RMBS complied with their underwriting guidelines, WaMu Capital made the same representation merely by soliciting CUNA Mutual's purchase of certificates in the WMALT 2006-7 securitization.

402.     Second, WaMu Capital had performed due diligence to confirm the originators' compliance with their underwriting guidelines when issuing the loans in the WMALT 2006-7 loan

pools. By soliciting CUNA Mutual's purchase of certificates in that securitization and not informing CUNA Mutual of any defects it had discovered in its due diligence process, WaMu Capital again represented that the loans in the WMALT 2006-7 loan pools were originated in compliance with the relevant originators' underwriting guidelines.

403.    Third, WaMu Capital expressly stated in the prospectus supplement that the loans backing WMALT 2006-7 were originated in compliance with the relevant originators' underwriting guidelines.

404.    WaMu Capital knew that CUNA Mutual, like all other investors, relied on originator compliance with underwriting guidelines as a basic and fundamental assumption of every RMBS transaction, including WMALT 2006-7. If WaMu Capital had any information inconsistent with that basic assumption, WaMu Capital was required to disclose it to CUNA Mutual and other investors.

405.    CUNA Mutual placed its trade for one certificate in the WMALT 2006-7 securitization on January 24, 2007.

## VI.   CUNA Mutual's forensic analysis revealed Defendants' misrepresentations about the quantitative characteristics of the loan pools backing each of the ten RBMS at issue.

### A.   Defendants misrepresented LTV and CLTV ratios.

406.    Defendants' Offering Documents presented detailed LTV or CLTV data for the underlying mortgage loans, including the number of mortgage loans with LTV or CLTV ratios within specified ranges, and weighted average LTV or CLTV ratios by aggregate balance. Defendants represented that there were maximum allowable LTV or CLTV ratios for the underlying mortgage loans based on the relevant Originators' underwriting guidelines.

407.    The LTV or CLTV ratio is one of the key risk factors that lenders assess when qualifying borrowers for a mortgage. A borrower with a small equity position in a property has much less to lose in the event of default. Moreover, there is a greater likelihood a foreclosure will result in

85

a loss for the mortgage holder (here, the securitization trusts on behalf of CUNA Mutual and other investors) if a property is highly leveraged. LTV or CLTV ratio is a key statistic for investors in evaluating both the price and the risk of RMBS. This ratio was material to CUNA Mutual's investment decisions in RMBS because lower ratios correlate with a lower risk of default and a higher probability of recovery from foreclosure in the event of default. For that reason, Defendants included detailed representations regarding LTV or CLTV ratios in the Offering Documents.

408.   Shortly before filing this lawsuit, CUNA Mutual commissioned a forensic review of the mortgage loans underlying the certificates it purchased from Defendants in order to test the accuracy of the representations Defendants made in their Offering Documents about LTV or CLTV ratios. That analysis revealed that Defendants misrepresented these quantitative characteristics of the mortgage loan pools in each of the RMBS at issue.

409.   Because CUNA Mutual had no access to the underlying loan files, it analyzed loans from each of the ten RMBS for which data was available to test Defendants' representations regarding the LTV or CLTV risk metrics of the underlying mortgage pools.

410.   In that process, CUNA Mutual analyzed over 70% of the loans backing the ten RMBS at issue. The sample size for each RMBS was large enough to be representative of the entire pool of loans that each RMBS contained, and hence to provide statistically representative information about the LTV or CLTV characteristics of each RMBS as a whole.

411.   For each of the loans analyzed, the underlying property was valued as of its loan origination date by an industry-leading retroactive AVM. Mortgage originators and servicers routinely used AVMs as a way of valuing properties during pre-qualification, origination, and servicing. AVMs produce independent, statistically-derived valuations using sales data for comparable properties in the same geographic area as the mortgaged property. This valuation

86

method is used by originators and servicers to support valuation conclusions and to detect fraud. Defendants also used AVMs as part of their due diligence on the loan pools backing RMBS.

412.    Retroactive AVMs such as the one CUNA Mutual used in its forensic analysis are even more accurate than contemporaneous AVMs because they draw on a larger set of sales data. For example, for any given loan, there may have been one or more sales transactions of comparable properties in the days and weeks leading up to the origination of the loan. Because there is typically a lag time between a sales transaction and its incorporation in the data sets used to generate AVMs, the accuracy of the AVM improves with additional comparable sales data. By being able to harness this additional data, a retroactive AVM improves the accuracy of the estimated value of a property at a certain point in time.

413.    The AVM used to test LTV or CLTV representations in this case is accurate, reliable, and rigorously tested. It actually consists of four separate AVM sub-models, each of which is optimized for different criteria such as geographical location, availability of data, and proximity of comparable properties.

414.    The first sub-model is based on estimating the ratio of the assessed value to the sales price for a sample of properties in the vicinity of the subject property. This model is particularly accurate in those jurisdictions where there is a strong relationship between the assessed value and market value of properties.

415.    The second sub-model is based on a local regression model using properties that have sold recently within a two mile radius of the subject property and focuses on various property features that impact property values. This model works particularly well in geographic areas where properties have similar characteristics.

416.    The third sub-model zeroes in on a set of recently sold comparable properties in the area and analyzes the differences in the features of those properties alongside the differences in the

sales prices. That feature-specific analysis is then applied to the subject property to fine-tune valuations based on the unique features of the subject property. This model works particularly well when there are a sufficient number of comparable properties available for the analysis.

417.    The fourth sub-model estimates the value of a subject property by multiplying the most recent sale price for that property by how much the housing price index for that property has changed since the most recent sale occurred. The housing price index is based on a statistical analysis of property-value trajectories at the zip-code, county, and state levels.

418.    Each of these four models was run on the properties in the loan pools backing each RMBS for which data was available. The AVM then combined the four results and created a weighted average valuation based on the relative predictive accuracy of each sub-model as determined via a confidence score, thus giving greatest weight to the most predictive sub-model for that particular property while discounting the sub-model that was least optimal.

419.    The benefit of the AVM utilized for CUNA Mutual's forensic analysis is that it produces stable valuations based on multiple data sources and methodologies; it has a large geographic footprint as a result of using multiple methodologies that are geographically optimized; it reduces the volatility of valuations by reducing the chance for outliers; and it enables a statistical analysis of valuation reliability across large populations.

420.    The AVM is particularly accurate and reliable for the purpose of CUNA Mutual's forensic analysis because CUNA Mutual generated AVM valuations for large populations of loans rather than for one specific property. Any potential variability of an AVM valuation decreases as the number of properties tested increases. As more and more properties are included in the dataset, the statistical accuracy of the weighted average valuation is greatly increased because the impact of any potential outliers in either direction (overvaluation or undervaluation) is mitigated.

421. In short, CUNA Mutual's RMBS-specific AVM analysis that led to the data detailed below is a reliable and statistically accurate estimate of the true weighted average LTV or CLTV ratios for the RMBS at issue.

422. CUNA Mutual's retroactive valuation analysis demonstrated that Defendants' Offering Documents materially understated the LTV and CLTV ratios and thus the risks of the mortgage pools. The purported values assigned to the mortgaged properties were significantly higher than what the properties were worth at the time of origination.

423. Defendants aggregated mortgage pool statistics about LTV or CLTV ratios in the Offering Documents were based on individual loan-level data that is listed in the mortgage pool's "loan tape." The loan tape is a compilation of loan-by-loan statistics (including loan amount, LTV or CLTV, and owner-occupancy) for a mortgage pool. Using the AVM valuation, CUNA Mutual was able to calculate the actual LTV or CLTV for each tested loan, and then compare that to the LTV or CLTV disclosed for that loan on the loan tape.

424. Table 5 below provides LTV or CLTV data based on a retro AVM for all ten RMBS to illustrate the falsity of Defendants' LTV statistics.

**Table 5**
**Defendants' False LTV or CLTV Ratio Statistics**

| Asset | Percentage of Loans with LTV or CLTV Ratio at Least 10 Percentage Points Higher than Represented | Percentage of Loans with LTV or CLTV Ratio at Least 15 Percentage Points Higher than Represented | Percentage of Loans with LTV or CLTV Ratio at Least 25 Percentage Points Higher than Represented |
|---|---|---|---|
| CWALT 2005-46CB | 70.3% | 65.32% | 54.6% |
| CHASE 2005-S3 | 72.57% | 66.02% | 52.01% |

89

| | | | |
|---|---|---|---|
| CWALT 2005-57CB | 75.94% | 71.02% | 60.44% |
| JPALT 2005-S1 | 72.38% | 66.96% | 57.05% |
| JPALT 2006-S1 | 76.33% | 72.90% | 63.91% |
| SACO 2005-WM1* | d/n/a | d/n/a | d/n/a |
| STALT 2006-1F | 79.58% | 75.79% | 69.75% |
| RALI 2006-QS14 | 80.49% | 76.59% | 67.45% |
| WAMU 2005-AR15 | 79.12% | 73.78% | 61.81% |
| WMALT 2006-7 | 85.39% | 81.95% | 74.32% |

**\*CLTV (pools of second-lien loans)**

425.    Defendants aggregated these false loan-by-loan statistics and made representations in the Offering Documents about weighted average LTV or CLTV ratios for the pools as a whole, as well as the number of loans falling within specified LTV or CLTV ratio ranges. Because Defendants' representations in the Offering Documents regarding LTV or ratios were based on false loan-level information, Defendants' aggregated statistics were also false. Accurate LTV or CLTV ratios would have had a significant effect on CUNA Mutual's decision to invest or take a certain position in these RMBS. Accurate LTV or CLTV ratios also would have altered the ratings for the certificates in each RMBS.

426.    Across the ten RMBS, CUNA Mutual's analysis shows that on average, the actual weighted average LTV or CLTV ratio was 39% higher than the weighted average LTV or CLTV

90

ratio represented by Defendants. Table 6 below shows the difference between the weighted average LTV ratios that Defendants represented in the Offering Documents, and the actual weighted average LTV ratios as revealed by CUNA Mutual's forensic analysis.

**Table 6**
**Defendants' False Representations About Weighted Average LTV or CLTV Ratios**

| Asset | Represented Weighted Average LTV or CLTV Ratio | Actual Weighted Average LTV or CLTV Ratio | Difference |
|---|---|---|---|
| CWALT 2005-46CB | 71.79% | 100.26% | 28.47% |
| CHASE 2005-S3 | 68.11% | 91.44% | 23.33% |
| CWALT 2005-57CB | 73.16% | 108.64% | 35.48% |
| JPALT 2005-S1 | 73.47% | 104.22% | 30.75% |
| JPALT 2006-S1 | 78.1% | 125.75% | 47.65% |
| SACO 2005-WM1* | 99.73% | 144.58% | 44.85% |
| STALT 2006-1F | 77.44% | 133.36% | 55.92% |
| RALI 2006-QS14 | 74.46% | 118.02% | 43.56% |
| WAMU 2005-AR15 | 71.5% | 101.28% | 29.78% |
| WMALT 2006-7 | 72.8% | 123.43% | 50.63% |

**\*CLTV (pools of second-lien loans)**

427.    In the same Offering Documents, Defendants also made specific representations about the number of loans in each mortgage pool that had LTV ratios higher than 80% and 90%.

428.    An LTV ratio of 80% is a critical threshold in underwriting mortgage loans. Traditionally, in order to qualify for a loan under most lenders' underwriting guidelines, borrowers had to make a down payment representing 20% of the mortgaged properties' value. An equity contribution of 20% ensured that the borrower was sufficiently committed to a property to continue making mortgage payments and also provided the lender (or the investor) with a substantial cushion if, in the event of default, the property had to be liquidated in order to repay the loan. Under the Originators' underwriting guidelines, borrowers whose loans had LTVs exceeding 80% were required to purchase primary mortgage insurance in order to protect investors. LTV ratios in excess of 90%, moreover, provide the mortgage holder with very little equity cushion to protect against borrower default and foreclosure loss. Consequently, an accurate disclosure of the number of loans within a mortgage pool with an LTV ratio over 80% and 90% is important to making an investment decision.

429.    Table 7 below shows the difference between the percentage of loans with LTV ratios greater than or equal to 80% as represented in Defendants' Offering Documents for the relevant RMBS, and the actual percentage of loans with LTV ratios greater than 80% as revealed by CUNA Mutual's forensic analysis.

**Table 7**
**Defendants' False Representations About the Number of Loans with LTV Ratio >80%**

| Asset | Represented Percentage of Loans with an LTV Ratio of 80% or Greater | Actual Percentage of Loans with an LTV Ratio of Greater than 80% | Difference |
|---|---|---|---|

| | | | |
|---|---|---|---|
| CWALT 2005-46CB | 7.5% | 64.7% | 57.2% |
| CHASE 2005-S3 | 3% | 63.3% | 60.3% |
| CWALT 2005-57CB | 8.8% | 73.1% | 64.3% |
| JPALT 2005-S1 | 12% | 72% | 60% |
| JPALT 2006-S1 | 15.7% | 80.5% | 64.8% |
| STALT 2006-1F | 4.7% | 84% | 79.3% |
| RALI 2006-QS14 | 10.7% | 81.5% | 70.8% |
| WAMU 2005-AR15 | 0.6% | 75.6% | 75% |
| WMALT 2006-7 | 4.0% | 84.5% | 80.5% |

430.    Table 8 below shows the difference between the percentage of loans with LTV ratios greater than or equal to 90% as represented in Defendants' Offering Documents for the relevant RMBS, and the actual percentage of loans with LTV ratios greater than 90% as revealed by CUNA Mutual's forensic analysis.

**Table 8**
**Defendants' False Representations About the Number of Loans with LTV Ratio >90%**

| Asset | Represented Percentage of Loans with an LTV Ratio of 90% or Greater | Actual Percentage of Loans with an LTV Ratio of Greater than 90% | Difference |
|---|---|---|---|

| | | | |
|---|---|---|---|
| CWALT 2005-46CB | 2.6% | 51.2% | 48.6% |
| CHASE 2005-S3 | 1.2% | 48.9% | 47.7% |
| CWALT 2005-57CB | 3.9% | 60.7% | 56.8% |
| JPALT 2005-S1 | 5.1% | 59.6% | 54.5% |
| JPALT 2006-S1 | 7% | 70.8% | 63.8% |
| STALT 2006-1F | 1.8% | 75.1% | 73.3% |
| RALI 2006-QS14 | 4.4% | 71.8% | 67.4% |
| WAMU 2005-AR15 | 0.5% | 62.1% | 61.6% |
| WMALT 2006-7 | 0.9% | 74.2% | 73.3% |

431. In the same Offering Documents, Defendants also represented that *none* of the mortgage loans in the pools had LTV or CLTV ratios greater than 100%. An LTV or CLTV ratio of greater than 100% is known as being "underwater," and indicates that the borrower owes more money than the property securing the loan is worth. Such loans offer the mortgage holder zero equity cushion and leave the mortgage holder with inadequate collateral from the moment the loan is originated. CUNA Mutual's forensic analysis found that a substantial percentage of mortgage loans in the pools—an average of 55% across the ten RMBS—had LTV or CLTV ratios greater than 100%.

432.    Table 9 below shows the difference between the percentage of loans with LTV or CLTV ratios greater than 100% as represented in Defendants' Offering Documents for the relevant RMBS, and the actual percentage of loans with LTV or CLTV ratios greater than 100% as revealed by CUNA Mutual's forensic analysis.

**Table 9**
**Defendants' False Representations**
**About the Number of Loans with LTV or CLTV Ratio >100%**

| Asset | Represented Percentage of Loans with an LTV or CLTV Ratio of Greater than 100% | Actual Percentage of Loans with an LTV or CLTV Ratio of Greater than 100% |
|---|---|---|
| CWALT 2005-46CB | 0% | 39.8% |
| CHASE 2005-S3 | 0% | 34.9% |
| CWALT 2005-57CB | 0% | 47.9% |
| JPALT 2005-S1 | 0% | 47.9% |
| JPALT 2006-S1 | 0% | 60.8% |
| SACO 2005-WM1* | 0% | 78.4% |
| STALT 2006-1F | 0% | 67% |
| RALI 2006-QS14 | 0% | 59.9% |
| WAMU 2005-AR15 | 0% | 48.4% |

| WMALT 2006-7 | 0% | 65.2% |
|---|---|---|

**\*CLTV (pools of second-lien loans)**

433.     The results of CUNA Mutual's forensic analysis on LTV or CLTV representations are dramatic: the actual values of the mortgaged properties at the time of loan origination were drastically lower than the values represented in the loan tapes, meaning that the loans were insufficiently collateralized from the beginning. The Originators had similar AVMs and comparable-property sales records available to them at the time of loan origination, and many purportedly used them to support the valuations that led to the represented LTV and CLTV ratios. Defendants likewise had access to and actually used AVMs in its due diligence.

434.     The dramatic understatement of LTV ratios as revealed by CUNA Mutual's AVM provides evidence that Originators and appraisers conspired to inflate property values in order to support a greater volume of loan originations, as well as that Defendants ignored their due-diligence responsibilities in keeping loans supported by fraudulently inflated appraisals out of their RMBS pools.

**B.     Defendants misrepresented owner-occupancy rates.**

435.     Defendants' Offering Documents also contained detailed occupancy statistics for the underlying mortgage loans. The owner-occupancy rate for an RMBS indicates the number or percentage of the collateralized loans for which the mortgaged property was to serve as the primary residence of the borrower.

436.     Representations regarding owner-occupancy status were material to CUNA Mutual because, all else being equal, RMBS collateralized by loans with high owner-occupancy rates make safer investments than RMBS backed by second homes or investment properties. Homeowners who reside in mortgaged properties are less likely to "walk away" and default than owners who purchase

96

properties as investments or vacation homes. The personal disruption involved in defaulting on a primary residence exacts a far greater toll than defaulting on a vacation or investment property. As a result, borrowers are far more incentivized to satisfy their mortgage obligations on the property they occupy rather than default.

437.    CUNA Mutual used borrower- and property-specific public records to test loan-level occupancy data for each of the RMBS at issue. Defendants aggregated the loan-level occupancy data to make representations about the owner-occupancy rates of the mortgage pools backing each RMBS.

438.    To test owner-occupancy on a loan-by-loan basis, CUNA Mutual analyzed contemporaneous property tax records of each property listed as owner-occupied to determine (1) whether borrowers received their property tax bill for the mortgaged property at the address of the mortgaged property; and (2) whether borrowers took a property tax exemption on the mortgaged property that is only available for owner-occupied properties. Borrowers are likely to have a tax bill sent to their primary residence to ensure their ability to make timely payment. If borrowers had tax records sent to a different address, it is an indication that they did not actually reside at the mortgaged property. Borrowers are also likely to designate their primary residence as the property for which they claim a tax deduction. If borrowers did not do so, that is another indication that the borrowers did not actually occupy the mortgaged property.

439.    CUNA Mutual ran these forensic owner-occupancy tests on each property backing the ten RMBS that was identified as an owner-occupied property in the loan tapes and for which property tax data was available. CUNA Mutual counted a property as not actually being owner-occupied only if contemporaneous property-tax records were available for that property and if the property failed all available owner-occupancy tests. In other words, if a property that was listed as owner-occupied passed either of the two available tests, CUNA Mutual treated it as being owner-

occupied. Because property-tax records were available for a significant percentage of properties in the loan pools backing each RMBS—over 70% on average—the sample was large enough to reliably extrapolate the owner-occupancy results to the loan pools at large.

440.    The results of CUNA Mutual's loan-level analysis of actual owner-occupancy rates are set forth in Table 10 below. CUNA Mutual's analysis demonstrates that Defendants materially overstated the percentage of owner-occupied properties in the collateral pools.

**Table 10**
**Defendants' False Representations About Owner-Occupancy Status**

| Asset | Represented Percentage of Owner-Occupied Properties | Percentage of Represented Owner-Occupied Properties Failing All Available Tests |
|---|---|---|
| CWALT 2005-46CB | 82.4% | 8.46% |
| CHASE 2005-S3 | 93.3% | 13.35% |
| CWALT 2005-57CB | 88.64% | 8.34% |
| JPALT 2005-S1 | 72% | 13.68% |
| JPALT 2006-S1 | 65.9% | 14.41% |
| SACO 2005-WM1* | 99.9% | 12.2% |
| STALT 2006-1F | 50% | 12.23% |

| RALI 2006-QS14 | 73% | 10.94% |
|---|---|---|
| WAMU 2005-AR15 | 90.2% | 7.46% |
| WMALT 2006-7 | 71.3% | 11.66% |

**VII.   Defendants' false LTV, CLTV, and owner-occupancy statistics necessarily mean that Defendants' representations that the Originators complied with their underwriting guidelines were also false.**

441.    As noted above, in order to conclusively establish that the relevant Originators systematically disregarded their underwriting guidelines—contrary to Defendants' representations— CUNA Mutual needs access to the loan files for the loans backing the ten RMBS at issue. While Defendants had access to these loan files during their due-diligence process and they in fact reviewed the loan files for compliance with the applicable underwriting guidelines, CUNA Mutual never had and still does not have the ability to obtain and review the loan files absent the subpoena power that accompanies this lawsuit.

442.    Nevertheless, the results of CUNA Mutual's forensic analysis almost certainly mean that the Originators routinely and systematically violated their underwriting guidelines when issuing a substantial percentage of the loans in the loan pools backing the ten RMBS CUNA Mutual purchased.

443.    For example, CUNA Mutual's forensic analysis revealed that Defendants drastically understated the number of loans that had an LTV ratio greater than or equal to 80% in each of the RMBS backed by first-lien loans. For the Originators of the loans in those securitizations, an LTV ratio of 80% was a critical threshold in their underwriting guidelines.

444.     While a borrower might be approved for a loan with an LTV ratio of 80% or below, the borrower would likely need to satisfy additional criteria in order to qualify for a loan with an LTV ratio greater than 80%: the borrower may no longer qualify for a loan under a reduced documentation or stated documentation program; the borrower may need to demonstrate a higher FICO score; the borrower may have to prove additional income or assets to qualify for the loan amount; or the borrower may have to satisfy additional conditions such as paying off certain debt at closing. In addition, under all Originators' guidelines, the borrower would need to take out mortgage insurance in order to protect the investors from loss.

445.     Had the Originators used the actual LTV ratios in underwriting the loans rather than the artificially suppressed LTV ratios based on inflated appraisals, a substantial number of the loans that were listed as having LTV ratios of 80% or below would never have been issued and thus would never have ended up in the loan pools backing the RMBS CUNA Mutual purchased from Defendants. The ones that would have ended up in the loan pools would have had mortgage insurance policies that provided additional recoveries for investors due to shortfalls in foreclosure recoveries.

446.     Similarly, CUNA Mutual's forensic analysis revealed that the actual number of loans that had an LTV or CLTV ratio of greater than 100% was substantial for each of the ten RMBS at issue. All of the Originators' underwriting guidelines prohibited them from issuing loans that were "underwater" at the time of origination, and Defendants uniformly represented that there were no such loans in the pools backing the RMBS they sold to CUNA Mutual.

447.     Had the Originators used the actual LTV or CLTV ratios in underwriting the loans rather than the artificially suppressed LTV or CLTV ratios based on inflated appraisals, none of the loans with ratios greater than 100% would have been issued, and thus they would not have ended up in the loan pools backing the RMBS CUNA Mutual purchased.

448.     Finally, just like the LTV or CLTV ratio, the owner-occupancy status of a property was a critical element in all of the Originators' underwriting guidelines. Loans on properties that were to serve as the borrower's primary residence were subject to less stringent requirements because, all else being equal, owner-occupied properties are historically much less likely to default than investment properties. To compensate for the increased default risk associated with an investment property, therefore, the Originators' guidelines imposed lower LTV limits, lower debt-to-income limits, and lower loan amount limits than if the same borrower was taking out a loan on a primary residence.

449.     CUNA Mutual's forensic analysis revealed that for each of the ten RMBS at issue, a significant percentage of properties that were listed as owner-occupied were actually not. Had the Originators used the true rather than the misrepresented owner-occupancy status for the loans on these properties, a substantial percentage of them would never have been issued under the applicable underwriting guidelines and thus would never have ended up in the loan pools backing the RMBS CUNA Mutual purchased.

## VIII.  CUNA Mutual's forensic analysis findings are consistent with information that has become publicly available after the financial collapse.

450.     Mortgage originators experienced unprecedented success during the mortgage boom. Yet their success was illusory. As the loans they originated began to significantly underperform, the demand for their products subsided. It became evident that originators had systematically disregarded their underwriting standards.

451.     The Office of the Comptroller of the Currency (the "OCC"), an office within the Treasury Department, published a report in November 2008 listing the "Worst Ten" metropolitan areas with the highest rates of foreclosures and the "Worst Ten" originators with the largest numbers of foreclosures in those areas ("2008 'Worst Ten in the Worst Ten' Report"). In this

report, the OCC emphasized the importance of adherence to underwriting standards in mortgage

loan origination:

> The quality of the underwriting process—that is, determining through analysis of the borrower and market conditions that a borrower is highly likely to be able to repay the loan as promised—is a major determinant of subsequent loan performance. The quality of underwriting varies across lenders, a factor that is evident through comparisons of rates of delinquency, foreclosure, or other loan performance measures across loan originators.

452.     Recently, government reports and investigations and newspaper reports have

uncovered the extent of the pervasive abandonment of underwriting standards. The Permanent

Subcommittee on Investigations in the United States Senate ("PSI") recently released its report

detailing the causes of the financial crisis. Using Washington Mutual Bank as a case study, the PSI

concluded through its investigation:

> Washington Mutual was far from the only lender that sold poor quality mortgages and mortgage backed securities that undermined U.S. financial markets. The Subcommittee investigation indicates that Washington Mutual was emblematic of a host of financial institutions that knowingly originated, sold, and securitized billions of dollars in high risk, poor quality home loans. These lenders were not the victims of the financial crisis; the high risk loans they issued became the fuel that ignited the financial crisis.

STAFF OF S. PERMANENT SUBCOMM. ON INVESTIGATIONS, 112TH CONG., WALL STREET AND THE

FINANCIAL CRISIS: ANATOMY OF A FINANCIAL COLLAPSE 50 (Subcomm. Print 2011).

453.     Indeed, the Financial Crisis Inquiry Commission ("FCIC") issued its final report in

January 2011 that detailed, among other things, the collapse of mortgage underwriting standards. *See*

FIN. CRISIS INQUIRY COMM'N, FINAL REPORT OF THE NATIONAL COMMISSION ON THE CAUSES OF

THE FINANCIAL AND ECONOMIC CRISIS IN THE UNITED STATES (2011) ("FCIC Report").

454.     Concluding that there had been a "systemic breakdown in accountability and ethics"

in the mortgage industry, the FCIC found:

> [I]t was the collapse of the housing bubble—fueled by low interest rates, easy and available credit, scant regulation, and toxic mortgages—that was the spark that

> ignited a string of events, which led to a full-blown crises in the fall of 2008. Trillions of dollars in risky mortgages had become embedded throughout the financial system, as mortgage-related securities were packaged, repackaged, and sold to investors around the world.

*Id.* at xvi.

455.    During the housing boom, mortgage lenders focused on quantity rather than quality, originating loans for borrowers who had no realistic capacity to repay the loan. The FCIC Report found "that the percentage of borrowers who defaulted on their mortgages within just a matter of months after taking a loan nearly doubled from the summer of 2006 to late 2007." *Id.* at xxii. Early Payment Default is a significant indicator of pervasive disregard for underwriting standards. The FCIC Report noted that mortgage fraud "flourished in an environment of collapsing lending standards ... ." *Id.*

456.    In this lax lending environment, mortgage lenders went unchecked, originating mortgages for borrowers in spite of underwriting standards:

> Lenders made loans that they knew borrowers could not afford and that could cause massive losses to investors in mortgage securities. As early as September 2004, Countrywide executives recognized that many of the loans they were originating could result in "catastrophic consequences." Less than a year later, they noted that certain high-risk loans they were making could result not only in foreclosures but also in "financial and reputational catastrophe" for the firm. But they did not stop.

*Id.*

457.    Lenders and borrowers took advantage of this climate, with borrowers willing to take on loans and lenders anxious to get those borrowers into the loans, ignoring even loosened underwriting standards. The FCIC Report observed: "Many mortgage lenders set the bar so low that lenders simply took eager borrowers' qualifications on faith, often with a willful disregard for a borrower's ability to pay." *Id.* at xxiii.

458.    In an interview with the FCIC, Alphonso Jackson, the Secretary of the Department of Housing and Urban Affairs ("HUD") from 2004 to 2008, related that HUD had heard about

mortgage lenders "running wild, taking applications over the Internet, not verifying people's income or their ability to have a job." *Id.* at 12-13 (internal quotation marks omitted).

459.    Chairman of the Federal Reserve Board, Benjamin Bernanke, spoke to the decline of underwriting standards in his speech before the World Affairs Council of Greater Richmond on April 10, 2008:

> First, at the point of origination, underwriting standards became increasingly compromised. The best-known and most serious case is that of subprime mortgages, mortgages extended to borrowers with weaker credit histories. To a degree that increased over time, these mortgages were often poorly documented and extended with insufficient attention to the borrower's ability to repay. In retrospect, the breakdown in underwriting can be linked to the incentives that the originate-to-distribute model, as implemented in this case, created for the originators. Notably, the incentive structures sometimes often tied originator revenue to loan volume, rather than to the quality of the loans being passed up the chain. Investors normally have the right to put loans that default quickly back to the originator, which should tend to apply some discipline to the underwriting process. However, in the recent episode, some originators had little capital at stake, reducing their exposure to the risk that the loans would perform poorly.

Benjamin Bernanke, Chairman, Federal Reserve Board, Speech to the World Affairs Council of Greater Richmond, *Addressing Weaknesses in the Global Financial Markets: The Report of the President's Working Group on Financial Markets*, Apr. 10, 2008.

460.    Investment banks securitized loans that were not originated in accordance with underwriting guidelines and failed to disclose this fact in RMBS offering documents. As the FCIC Report noted:

> The Commission concludes that firms securitizing mortgages failed to perform adequate due diligence on the mortgages they purchased and at times knowingly waived compliance with underwriting standards. Potential investors were not fully informed or were misled about the poor quality of the mortgages contained in some mortgage-related securities. These problems appear to have been significant.

FCIC Report at 187.

461.    The lack of disclosure regarding the true underwriting practices of the Originators in the Offering Documents at issue in this Complaint put CUNA Mutual at a severe disadvantage. The

FSOC explained that the origination and securitization process contains inherent "information asymmetries" that put investors at a disadvantage regarding critical information concerning the quality and performance of RMBS. The FSOC Risk Retention Report described the information disadvantage for investors of RMBS:

> One important informational friction highlighted during the recent financial crisis has aspects of a "lemons" problem that exists between the issuer and investor. An originator has more information about the ability of a borrower to repay than an investor, because the originator is the party making the loan. Because the investor is several steps removed from the borrower, the investor may receive less robust loan performance information. Additionally, the large number of assets and the disclosures provided to investors may not include sufficient information on the quality of the underlying financial assets for investors to undertake full due diligence on each asset that backs the security.

FSOC Risk Retention Report at 9 (footnote omitted).

462.    Because investors had limited or no access to information concerning the actual quality of loans underlying the RMBS, the OTD model created a situation where the origination of low quality mortgages through poor underwriting thrived. The FSOC found:

> In the originate-to-distribute model, originators receive significant compensation upfront without retaining a material ongoing economic interest in the performance of the loan. This reduces the economic incentive of originators and securitizers to evaluate the credit quality of the underlying loans carefully. Some research indicates that securitization was associated with lower quality loans in the financial crisis. For instance, one study found that subprime borrowers with credit scores just above a threshold commonly used by securitizers to determine which loans to purchase defaulted at significantly higher rates than those with credit scores below the threshold. By lowering underwriting standards, securitization may have increased the amount of credit extended, resulting in riskier and unsustainable loans that otherwise may not have been originated.

*Id.* at 11 (footnote omitted).

463.    The FSOC reported that as the OTD model became more pervasive in the mortgage industry, underwriting practices weakened across the industry. The FSOC Risk Retention Report found "[t]his deterioration was particularly prevalent with respect to the verification of the borrower's income, assets, and employment for residential real estate loans ... ." *Id.*

464.     In sum, the disregard of underwriting standards was pervasive across originators. The failure to adhere to underwriting standards directly contributed to the sharp decline in the quality of mortgages that became part of mortgage pools collateralizing RMBS. The lack of adherence to underwriting standards for the loans underlying RMBS was not disclosed to investors in the offering materials. The nature of the securitization process, with the investor several steps removed from the origination of the mortgages underlying the RMBS, made it difficult for investors to ascertain how the RMBS would perform.

465.     As discussed below, facts have recently come to light indicating that the Originators that contributed to the loan pools underlying the RMBS at issue in this Complaint engaged in systematic disregard of their underwriting standards.

### A.     Countrywide's systematic disregard of underwriting standards.

466.     Countrywide originated the loans in the loan pools backing the CWALT 2005-46CB and CWALT 2005-57CB securitizations. Countrywide was among the largest originators of residential mortgages in the United States during the period at issue in this complaint.

467.     In October 2009, the House Committee on Oversight and Government Reform launched an investigation into the entire subprime mortgage industry, including Countrywide, focusing on "whether mortgage companies employed deceptive and predatory lending practices, or improper tactics to thwart regulation, and the impact of those activities on the current crisis." Press Release, Comm. on Oversight & Government Reform, Statement of Chairman Towns on Committee Investigation Into Mortgage Crisis at 1 (Oct. 23, 2009) (internal quotation marks omitted).

468.     On May 9, 2008, the New York Times noted that minimal documentation and stated income loans—Countrywide's No Income/No Assets Program and Stated Income/Stated Assets Program—have "bec[o]me known [within the mortgage industry] as 'liars' loans' because many [of

the] borrowers falsified their income." Floyd Norris, *A Little Pity, Please, for Lenders*, N.Y. TIMES, May 9, 2008, at C1.

469.    In a television special titled, "If You Had a Pulse, We Gave You a Loan," Dateline NBC reported on March 27, 2009:

> To highlight just how simple it could be to borrow money, Countrywide marketed one of its stated-income products as the "Fast and Easy loan."
>
> As manager of Countrywide's office in Alaska, Kourosh Partow pushed Fast and Easy loans and became one of the company's top producers.
>
> He said the loans were "an invitation to lie" because there was so little scrutiny of lenders. "We told them the income that you are giving us will not be verified. The asset that you are stating will not be verified."
>
> He said they joked about it: "If you had a pulse, we gave you a loan. If you fog the mirror, give you a loan."
>
> But it turned out to be no laughing matter for Partow. Countrywide fired him for processing so-called "liar loans" and federal prosecutors charged him with crimes. On April 20, 2007, he pleaded guilty to two counts of wire fraud involving loans to a real estate speculator; he spent 18 months in prison.
>
> In an interview shortly after he completed his sentence, Partow said that the practice of pushing through loans with false information was common and was known by top company officials. "It's impossible they didn't know."
>
> ...
>
> During the criminal proceedings in federal court, Countrywide executives portrayed Partow as a rogue who violated company standards.
>
> But former senior account executive Bob Feinberg, who was with the company for 12 years, said the problem was not isolated. "I don't buy the rogue. I think it was infested."
>
> He lamented the decline of what he saw as a great place to work, suggesting a push to be number one in the business led Countrywide astray. He blamed Angelo Mozilo, a man he long admired, for taking the company down the wrong path. It was not just the matter of stated income loans, said Feinberg. Countrywide also became a purveyor of loans that many consumer experts contend were a bad deal for borrowers, with low introductory interest rates that later could skyrocket.
>
> In many instances, Feinberg said, that meant borrowers were getting loans that were "guaranteed to fail."

470.    On June 4, 2009, the SEC sued Angelo Mozilo and other Countrywide executives, alleging securities fraud. Specifically, the SEC alleged that Mozilo and the others misled investors about the credit risks that Countrywide created with its mortgage origination business, telling investors that Countrywide was primarily involved in prime mortgage lending, when it was actually heavily involved in risky sub-prime loans with expanded underwriting guidelines. *See* Compl. for Violations of the Federal Securities Laws, *SEC v. Mozilo*, No. CV 09-3994-JFW (C.D. Cal. filed June 4, 2009). Mozilo and the other executives settled the charges with the SEC for $73 million on October 15, 2010. *See* Walter Hamilton & E. Scott Reckard, *Angelo Mozilo, Other Former Countrywide Execs Settle Fraud Charges*, L.A. TIMES, Oct. 16, 2010, at A1.

471.    Internal Countrywide e-mails the SEC released in connection with its lawsuit show the extent to which Countrywide systematically deviated from its underwriting guidelines. For instance, in an April 13, 2006 e-mail from Mozilo to other top Countrywide executives, Mozilo stated that Countrywide was originating home mortgage loans with "serious disregard for process, compliance with guidelines and irresponsible behavior relative to meeting timelines." E-mail from Angelo Mozilo to Eric Sieracki and other Countrywide Executives (Apr. 13, 2006 7:42 PM PDT). Mozilo also wrote that he had "personally observed a serious lack of compliance within our origination system as it relates to documentation and generally a deterioration in the quality of loans originated versus the pricing of those loan[s]." *Id.* (internal quotation marks omitted).

472.    Indeed, in September 2004, Mozilo had voiced his concern over the "clear deterioration in the credit quality of loans being originated," observing that "the trend is getting worse" because of competition in the non-conforming loans market. With this in mind, Mozilo argued that Countrywide should "seriously consider securitizing and selling ([Net Interest Margin Securities]) a substantial portion of [Countrywide's] current and future sub prime [sic] residuals." E-mail from Angelo Mozilo to Stan Kurland & Keith McLaughlin, Managing Directors, Countrywide

(Sept. 1, 2004 8:17 PM PDT).

473.    To protect themselves against poorly underwritten loans, parties that purchase loans from an originator frequently require the originator to repurchase any loans that suffer Early Payment Default.

474.    In the first quarter of 2006, HSBC Holdings plc ("HSBC"), a purchaser of Countrywide's 80/20 subprime loans, began to force Countrywide to repurchase certain loans that HSBC contended were defective under the parties' contract. In an e-mail sent on April 17, 2006, Mozilo asked, "[w]here were the breakdowns in our system that caused the HSBC debacle including the creation of the contract all the way through the massive disregard for guidelines set forth by both the contract and corporate." E-mail from Angelo Mozilo to Dave Sambol, former Executive Managing Director and Chief of Mortgage Banking and Capital Markets, Countrywide Financial (Apr. 17, 2006 5:55 PM PST). Mozilo continued:

> In all my years in the business I have never seen a more toxic prduct. [sic] It's not only subordinated to the first, but the first is subprime. In addition, the [FICOs] are below 600, below 500 and some below 400 ... . With real estate values coming down ... the product will become increasingly worse. There has [sic] to be major changes in this program, including substantial increases in the minimum [FICO].

*Id.*

475.    Countrywide sold a product called the "Pay Option ARM." This loan was a 30-year adjustable rate mortgage that allowed the borrower to choose between various monthly payment options, including a set minimum payment. In a June 1, 2006 e-mail, Mozilo noted that most of Countrywide's Pay Option ARMs were based on stated income and admitted that "[t]here is also some evidence that the information that the borrower is providing us relative to their income does not match up with IRS records." E-mail from Angelo Mozilo to Carlos Garcia, former CFO of Countrywide Financial, and Jim Furash, former President of Countrywide Bank (June 1, 2006 10:38 PM PST).

476.     An internal quality control report e-mailed on June 2, 2006, showed that, for stated income loans, 50.3% of loans indicated a variance of 10% or more from the stated income in the loan application. *See* E-mail from Clifford Rossi, Chief Risk Officer, Countrywide, to Jim Furash, Executive, CEO, Countrywide Bank, N.A., among others (June 2, 2006 12:28 PM PDT).

477.     Countrywide was apparently "flying blind" on how one of its popular loan products, the Pay Option ARM loan, would perform, and, admittedly, had "no way, with any reasonable certainty, to assess the real risk of holding these loans on [its] balance sheet." E-mail from Angelo Mozilo to Dave Sambol, Managing Director Countrywide (Sept. 26, 2006 10:15 AM PDT). Yet such loans were securitized and passed on to unsuspecting investors such as CUNA Mutual.

478.     With growing concern over the performance of Pay Option ARM loans in the waning months of 2007, Mozilo advised that he "d[id]n't want any more Pay Options originated for the Bank." E-mail from Angelo Mozilo to Carlos Garcia, former Managing Director, Countrywide (Nov. 3, 2007 5:33 PM PST). In other words, if Countrywide was to continue to originate Pay Option ARM loans, it was not to hold onto the loans. Mozilo's concerns about Pay Option ARM loans were rooted in "[Countrywide's] inability to underwrite [Pay Option ARM loans] combined with the fact that these loans [we]re inherently unsound unless they are full doc, no more than 75% LTV and no piggys." *Id.*

479.     In a March 27, 2006 e-mail, Mozilo reaffirmed the need to "oversee all of the corrective processes that will be put into effect to permanently avoid the errors of both judgement [sic] and protocol that have led to the issues that we face today" and that "the people responsible for the origination process understand the necessity for adhering to the guidelines for 100% LTV sub-prime product. This is the most dangerous product in existence and there can be nothing more toxic and therefore requires that no deviation from guidelines be permitted irrespective of the circumstances." E-mail from Angelo Mozilo to the former Countrywide Managing Directors (Mar.

110

27, 2006 8:53 PM PST).

480.    Yet Countrywide routinely found exceptions to its underwriting guidelines without sufficient compensating factors. In an April 14, 2005 e-mail, Frank Aguilera, a Countrywide managing director, explained that the "spirit" of Countrywide's exception policy was not being followed. He noted a "significant concentration of similar exceptions" that "denote[d] a divisional or branch exception policy that is out side [sic] the spirit of the policy." E-mail from Frank Aguilera, Managing Director, Countrywide to John McMurray, Managing Director, Countrywide (Apr. 14, 2005 12:14 PM PDT). Aguilera continued: "The continued concentration in these same categories indicates either a) inadequate controls in place to mange [sic] rogue production units or b) general disregard for corporate program policies and guidelines." *Id.* Aguilera observed that pervasive use of the exceptions policy was an industry-wide practice:

> It appears that [Countrywide Home Loans]' loan exception policy is more loosely interpreted at [Specialty Lending Group] than at the other divisions. I understand that [Correspondent Lending Division] has decided to proceed with a similar strategy to appease their complaint customers ... . [Specialty Lending Group] has clearly made a market in this unauthorized product by employing a strategy that Blackwell has suggested is prevalent in the industry ... .

*Id.*

481.    Internal reports months after an initial push to rein in the excessive use of exceptions with a "zero tolerance" policy showed the use of exceptions remained excessive. E-mail from Frank Aguilera, Managing Director, Countrywide, to Brian Kuelbs, Managing Director, Countrywide, among others (June 12, 2006 10:13 AM PDT).

482.    In February 2007, nearly a year after pressing for a reduction in the overuse of exceptions and as Countrywide claimed to be tightening lending standards, Countrywide executives found that exceptions continued to be used at an unacceptably high rate. Frank Aguilera stated that any "[g]uideline tightening should be considered purely optics with little change in overall execution

unless these exceptions can be contained." E-mail from Frank Aguilera, Managing Director, Countrywide, to Mark Elbuam, Managing Director, Countrywide, among others (Feb. 21, 2007 4:58 PM PST).

483.    John McMurray, a former Countrywide managing director, expressed his opinion in a September 2007 e-mail that "the exception process has never worked properly." E-mail from John McMurray, Managing Director, Countrywide, to Jess Lederman, Managing Director, Countrywide (Sept. 7, 2007 10:12 AM PDT).

484.    Countrywide conceded that the poor performance of loans it originated was, in many cases, due to poor underwriting. In April 2007, Countrywide noticed that its high combined loan-to-value ratio ("CLTV") stated income loans were performing worse than those of its competitors. After reviewing many of the loans that went bad, a Countrywide executive stated that "in most cases [poor performance was] due to poor underwriting related to reserves and verification of assets to support reasonable income." E-mail from Russ Smith, Countrywide, to Andrew Gissinger, Managing Director, Countrywide (Apr. 11, 2007 7:58 AM PDT).

485.    On October 6, 2008, 39 states announced that Countrywide agreed to pay up to $8 billion in relief to homeowners nationwide to settle lawsuits and investigations regarding Countrywide's deceptive lending practices.

486.    On July 1, 2008, NBC Nightly News aired the story of a former Countrywide regional Vice President, Mark Zachary, who sued Countrywide after he was fired for questioning his supervisors about Countrywide's poor underwriting practices.

487.    According to Zachary, Countrywide pressured employees to approve unqualified borrowers. Countrywide's mentality, he said, was "what do we do to get one more deal done. It doesn't matter how you get there [*i.e.*, how the employee closes the deal] ... ." NBC Nightly News, Countrywide Whistleblower Reports "Liar Loans" (July 1, 2008) ("July 1, 2008 NBC Nightly

News"). Zachary also stated that the practices were not the work of a few bad apples, but rather: "It comes down, I think from the very top that you get a loan done at any cost." *Id.*

488.    Zachary also told of a pattern of: (1) inflating home appraisals so buyers could borrow enough to cover closing costs, but leaving the borrower owing more than the house was truly worth; (2) employees steering borrowers who did not qualify for a conventional loan into riskier mortgages requiring little or no documentation, knowing they could not afford it; and (3) employees coaching borrowers to overstate their income in order to qualify for loans.

489.    NBC News interviewed six other former Countrywide employees from different parts of the country, who confirmed Zachary's description of Countrywide's corrupt culture and practices. Some said that Countrywide employees falsified documents intended to verify borrowers' debt and income to clear loans. NBC News quoted a former loan officer: "'I've seen supervisors stand over employees' shoulders and watch them ... change incomes and things like that to make the loan work.'" July 1, 2008 NBC Nightly News.

490.    Not surprisingly, Countrywide's default rates reflected its approach to underwriting. *See* 2008 "Worst Ten in the Worst Ten" Report. Countrywide appeared on the top ten list in six of the ten markets: 4th in Las Vegas, Nevada; 8th in Sacramento, California; 9th in Stockton, California, and Riverside, California; and 10th in Bakersfield, California, and Miami, Florida. When the OCC issued its updated 2009 "Worst Ten in the Worst Ten" Report, Countrywide appeared on the top ten list in every market, holding 1st place in Las Vegas, Nevada; 2nd in Reno, Nevada; 3rd in Merced, California; 6th in Fort Myers-Cape Coral, Florida, Modesto, California, and Stockton-Lodi, California; 7th in Riverside-San Bernardino, California, and Fort Pierce-Port St. Lucie, Florida; 8th in Vallejo-Fairfield-Napa, California; and 9th in Bakersfield, California. *See* 2009 "Worst Ten in the Worst Ten" Report.

**B.      WaMu's systematic disregard of underwriting standards.**

491.     WaMu and/or affiliate Long Beach Mortgage ("Long Beach") originated a material percentage of loans in the loan pools backing the SACO 2005-WM1, WAMU 2005-AR15, and WMALT 2006-7 securitizations.

492.     WaMu was a Seattle-based bank that rapidly grew from a regional to a national mortgage lender during the period from 1991 to 2006. At over $300 billion in total assets, WaMu was at one time the largest institution regulated by the Office of Thrift Supervision ("OTS"). On September 25, 2008, however, federal regulators closed WaMu when loan losses, borrowing capacity limitations, a plummeting stock price, and rumors of WaMu's problems led to a run on the thrift by depositors. Federal regulators facilitated the sale of WaMu to JPMorgan Chase Bank in September 2008.

493.     In April 2010, the Treasury OIG, issued a report titled "Evaluation of Federal Regulatory Oversight of Washington Mutual Bank," Report No. EVAL-10-002 (the "WaMu OIG Report"), discussing the reasons for WaMu's meteoric rise and consequent collapse. The WaMu OIG Report found, "WaMu failed primarily because of management's pursuit of a high-risk lending strategy that included liberal underwriting standards and inadequate risk controls." WaMu OIG Report at 2. The report elaborated on how WaMu adopted this new strategy to compete with Countrywide and maximize profits:

> In 2005, WaMu management made a decision to shift its business strategy away from originating traditional fixed-rate and conforming single family residential loans, towards riskier nontraditional loan products and subprime loans. WaMu pursued the new strategy in anticipation of increased earnings and to compete with Countrywide…
> . . . .
> WaMu estimated in 2006 that its internal profit margin from subprime loans could be more than 10 times the amount for a government-backed loan product and more than 7 times the amount for a fixed-rate loan product.

*Id.* at 8 (footnote omitted).

494.     As previously noted in this Complaint, the PSI issued its report on the causes of the

economic crisis. The PSI Wall Street Report used WaMu as its case study into lending practices of the mortgage industry during the housing bubble. Citing internal e-mails and correspondence the PSI obtained as part of its investigation, the PSI made the following factual findings:

(1) High Risk Lending Strategy. [WaMu] executives embarked upon a High Risk Lending Strategy and increased sales of high risk home loans to Wall Street, because they projected that high risk home loans, which generally charged higher rates of interest, would be more profitable for the bank than low risk home loans.

(2) Shoddy Lending Practices. WaMu and its affiliate, [Long Beach], used shoddy lending practices riddled with credit, compliance, and operational deficiencies to make tens of thousands of high risk home loans that too often contained excessive risk, fraudulent information, or errors.

(3) Steering Borrowers to High Risk Loans. WaMu and Long Beach too often steered borrowers into home loans they could not afford, allowing and encouraging them to make low initial payments that would be followed by much higher payments, and presumed that rising home prices would enable those borrowers to refinance their loans or sell their homes before the payments shot up.

(4) Polluting the Financial System. WaMu and Long Beach securitized over $77 billion in subprime home loans and billions more in other high risk home loans, used Wall Street firms to sell the securities to investors worldwide, and polluted the financial system with mortgage backed securities which later incurred high rates of delinquency and loss.

(5) Securitizing Delinquency-Prone and Fraudulent Loans. At times, WaMu selected and securitized loans that it had identified as likely to go delinquent, without disclosing its analysis to investors who bought the securities, and also securitized loans tainted by fraudulent information, without notifying purchasers of the fraud that was discovered.

(6) Destructive Compensation. WaMu's compensation system rewarded loan officers and loan processors for originating large volumes of high risk loans, paid extra to loan officers who overcharged borrowers or added stiff prepayment penalties, and gave executives millions of dollars even when their High Risk Lending Strategy placed the bank in financial jeopardy.

PSI Wall Street Report at 50-51.

495.    In particular, the PSI Wall Street Report noted that WaMu had engaged in internal reviews of its lending practices and the lending practices of its subsidiary, Long Beach. WaMu's Chief Risk Officer, Ron Cathcart commissioned a study to look into the quality of loans originated

by Long Beach. The review found that the "top five priority issues" were as follows:

> "Appraisal deficiencies that could impact value and were not addressed[;]
> Material misrepresentations relating to credit evaluation were confirmed[;]
> Legal documents were missing or contained errors or discrepancies[;]
> Credit evaluation or loan decision errors[; and]
> Required credit documentation was insufficient or missing from the file."

*Id.* at 82 (quoting e-mail from Ron Cathcart, Chief Risk Officer, WaMu, to Cory Gunderson

(Dec. 11, 2006 9:21 AM PST)).

496.    Pushing "Option ARMs" was a major part of WaMu's new "high risk" lending strategy. In a bipartisan memorandum from Senators Carl Levin and Tom Coburn to the Members of the PSI, dated April 13, 2010, Option ARMs are labeled WaMu's "flagship" product. Senate Exhibit 1.a, at 3. The WaMu OIG Report describes the inherently dangerous nature of WaMu's Option ARMs:

> WaMu's Option ARMs provided borrowers with the choice to pay their monthly mortgages in amounts equal to monthly principal and interest, interest-only, or a minimum monthly payment. Borrowers selected the minimum monthly payment option for 56 percent of the Option ARM portfolio in 2005.
>
> The minimum monthly payment was based on an introductory rate, also known as a teaser rate, which was significantly below the market interest rate and was usually in place for only 1 month. After the introductory rate expired, the minimum monthly payment feature introduced two significant risks to WaMu's portfolio: payment shock and negative amortization. WaMu projected that, on average, payment shock increased monthly mortgage amounts by 60 percent. At the end of 2007, 84 percent of the total value of Option ARMs on WaMu's financial statements was negatively amortizing.

WaMu OIG Report at 9.

497.    The WaMu OIG Report notes that "Option ARMs represented as much as half of all loan originations from 2003 to 2007 and approximately $59 billion, or 47 percent, of the home loans on WaMu's balance sheet at the end of 2007." *Id.*

498.    The OIG also notes that WaMu's "new strategy included underwriting subprime loans, home equity loans, and home equity lines of credit to high-risk borrowers. In line with that

strategy, WaMu purchased and originated subprime loans, which represented approximately $16 billion, or 13 percent, of WaMu's 2007 home loan portfolio." *Id.* at 10.

499.   WaMu's careless underwriting practices rendered these already high risk loan products even more risky. *See id.* The WaMu OIG Report stated that the OTS and the FDIC repeatedly "identified concerns with WaMu's high-risk lending strategy" and loan underwriting, weaknesses in management and "inadequate internal controls." *Id.* at 3-4. Those concerns included "questions about the reasonableness of stated incomes contained in loan documents, numerous underwriting exceptions, miscalculations of loan-to-value ratios, and missing or inadequate documentation." *Hearing on Wall Street & the Fin. Crisis: The Role of Bank Regulators Before the United States S. Homeland Sec. and Governmental Affairs Comm., Permanent Subcomm. on Investigations*, 111th Cong. 9 (Apr. 16, 2010) (statement of the Hon. Eric M. Thorson, Inspector General, Dep't of the Treasury) ("Thorson Statement").

500.   WaMu management began to notice the pattern of "first payment default" ("FPD") for loans its Long Beach subsidiary originated. In June 2007, WaMu closed Long Beach as a separate entity and placed its subprime lending operations in a new division called "Wholesale Specialty Lending."

501.   In late 2007, WaMu performed an internal review to determine whether its plans to address its poor underwriting practices were effective. The review focused on 187 loans that experienced FPD, originated from November 2006 to March 2007. As an initial matter, the review found:

> The overall system of credit risk management activities and process has major weaknesses resulting in unacceptable level of credit risk. Exposure is considerable and immediate corrective action is essential in order to limit or avoid considerable losses, reputation damage, or financial statement errors.

PSI High Risk Home Loans Hearing, Senate Ex. 21, "WaMu Corporate Credit Review:

Wholesale Specialty Lending-FPD" at 2 (Sept. 28, 2007).

502.    Specifically, the WaMu internal review reported the following findings regarding the

187 FPD loans:

- (High) Ineffectiveness of fraud detection tools – 132 of the 187 (71%) files were reviewed by Risk Mitigation for fraud. Risk Mitigation confirmed fraud on 115 files and could not confirm on 17 of the files, but listed them as "highly suspect." This issue is a repeat finding with CCR.
- (High) Weak credit risk infrastructure impacting credit quality. Credit weakness and underwriting deficiencies is a repeat finding with CCR. It was also identified as a repeat finding and Criticism in the OTS Asset Quality memo 3 issued May 17, 2007. Internal Audit in their August 20, 2007 Loan Origination & Underwriting report identified it as a repeat issue. Findings from the CCR FPD review in relation to credit quality:

  - 132 of the 187 loans sampled were identified with red flags that were not addressed by the business unit
  - 80 of the 112 (71%) stated income loans were identified for lack of reasonableness of income
  - 87 files (47%) exceeded program parameters in place at the time of approval
  - 133 (71%) had credit evaluation or loan decision errors present
  - 25 (13%) had the title report issues that were not addressed
  - 28 (14%) had income calculation errors and 35 (19%) had income documentation errors
  - 58 (31%) had appraisal discrepancies that raised concerns that the value was not supported

*Id.* at 3.

503.    An OTS memorandum on Loan Fraud Investigation, dated June 19, 2008, observes

the systematic nature of the problem: "[T]he review defines an origination culture focused more

heavily on production volume rather than quality. An example of this was a finding that production

personnel were allowed to participate in aspects of the income, employment, or asset verification

process, a clear conflict of interest. . . . Prior OTS examinations have raised similar issues including

the need to implement incentive compensation programs to place greater emphasis on loan quality."

PSI High Risk Home Loans Hearing, Senate Ex. 25, Memorandum from D. Schneider, President

Home Loans, to A. Hedger, OTS Examiner and B. Franklin, OTS EIC at 1 (June 19, 2008).

504.    A WaMu Significant Incident Notification, Date Incident Reported – 04/01/2008,

Loss Type - Mortgage Loan, stated:

> One Sales Associate admitted that during that crunch time some of the Associates would 'manufacture' assets statements from previous loan docs and submit them to the [Loan Fulfillment Center ('LFC')]. She said the pressure was tremendous from the LFC to get them the docs since the loan had already funded and pressure from the Loan Consultants to get the loans funded.

PSI High Risk Home Loans Hearing, Senate Ex. 30, "Significant Incident Notification

(SIN)" at 1 (Apr. 1, 2008).

505.    A New York Times article described WaMu's underwriting practices as follows: "On

a financial landscape littered with wreckage, WaMu, a Seattle-based bank that opened branches at a

clip worthy of a fast-food chain, stands out as a singularly brazen case of lax lending." Peter S.

Goodman & Gretchen Morgenson, *Saying Yes, WaMu Built Empire on Shaky Loans*, N.Y. TIMES, Dec.

27, 2008 at A1.

506.    Sherri Zaback, a former underwriter at a WaMu branch in San Diego, California,

stated that "[m]ost of the loans she . . . handled merely required borrowers to provide an address

and Social Security number, and to state their income and assets." *Id.* On one occasion, Zaback

asked a loan officer for verification of a potential borrower's assets. The officer sent her a letter

from a bank showing a balance of about $150,000 in the borrower's account. Zaback called the bank

to confirm and was told the balance was only $5,000. The loan officer yelled at her, Ms. Zaback

recalled. "She said, 'We don't call the bank to verify.'" *Id.*

507.    Zaback also recalled that the sheer volume of loans precluded WaMu employees

from adhering to underwriting standards. According to Zaback, she would typically spend a

maximum of 35 minutes per file: "'Just spit it out and get it done. That's what they wanted us to do.

Garbage in, and garbage out.'" *Id.* Another WaMu agent in Irvine, California told the New York

Times that she "coached brokers to leave parts of applications blank to avoid prompting verification if the borrower's job or income was sketchy." *Id.*

508.     WaMu's underwriting also critically failed with respect to appraisals as well. An accurate appraisal of a property's market value is crucial to the underwriting process as the property provides collateral for the loan in case of default.

> WaMu's review of appraisals establishing the value of single family homes did not always follow standard residential appraisal methods because WaMu allowed a homeowner's estimate of the value of the home to be included on the form sent from WaMu to third-party appraisers, thereby biasing the appraiser's evaluation.

WaMu OIG Report at 11.

509.     The New York Times reported, "WaMu pressured appraisers to provide inflated property values that made loans appear less risky, enabling Wall Street to bundle them more easily for sale to investors." Goodman & Morgenson, *Saying Yes, WaMu Built Empire on Shaky Loans* at A1. The article quoted the founder of one appraisal company that did business with WaMu until 2007 as saying, "'It was the Wild West,'. . . . 'If you were alive, they would give you a loan. Actually, I think if you were dead, they would still give you a loan.'" *Id.* (quoting Steven Knoble, founder Mitchell, Maxwell & Jackson).

510.     Nor did WaMu adequately monitor third-party brokers (non-employees) who originated most of WaMu's loans. As Eric Thorson explained before the PSI:

> In addition to originating retail loans with its own employees, WaMu began originating and purchasing wholesale loans through a network of brokers and correspondents. From 2003 to 2007, wholesale loan channels represented 48 to 70 percent of WaMu's total single family residential loan production. WaMu saw the financial incentive to use wholesale loan channels for production as significant. According to an April 2006 internal presentation to the WaMu Board, it cost WaMu about 66 percent less to close a wholesale loan ($1,809 per loan) than it did to close a retail loan ($5,273). So while WaMu profitability increased through the use of third-party originators, it had far less oversight and control over the quality of the originations.

Thorson Statement at 5. According to the WaMu OIG Report, WaMu had only 14 employees

monitoring the actions of 34,000 third-party brokers. *See* WaMu OIG Report at 11. This lack of oversight led to WaMu "identif[ying] fraud losses attributable to third-party brokers of $51 million for subprime loans and $27 million for prime loans" in 2007. *Id.*

511.    Federal regulators also noted that "WaMu acquired 11 institutions and merged with 2 affiliates" from 1991 to 2006, yet failed to "fully integrate . . . information technology systems, risk controls, and policies and procedures" from its acquisitions and institute "a single enterprise-wide risk management system." Thorson Statement at 5. An integrated risk management system was critically important in light of WaMu's high-risk lending strategy. *See id.*

512.    Based on interviews with two dozen former employees, mortgage brokers, real estate agents and appraisers, Goodman and Morgenson of the New York Times noted the "relentless pressure to churn out loans" "while disregarding borrowers' incomes and assets" that came from WaMu's top executives. Goodman & Morgenson, *Saying Yes, WaMu Built Empire on Shaky Loans* at A1. According to Dana Zweibel, a former financial representative at a WaMu branch in Tampa, Florida, even if she doubted whether a borrower could repay the loan, she was told by WaMu management that it was not her concern: her concern was "'just to write the loan.'" *Id.* Said Zweibel, "'[i]t was a disgrace'. . . . 'We were giving loans to people that never should have had loans.'" *Id.*

513.    In November 2008, the New York Times, quoting Keysha Cooper, a Senior Mortgage Underwriter at WaMu from 2003 to 2007, recounted "'[a]t WaMu it wasn't about the quality of the loans; it was about the numbers'. . . . 'They didn't care if we were giving loans to people that didn't qualify. Instead, it was how many loans did you guys close and fund?'" Gretchen Morgenson, *Was There a Loan It Didn't Like?*, N.Y. TIMES, Nov. 1, 2008. According to the article, "[i]n February 2007 . . . the pressure became intense. WaMu executives told employees they were not making enough loans and had to get their numbers up. . . ." Cooper concluded, "'I swear 60 percent of the loans I approved I was made to.' . . . 'If I could get everyone's name, I would write

121

them apology letters.'" *Id.*

514.    WaMu inflated salaries of baby sitters and mariachi singers to the six-figure range. Indeed, the only verification of the mariachi singer's income was a photograph of the mariachi singer in his outfit included in the loan application file. The New York Times reported:

> As a supervisor at a Washington Mutual mortgage processing center, John D. Parsons was accustomed to seeing baby sitters claiming salaries worthy of college presidents, and schoolteachers with incomes rivaling stockbrokers'. He rarely questioned them. A real estate frenzy was under way and WaMu, as his bank was known, was all about saying yes.
>
> Yet even by WaMu's relaxed standards, one mortgage four years ago raised eyebrows. The borrower was claiming a six-figure income and an unusual profession: mariachi singer.
>
> Mr. Parsons could not verify the singer's income, so he had him photographed in front of his home dressed in his mariachi outfit. The photo went into a WaMu file. Approved.
>
> "I'd lie if I said every piece of documentation was properly signed and dated," said Mr. Parsons.
> . . .
> At WaMu, getting the job done meant lending money to nearly anyone who asked for it — the force behind the bank's meteoric rise and its precipitous collapse this year in the biggest bank failure in American history.
> . . .
> Interviews with two dozen former employees, mortgage brokers, real estate agents and appraisers reveal the relentless pressure to churn out loans that produced such results.

Goodman & Morgenson, Saying Yes, WaMu Built Empire on Shaky Loans at A1.

515.    Long Beach, a WaMu affiliate, specialized in the riskiest of loans—subprime mortgages. Internal WaMu documents reveal a well-documented pattern of underwriting deficiencies at Long Beach. A memorandum to the Washington Mutual, Inc. and WaMu Board of Directors' Audit Committees, dated April 17, 2006, re: *Long Beach Mortgage Company -Repurchase Reserve Root Cause Analysis* states: "[Long Beach] experienced a dramatic increase in EPDs[] during the third quarter of 2005. . . . [R]elaxed credit guidelines, breakdowns in manual underwriting processes, and

inexperienced subprime personnel . . . coupled with a push to increase loan volume and the lack of an automated fraud monitoring tool, exacerbated the deterioration in loan quality." Senate Exhibit 10 at 1-2.

516.    A WaMu Audit Report titled *Long Beach Mortgage Loan Origination & Underwriting*, dated August 20, 2007, states: "[T]he overall system of risk management and internal controls has deficiencies related to multiple, critical origination and underwriting processes. . . . These deficiencies require immediate effective corrective action to limit continued exposure to losses." Senate Exhibit 19 at 2. In its "Executive Summary" section, this Audit Report states:

> In response to challenges resulting from the softening housing market, rising interest rates, tightening capital markets, poor portfolio performance and underwriting deficiencies, [Long Beach] continually refines their processes and guidelines. While management has been responsive to these challenges by identifying and implementing corrective actions, actual underwriting practices have not been consistent to achieve the desired levels of improvement. Continued patterns of loans being underwritten outside of established underwriting and documentation guidelines have been previously identified.

*Id.* at 2. It also identifies the following as the number one high rated "repeat issue" to correct: "Underwriting guidelines established to mitigate the risk of unsound underwriting decisions are not always followed and the decisioning methodology is not always fully documented." *Id.* at 8. The number two "repeat issue" was identified as "[p]olicies and procedures defined to allow and monitor reasonable and appropriate exceptions to underwriting guidelines are not consistently followed." *Id.* at 10. An e-mail from a WaMu executive describes the Long Beach audit report as "the ultimate in bayonetting the wounded, if not the dead." Senate Exhibit 20 at 1.

517.    In a WaMu internal report titled "[Long Beach] Post Mortem – Early Findings Read Out," dated November 1, 2005, the authors note the following "common theme" surfacing: "Underwriting guidelines are not consistently followed and conditions are not consistently or effectively met." Senate Exhibit 9 at 1. The report goes on to note that 60% of First Payment

Default cases could have been prevented "had current policy, procedures and guidelines been better executed." *Id.* at 2.

518.    In Gretchen Morgenson's July 9, 2010, article titled *Mortgage Investors Turn to State Courts for Relief*, Morgenson of The New York Times reported on a lawsuit filed by Cambridge Place Investment Management, an investment management firm that lost over a billion dollars in RMBS it bought for clients, against 15 banks, for abetting fraud. The complaint alleges that management at Long Beach directed underwriters to "'approve, approve, approve'" and highlights the "anything-goes" lending practices at Long Beach:

> One Long Beach program made loans to self-employed borrowers based on three letters of reference from past employers. A former worker said some letters amounted to "So-and-so cuts my lawn and does a good job," adding that the company made no attempt to verify the information, the complaint stated.

519.    The OTS also reported concerns with subprime underwriting practices by Long Beach from 2006 to 2007. *See* Thorson Statement at 9-10.

520.    As a result of its systematic disregard of underwriting standards, Long Beach also appeared in the 2008 "Worst Ten in the Worst Ten" Report. In fact, Long Beach was in the top five in every city other than Las Vegas, Nevada (1st in Stockton, California, Sacramento, California, Denver, Colorado, and Memphis, Tennessee; 2nd in Bakersfield, California and Detroit, Michigan; 3rd in Cleveland, Ohio and Miami, Florida; and 4th in Riverside, California). *See* 2008 "Worst Ten in the Worst Ten" Report. Long Beach again ranked near the top in nearly every city in the 2009 "Worst Ten in the Worst Ten" Report (1st in Stockton-Lodi, California, Merced, California, and Vallejo-Fairfield-Napa, California; 5th in Fort Pierce-Port St. Lucie, Florida; and 6th in Riverside-San Bernardino, California). *See* 2009 "Worst Ten in the Worst Ten" Report.

### C.     The Chase Originators' systematic disregard of underwriting standards.

521.    Chase Home Finance, Chase Home Mortgage, and J.P. Morgan Chase Bank, N.A. (the "Chase Originators") compose the mortgage-lending arm of JP Morgan Chase. The Chase Originators originated a material percentage of the loans in the loan pools backing the CHASE 2005-3, JPALT 2005-S1, and JPALT 2006-S1 securitizations.

522.    Chase Home Finance, in its capacity as a mortgage originator, systemically disregarded its stated underwriting guidelines, resulting in mortgage pools composed of risky loans underlying RMBS sold to investors who were unaware of the dubious nature of the Chase Originators' lack of adherence to their underwriting standards. One glaring example of Chase's disregard can be found in a memo sent to mortgage lenders which outlined ways to "trick" Chase's automated underwriting program into approving loans that would otherwise fall outside of Chase's underwriting standards. This memo is discussed in detail in a March 8, 2008 article in the Oregonian:

> A newly surfaced memo from banking giant JPMorgan Chase provides a rare glimpse into the mentality that fueled the mortgage crisis.
>
> The memo's title says it all: "Zippy Cheats & Tricks."
> It is a primer on how to get risky mortgage loans approved by Zippy, Chase's in-house automated loan underwriting system. The secret to approval? Inflate the borrowers' income or otherwise falsify their loan application.
>
> The document, a copy of which was obtained by The Oregonian, bears a Chase corporate logo. But it's unclear how widely it was circulated or used within Chase.
> …
> Even if the memo was penned by a single employee, it illustrates an attitude prevalent in certain corners of the mortgage industry during the boom years. In the face of sustained and significant home price increases, much of the industry veered away from traditional notions of safe and sound lending. Loan volume became as important as loan quality, particularly for the rank and file typically paid on commission.
>
> During the boom, it was common for lenders and brokers to get paid more for risky subprime loans than for 30-year fixed-rate loans because the higher-interest loans fetched a higher price on Wall Street.
>
> Chase, the nation's second-largest bank, originates mortgage loans itself but also

operates a wholesale arm that underwrites and funds loans brought to them by a network of mortgage brokers. The "Cheats & Tricks" memo was instructing those brokers how to get difficult loans approved by Zippy.

"Never fear," the memo states. "Zippy can be adjusted (just ever so slightly.)"

The Chase memo deals specifically with so-called stated-income asset loans, one of the most dangerous of the mortgage industry's innovations of recent years. Known as "liar loans" in some circles because lenders made little effort to verify information in the borrowers' loan application, they have defaulted in large number since the housing bust began in 2007.
…
The document recommends three "handy steps" to loan approval:

Do not break out a borrower's compensation by income, commissions, bonus and tips, as is typically done in a loan application. Instead, lump all compensation as the applicant's base income.

If your borrower is getting some or all of a down payment from someone else, don't disclose anything about it. "Remove any mention of gift funds," the document states, even though most mortgage applications specifically require borrowers to disclose such gifts.

If all else fails, the document states, simply inflate the applicant's income. "Inch it up $500 to see if you can get the findings you want," the document says. "Do the same for assets."

Mark Friesen, *Chase mortgage memo pushes 'Cheats & Tricks'*, OREGONIAN, March 28, 2008, *available                                                                                            at* http://www.oregonlive.com/business/index.ssf/2008/03/chase_mortgage_memo_pushes_che.html

523.    Chase's disregard for its underwriting standards has been the topic of numerous articles and blogs during the relevant time period. This July 16, 2009 article from Personal Finance Analyst reports:

One of the lenders who made more than a handful of those doomed mortgage loans was Chase Home Finance. They managed to put themselves in enough trouble that they're now slated to receive a huge chunk of change from Uncle Sam just to insure that they don't fail.

So, what do you think Chase Home Finance has been doing lately?
Well, they've been spending a great deal of time in courthouses, for one thing. That's because they're filing suits left and right as they're forced to foreclose on a city's worth of defaulted mortgages. If you do a Google News search for "Chase Home

126

Finance, LLC", you'll find yourself staring at a seemingly never-ending list of people Chase is dragging into court because of [their] inability to make payments.

A serious analysis of the data indicates that anecdotal evidence like that does give us a fairly clear picture of what's happening, too. Foreclosure numbers remain very significant–and that includes those with which Chase Home Finance is involved.
…
You might think Chase would be reluctant to go after more and more home lending in the aftermath of the last few years. You'd be wrong. They're strategy seems to be to solidify their place as one of the biggest home lenders out there.

A recent New York Times report explains that one of the reasons Chase's first quarter numbers for '09 look a little better than one might expect is because they've been acquiring more notes:

As independent mortgage companies and brokers closed last fall, and major players like **Bank of America, JPMorgan Chase** and **Wells Fargo** swallowed up troubled rivals, lending profit margins widened, doubling at big banks amid a refinancing wave during the first half of the year, analysts said.

Right now, Chase is picking up more mortgages and they're playing the game on our dime.

So far, it's working. Their numbers are on an upward trajectory. We can only hope that this means they're cherry-picking the right assets from the mortgage companies that bit the dust and that Chase isn't picking up too many weak mortgages like the ones currently involved in all of those foreclosure suits.
Then again, if the folks at Chase Home Finance were capable of making those quality decisions while avoiding the urge to overextend, we might not be having this conversation in the first place.

David Lampsen, *Chase Home Finance and The Hair of The Dog That Bit Them*, PERSONAL FINANCE ANALAYST, July 16, 2009, *available at* http://www.personalfinanceanalyst.com/chase-home-finance-and-the-hair-of-the-dog-that-bit-them/

524.    The New York Times published an article describing Chase's mortgage lending practices during the mortgage lending boom:

Last weekend, after the column was published, an angry mortgage broker — someone who felt she and her ilk were being unfairly scapegoated by the banking industry — sent me a series of rather eye-opening documents. They were a series of fliers and advertisements that had been sent to her office (and mortgage brokers all over the country) from JPMorgan Chase, advertising their latest wares. They were dated 2005, which was before the subprime mortgage boom got completely out of control. They're still pretty sobering.

127

"The Top 10 Reasons to Choose Chase for All Your Subprime Needs," screams the headline on the first one. Another was titled, "Chase No Doc," and described the criteria for a borrower to receive a so-called no-document loan. "Got Bank Statements?" asked a third flier. "Get Approved!" In a number of the fliers, Chase makes it clear to the mortgage brokers that the bank doesn't need income or job verification — it just needs to look at a handful of old bank statements.

"There were mortgage brokers who acted unethically, absolutely," my source told me when I called her on Monday. (She asked to remain anonymous because she still has to work with JPMorgan Chase and the other big banks.) "But where do you think mortgage brokers were getting the subprime mortgages they were selling to customers? From the big banks, that's where. Chase, Wells Fargo, Bank of America — they were all doing it."

So enough already about how the banks weren't the problem. Of course they were. Here's the evidence, right here. Read 'em and weep.

Joe Nocera, *Subprime and the Banks: Guilty as Charged*, N.Y. Times, Oct. 14, 2009, *available at* http://executivesuite.blogs.nytimes.com/2009/10/14/subprime-and-the-banks-guilty-as-charged/

### D.   Homecomings's systematic disregard of underwriting standards.

525.   Homecomings Financial Network, Inc. originated a material percentage of loans backing the RALI 2006-QS14 securitization.

526.   Homecomings was a wholly-owned subsidiary of Residential Funding Company LLC. Homecomings systematically disregarded its underwriting guidelines in favor of riskier, fee-driven mortgage lending practices including subprime, Alt-A and option-ARM loans, and engaged in predatory lending.

527.   The Federal Trade Commission opened an investigation into Homecomings mortgage lending and underwriting practices, closing the investigation in January 2009, after Homecomings ceased mortgage loan origination. *See* Letter from Peggy L. Twohig, Associate Dir., Div. of Fin. Practices, Bur. of Consumer Protection, Federal Trade Commission, to Andrew Sandler, Skadden, Arps (counsel for Homecomings) (Jan. 22, 2009).

528.   In March 2009, the Portland Tribune reported that Homecomings lending practices allowed for the origination of shaky loans that precipitated a wave of foreclosures. The article reported:

> "In order to keep your market share, you had to be more aggressive," said Tim Boyd, who sold subprime loans in the Portland area for six years and then Alt A loans for seven years for Homecomings Financial.
>
> "The main focus was doing Alt A because that's where the money was," said Boyd, who left the industry. A loan officer arranging a $300,000 Option ARM loan could collect $10,500 in fees, he said.
>
> Lenders could unload shaky loans by selling them to investors, who often resold them in what amounted to a worldwide game of financial musical chairs. Wall Street's insatiable appetite for more loans kept the pipeline filled, even if the deals weren't always sound.
>
> "The V.P.s came down to the office beating the drums about Option ARMs," urging mortgage brokers to sell them to customers, [Bill Ridge, owner of Ridge Mortgage Services] said. "I had Wachovia march through there; I had GMAC."
> . . . .
> He said he knows of loan officers who'd tell title agents to keep quiet about Option ARM loan provisions during document-signing time.
>
> "They'd tell the title officer, 'Don't go over this; just glean through it quickly and get the thing signed.'"
>
> Tim Boyd said he drew the line at selling Option ARMs because he saw how that could get people into trouble. "It made me sick," he said.

Steve Law, *Shaky Loans May Spur New Foreclosure Wave; Unraveling 'Alt A' Mortgages Could Keep Portland Housing Market Dismal*, PORTLAND TRIB., Mar. 5, 2009. *available at* http://www.portlandtribune.com/news/story.php?story_id=123620453702532400.

### E.   GMAC's systematic disregard of underwriting standards.

529.   GMAC Bank n/k/a Ally Bank and GMAC Mortgage originated a material portion of the loans backing RALI 2006-QS14.

530.   GMAC's abandonment of its underwriting guidelines is at issue in suits filed by MBIA, Inc. MBIA was a monoline insurer for RMBS.  *See* Compl., *MBIA Ins. Corp. v. Ally Fin., Inc.*, No. 12-18889 (MN Ct., Hennepin Cnty. filed Sept. 17, 2012) ("*MBIA v. Ally* Compl."); Compl.,

*MBIA Ins. Corp. v. GMAC Mortg., LLC*, No. 600837/2010 (N.Y. Sup. Ct. filed Apr. 1, 2010) ("*MBIA v. GMAC* Compl.").

531.    MBIA's suits concern loans underlying certain offerings for which GMAC Bank and GMAC Mortgage were the principal originators. *MBIA v. Ally* Compl. ¶¶ 7, 45; *MBIA v. GMAC* Compl. ¶¶ 2, 44.

532.    After sustaining large losses, MBIA conducted forensic analyses of loans underlying these offerings. MBIA found material breaches of representations and warranties in more than 89% of the loans from GMAC Mortgage. These breaches included:

> GMAC Mortgage egregiously and routinely breached its representation and warranty that the mortgage loans were underwritten generally in compliance with GMAC Mortgage's underwriting standards.
>
> A significant number of mortgage loans were made on the basis of "stated incomes" that were grossly unreasonable or were approved despite DTI or CLTV ratios in excess of the cut-offs stated in GMAC Mortgage's Underwriting Guidelines or the Purchase Agreements or Prospectus Supplements.
> Moreover, contrary to its Underwriting Guidelines, GMAC Mortgage failed in many cases to verify the borrower's employment when required to do so or to verify prior rental or mortgage payment history, approved mortgage loans with ineligible collateral, approved mortgage loans to borrowers with ineligible credit scores, and approved loans without verifying that the borrower had sufficient funds or reserves.
>
> GMAC Mortgage used its proprietary automated electronic loan underwriting program, known as "Assetwise," to approve loans that did not comply with its Underwriting Guidelines. Assetwise assisted in the underwriting of mortgage loans by automating the process of determining whether a loan met prespecified underwriting criteria set up in the program. GMAC Mortgage used the program itself and also made the program available to its affiliates. Assetwise, however, failed to analyze proposed mortgage loans using the criteria set forth in GMAC Mortgage's Underwriting Guidelines. As a result, GMAC Mortgage routinely contributed loans to the Transactions that failed to comply with its own underwriting standards.

*MBIA v. GMAC* Compl. ¶ 76; *see MBIA v. Ally* Compl. ¶¶ 76-83; *MBIA v. GMAC* Compl. ¶¶ 70- 79.

533.    Representative examples of the breaches encountered by the MBIA include:

On January 25, 2006, a loan in the amount of $210,000 was made to a borrower in Vacaville, California on a property with an original appraisal value of $460,000 and

a senior loan balance of $368,150. The borrower was employed as a correctional officer by the State of California. The loan was approved based on a DTI that was calculated using the borrower's highest reported monthly income, rather than his average income over a 33-month period, as is required by the Underwriting Guidelines. As a result, the true DTI on the loan was 65.56%, which exceeded the maximum ratio of 50% permitted under the applicable loan program. The CLTV ratio of 125.68% also exceeded the maximum CLTV ratio of 100% permitted under the Guidelines. The loan has been charged-off (Loan # 8601487693 — 2004 Transaction.)

On April 20, 2007, a loan in the amount of $40,000 was made to co-borrowers in Vernon, New Jersey on a property with an original appraisal value of $305,000 and a senior loan balance of $244,000. The loan file is incomplete and lacks, among other documents, verbal verification of either borrower's employment, evidence of sufficient closing funds and reserves, an appraisal, a copy of the note from the senior lien, and the borrowers' credit reports. Further, the loan was approved even though the income stated by each borrower was unreasonable. One claimed to earn $4,583 per month as a counter manager at a discount tire store though, for example, salary.com, a website which maintains a national salary database based on job title and zip code, reports that the income at the 90th percentile for such a position is only $2,801 per month. The second borrower claimed to earn $59,592 annually as a sales associate at a home improvement store, but an income verification database showed that the borrower earned only $28,092 in 2006 and $32,977 in 2007. The loan has been charged-off (Loan # 1000117685 — 2006 Transaction.)

On December 15, 2006, a loan in the amount of $22,000 was made to a borrower in Medford, Oregon on a property with an original appraisal value of $220,000 and a senior loan balance of $176,000. The loan file is missing many documents that bear upon the borrower's ability to repay and are required to be included in the file, including: verification of down payment funds, a CPA letter, an appraisal, a twelve-month housing history, a copy of the first mortgage, a preliminary title commitment, a credit report, and the final loan application. Moreover, although the borrower, an operator at a drywall company, had declared bankruptcy prior to applying for the loan, the loan file lacks documentation that the bankruptcy had been discharged for at least three years, as required by the Guidelines. The loan has been charged off. (Loan # 8254682837 – 2007 Transaction.)

On January 23, 2007, a loan with a principal balance of $100,000 was made to a borrower in Yuma, Arizona on a property with an original appraisal value of $298,000 and a senior loan balance of $129,035. The borrowers claimed on their loan application that their combined income was $113,520 per year. However, on May 12, 2009, the borrowers jointly filed for bankruptcy under Chapter 7, and their court filings indicated that they earned only $13,085 in 2007 and $17,650 in 2008. Moreover, no record of the borrower's claimed employer can be located on websites commonly used to verify the existence of a business: manta.com or yellowpages.com. The loan has been charged-off. (Loan # 8254730412 – 2007

Transaction.)

MBIA v. GMAC Compl. ¶ 78.

534.     Both suits are still pending.  The Court in *MBIA v. GMAC* denied a motion to dismiss; there have been no rulings in *MBIA v. Ally.  See MBIA v. GMAC*, 914 N.Y.S.2d 604 (N.Y. Sup. Ct. 2010); *MBIA v. RFC*, Order, No. 603552/08 (N.Y. Sup. Ct. Dec. 22, 2009).

535.     GMAC's disregard of its underwriting guidelines has led to the repurchase of loans it had sold to Fannie Mae.  As of September 10, 2010, Fannie Mae had required GMAC to repurchase 2,887 loans because of violations of representations and warranties regarding those loans.  They had a total unpaid principal balance of $544 million. *See* Letter to Gary Cohen, FCIC (Sept. 21, 2010), Attach. "Total Aggregate Recovery, Data as of 8/31/2010," at 1, *available at* http://fcic-static.law.stanford.edu/cdn_media/fcic-docs/2010-09-21%20Fannie%20Mae%20Counsel%20letter%20to%20the%20FCIC.pdf.

**F.     GreenPoint's systematic disregard of underwriting standards.**

536.     GreenPoint originated a material percentage of loans backing JPALT 2005-S1.

537.     GreenPoint, based in Novato, California, was the wholesale mortgage banking unit of Capital One Financial Corp. ("Capital One"). Capital One acquired GreenPoint when it purchased GreenPoint's holding company, North Fork Bancorp, in December 2006. Capital One shut down GreenPoint's operations less than one year later on August 21, 2007.

538.     According to a press release issued by Capital One on August 20, 2007, GreenPoint had an "originate and sell" (*i.e.*, OTD) business model with a focus on "prime non-conforming and near-prime markets, especially the Alt-A mortgage sector." Capital One eventually liquidated GreenPoint in December 2008, taking an $850 million write-down due to mortgage-related losses associated with GreenPoint's origination business.

539.     When originating stated income loans, GreenPoint often inflated the borrowers'
income by as much as 5%. A September 12, 2008, article on Bloomberg reports on GreenPoint's
underwriting practices:

> Many Alt-A loans go to borrowers with credit scores higher than subprime and
> lower than prime, and carried lower interest rates than subprime mortgages.
>
> So-called no-doc or stated-income loans, for which borrowers didn't have to furnish
> pay stubs or tax returns to document their earnings, were offered by lenders such as
> GreenPoint Mortgage and Citigroup Inc. to small business owners who might have
> found it difficult to verify their salaries.
> . . .
> "To grow, the market had to embrace more borrowers, and the obvious way to do
> that was to move down the credit scale," said Guy Cecala, publisher of Inside
> Mortgage Finance. "Once the door was opened, it was abused."
> . . .
> Almost all stated-income loans exaggerated the borrower's actual income by 5
> percent or more, and more than half increased the amount by more than 50 percent,
> according to a study cited by Mortgage Asset Research Institute in its 2006 report to
> the Washington-based Mortgage Bankers Association.

Dan Levy & Bob Ivry, *Alt-A Mortgages Next Risk for Housing Market as Defaults Surge*,
BLOOMBERG,          Sept.          12,          2008,          *available          at*
http://www.bloomberg.com/apps/news?pid=newsarchive&sid=arb3xM3SHBVk.

540.     GreenPoint is the defendant in private litigation regarding its origination practices.
The allegations concern GreenPoint's adherence to its underwriting guidelines in the mortgage loan
origination process, and the plaintiff seeks to have GreenPoint repurchase 30,000 loans it issued that
allegedly were not in compliance with GreenPoint's own underwriting guidelines. *See U.S. Bank Nat'l
Ass'n v. GreenPoint Mortgage Funding, Inc.*, No. 09-600352 (N.Y. Sup. Ct. filed Apr. 22, 2009). On
March 3, 2010, the court denied GreenPoint's motion to dismiss this claim, holding that discovery
would be required to determine whether GreenPoint would be required under the parties' contract
to repurchase all 30,000 loans based on the deficiencies in individual loans identified by U.S. Bank.

541.     GreenPoint's pervasive disregard of underwriting standards resulted in its inclusion
among the worst ten originators in the 2008 "Worst Ten in the Worst Ten" Report. GreenPoint was

identified 7th worst in Stockton, California, and 9th worst in both Sacramento, California, and Las Vegas, Nevada. *See* 2008 "Worst Ten in the Worst Ten" Report. In the 2009 "Worst Ten in the Worst Ten" Report, GreenPoint was listed as 3rd worst in Modesto, California; 4th worst in Stockton, Merced, and Vallejo-Fairfield-Napa, California; 6th worst in Las Vegas, Nevada; and 9th in Reno, Nevada. *See* 2009 "Worst Ten in the Worst Ten" Report.

### G.    American Home's systematic disregard of underwriting standards.

542.    American Home Mortgage originated a material percentage of the loans backing WMALT 2006-7.

543.    Edmund Andrews, an economics reporter for the New York Times, recounted his own personal experience using American Home as a lender. According to Andrews, he was looking to purchase a home in 2004, and his real estate agent referred him to a loan officer at American Home. The American Home loan officer began the ordeal by asking Andrews how large of a loan he needed. Andrews, who had a monthly take home pay of $2,777, advised the loan officer that he had hefty child support and alimony payments to an ex-wife. Andrews would be relying on his then-unemployed fiancée to earn enough money to meet his monthly obligations—including the mortgage. Andrews reported:

> As I quickly found out, American Home Mortgage had become one of the fastest-growing mortgage lenders in the country. One of its specialties was serving people just like me: borrowers with good credit scores who wanted to stretch their finances far beyond what our incomes could justify. In industry jargon, we were "Alt-A" customers, and we usually paid slightly higher rates for the privilege of concealing our financial weaknesses.
>
> I thought I knew a lot about go-go mortgages. I had already written several articles about the explosive growth of liar's loans, no-money-down loans, interest-only loans and other even more exotic mortgages. I had interviewed people with very modest incomes who had taken out big loans. Yet for all that, I was stunned at how much money people were willing to throw at me.
>
> [The American Home loan officer] called back the next morning. "Your credit scores are almost perfect," he said happily. "Based on your income, you can qualify for a

mortgage of about $500,000."

What about my alimony and child-support obligations? No need to mention them. What would happen when they saw the automatic withholdings in my paycheck? No need to show them. If I wanted to buy a house, [The American Home loan officer] figured, it was my job to decide whether I could afford it. His job was to make it happen.

"I am here to enable dreams," he explained to me long afterward. [The American Home loan officer]'s view was that if I'd been unemployed for seven years and didn't have a dime to my name but I wanted a house, he wouldn't question my prudence. "Who am I to tell you that you shouldn't do what you want to do? I am here to sell money and to help you do what you want to do. At the end of the day, it's your signature on the mortgage — not mine."

Edmund L. Andrews, *My Personal Credit Crisis*, N.Y. TIMES, May 17, 2009, at MM46.

544.    The American Home loan officer steered Andrews to a stated-income loan so that he would not have to produce paychecks or tax returns that would reveal his alimony and child support obligations. The loan officer wanted to limit disclosure of Andrews's alimony and child support payments when an existing mortgage showed up under Andrews's name. Although his ex-wife was solely responsible for that mortgage under the terms of the couple's separation agreement, the only way Andrews could explain that fact would be to produce the agreement, which would also reveal his alimony and child support obligations. According to Andrews:

[The American Home loan officer] didn't get flustered. If Plan A didn't work, he would simply move down another step on the ladder of credibility. Instead of "stating" my income without documenting it, I would take out a "no ratio" mortgage and not state my income at all. For the price of a slightly higher interest rate, American Home would verify my assets, but that was it. Because I wasn't stating my income, I couldn't have a debt-to-income ratio, and therefore, I couldn't have too much debt. I could have had four other mortgages, and it wouldn't have mattered. American Home was practically begging me to take the money.

*Id.*

545.    American Home ultimately approved Andrews's application. Not surprisingly, Andrews was unable to afford his monthly mortgage payments.

135

546.     American Home's lack of adherence to underwriting guidelines was set forth in detail in a 165-page amended class action complaint filed June 4, 2008, in *In re American Home Mortgage Sec. Litig.*, No. 07-md-1898 (TCP) (E.D.N.Y.). Investors in American Home common/preferred stock alleged that the company misrepresented itself as a conservative lender, when, based on statements from more than 33 confidential witnesses and internal company documents, American Home in reality was a high risk lender, promoting quantity of loans over quality by targeting borrowers with poor credit, violating company underwriting guidelines, and providing incentives for employees to sell risky loans, regardless of the borrowers' creditworthiness. *See* Am. Class Action Compl., *In re American Home Mortgage Sec. Litig.*, No. 07-md-1898 (E.D.N.Y. filed June 4, 2008) ("American Home ACC").

547.     According to the American Home ACC, former American Home employees recounted underwriters were consistently bullied by sales staff when underwriters challenged questionable loans, while exceptions to American Home's underwriting guidelines were routinely applied. *See id.* at 43.

548.     The American Home ACC cited to witnesses who were former American Home employees. These witnesses reported that American Home management told underwriters to not decline a loan, regardless of whether the loan application included fraud. *See id.*

549.     Another former American Home employee stated that American Home routinely made exceptions to its underwriting guidelines to be able to close loans. When American Home mortgage underwriters raised concerns to the sales department about the pervasive use of exceptions to American Home's mortgage underwriting practices, the sales department contacted American Home headquarters to get approval for the use of exceptions. Indeed, it was commonplace to overrule mortgage underwriters' objections to approving a loan to facilitate loan approval. *See id.* at 44.

550.    A former American Home auditor confirmed this account that American Home mortgage underwriters were regularly overruled when they objected to loan originations. *See id.*

551.    The parties settled the litigation on January 14, 2010, for $37.25 million.

552.    American Home's lax lending practices landed it in the 2008 "Worst Ten in the Worst Ten" Report. American Home came in 8th in Las Vegas, Nevada and 9th in both Detroit, Michigan and Miami, Florida. *See* 2008 "Worst Ten in the Worst Ten" Report. When the OCC issued the 2009 "Worst Ten in the Worst Ten" Report, American Home again featured prominently, appearing in the top ten in six of the ten worst metropolitan areas (4th in both Fort Pierce-Port St. Lucie, Florida and Fort Myers-Cape Coral, Florida; 7th in Vallejo-Fairfield-Napa, California; 8th in Las Vegas, Nevada, 9th in Stockton-Lodi, California; and 10th in Bakersfield, California). *See* 2009 "Worst Ten in the Worst Ten" Report.

## IX.    Defendants' due-diligence process failed to keep improperly underwritten and materially defective loans out of the loan pools.

553.    Usually, rather than performing loan-level re-underwriting themselves, Defendants hired third-party due-diligence companies specializing in loan re-underwriting, such as Clayton Holdings, LLC ("Clayton"), to fulfill Defendants' due-diligence obligations.

554.    Clayton personnel would typically re-underwrite a sample of loan files from a particular loan originator and assign each loan a credit grade, which Clayton called "Events."

555.    An "Event 1" or "EV1" credit grade meant that the loan met the applicable loan originator's underwriting guidelines.

556.    An "Event 2" or "EV2" credit grade meant that the loan was issued in violation of the applicable loan originator's underwriting guidelines but was nonetheless approved by the securities underwriter to be included in the loan pools backing RMBS ostensibly because sufficient compensating factors were supposedly documented in the loan file.

137

557.    An "Event 3" or "EV3" credit grade meant that the loan was issued in violation of the applicable loan originator's underwriting guidelines with no sufficient compensating factors to offset the overall risk. EV3 loans should have been rejected from the loan pools and sent back to the relevant originator because such underwriting-guideline violations were in breach of the originator's representations and warranties.

558.    After conducting its re-underwriting review, Clayton would typically issue reports for each re-underwriting project showing the original, and later the final, Event credit grade assigned by Clayton to a specific loan. These reports were shared with Defendants, but not with CUNA Mutual.

559.    While Clayton re-underwrote the loan samples and assigned grades to each sampled loan, Clayton was supervised by a due-diligence representative from Defendants who managed Clayton's work, communicated with the loan originators on violations that Clayton found during its loan re-underwriting in an attempt to cure the identified problem (if possible), and made the final decision on whether a loan would be included in the loan pools backing a proposed RMBS.

560.    Recent public disclosures have revealed that Defendants routinely chose to include Event 3 loans identified by Clayton during Clayton's re-underwriting review in the final loan pools backing RMBS sold to investors like CUNA Mutual.

561.    Clayton created, and testified before the FCIC under oath about, a "Trending Report" for First Quarter 2006 to Second Quarter 2007 in which Clayton identified the percentage of loans graded by Clayton as Event 3 that its various Wall Street investment bank clients, including Defendants, waived into the final loan pools backing RMBS sold to investors.

562.    According to Clayton's Trending Report, J.P. Morgan waived in 51% of the Event 3 loans identified by Clayton during the due diligence re-underwriting review conducted between First Quarter 2006 and Second Quarter 2007.

138

563.     According to Clayton's Trending Report, Bear Stearns waived in 29% of the Event 3 loans identified by Clayton during the due diligence re-underwriting review conducted between First Quarter 2006 and Second Quarter 2007. Including its affiliate EMC Mortgage, that waiver rate increased to 42%.

564.     According to Clayton's Trending Report, Washington Mutual waived in 29% of the Event 3 loans identified by Clayton during the due diligence re-underwriting review conducted between First Quarter 2006 and Second Quarter 2007. In Q1 2006 alone, Washington Mutual waived in 83% of the Event 3 loans identified by Clayton. In Q2 2006, Washington Mutual waived in 72% of the Event 3 loans identified by Clayton.

565.     Thus, contrary to Defendants' representations to CUNA Mutual that loans not originated in accordance with originator underwriting guidelines and not compensated for by sufficient factors (*i.e.*, Event 3 loans) were being excluded from the final loan pools, Defendants made the affirmative decision to include Event 3 loans into those final loan pools backing the RMBS it sold to investors, including CUNA Mutual.

566.     The Clayton Trending Report is further evidence that the loans in the final loan pools backing the RMBS sold to CUNA Mutual were materially defective, and that Defendants' representation to CUNA Mutual and the rest of the investor community regarding its due diligence efforts was false.

## X.     Defendants likewise misrepresented credit ratings.

567.     Investors routinely rely on credit ratings to assist them in distinguishing between safe and risky investments. Indeed, a variety of U.S. statutes and regulations explicitly reference and are tied to credit ratings—evincing the apparent credibility of the credit ratings process. Many institutional investors are prohibited by rule, regulation, or internal policy from buying assets that are rated below investment grade.

568.     Each tranche of the ten RMBS at issue received a credit rating reflecting the rating agencies' assessment of its risk profile. Defendants' Offering Documents disclosed the ratings of each tranche in the deals, and hence each certificate in each deal, based on ratings analyses performed by one or more rating agencies.

569.     These credit ratings were material to CUNA Mutual because they provided additional information and assurances about the risks associated with the certificates CUNA Mutual was considering purchasing. Also, CUNA Mutual's investment policy dictated that the overwhelming majority of its RMBS purchases be rated investment grade. As a consequence, CUNA Mutual relied on the credit ratings that Defendants used to market the RMBS as an indication of the actual risk associated with the securities, and purchased overwhelmingly investment grade certificates in order to comply with its own investment policy.

570.     Defendants' representations to CUNA Mutual about credit ratings were false and misleading because the ratings were based on Defendants' misrepresentations to the rating agencies about the credit quality of the loan collateral and compliance with the guidelines supposedly used to originate the loans. Hence, the credit ratings for the eleven certificates at issue were artificially inflated.

571.     In April 2011, the U.S. Senate Permanent Subcommittee on Investigations ("SPSI") issued its final report on the role of the investment banks and other securitizing parties in the financial crisis. The SPSI report is the culmination of more than two years of Congressional investigation into the financial crisis, and is based on eleven Senate hearings held in April 2010, over 150 interviews and depositions, and the SPSI's review of tens of millions of pages of documents, many of which were recently disclosed in connection with the SPSI report. The SPSI report includes express Congressional findings of fact on the "inflated credit ratings" that investment banks like Defendants procured and used to sell their RMBS products.

572.     In particular, the SPSI found that investment banks used "financially engineered" credit ratings to sell their faulty products as highly rated securities:

> Wall Street firms used financial engineering to combine AAA ratings - normally reserved for ultra-safe investments with low rates of return - with high risk assets, such as the AAA tranche from a subprime RMBS paying a relatively high rate of return. Higher rates of return, combined with AAA ratings, made subprime RMBS and related CDOs especially attractive investments.

(SPSI Report, at 30.)

573.     Defendants received inflated ratings on their RMBS products by providing false data to the rating agencies that overestimated the credit quality of the underlying mortgage loans, which skewed ratings in Defendants' favor. Each credit rating agency uses a model to assign ratings to the different tranches of the RMBS deals. The inputs to the credit rating agencies' models include, among other things, the debt-to-income ratios, LTV ratios, CLTV ratios, owner-occupancy status, and home values corresponding to the mortgage loans underlying the particular deal being rated.

574.     Just as CUNA Mutual relied on Defendants to provide accurate information concerning the credit quality of the mortgage pools, the rating agencies relied on Defendants to provide them with accurate information on which to base their ratings. The SPSI report describes the flow of information from investment banks like Defendants to the rating agencies:

> For RMBS, the "arranger" - typically an investment bank - initiated the rating process by sending to the credit rating agency information about a prospective RMBS and data about the mortgage loans included in the prospective pool. The data typically identified the characteristics of each mortgage in the pool including: the principal amount, geographic location of the property, FICO score, loan to value ratio of the property, and type of loan. … In addition to data on the assets, the arranger provided a proposed capital structure for the financial instrument, identifying, for example, how many tranches would be created, how the revenues being paid into the RMBS or CDO would be divided up among those tranches, and how many of the tranches were designed to receive investment grade ratings. The arranger also identified one or more "credit enhancements" for the pool to create a financial cushion that would protect the designated investment grade tranches from expected losses.

(SPSI Report, at 250-251.)

575.     In her testimony to the SPSI, Susan Barnes, the North American Practice Leader for RMBS at S&P from 2005 to 2008, highlighted the importance of accurate information to the credit ratings process:

> The securitization process relies on the quality of the data generated about the loans going into the securitizations. S&P relies on the data produced by others and reported to both S&P and investors about those loans. At the time that it begins its analysis of a securitization, S&P received detailed data concerning the loan characteristics of each of the loans in the pool - up to 70 separate characteristics for each loan in a pool of, potentially, thousands of loans. S&P does not receive the original loan files for the loans in the pool. Those files are reviewed by the arranger or sponsor of the transaction, who is also responsible for reporting accurate information about the loans in the deal documents and offering documents to potential investors.

576.     Defendants gave the rating agencies the same false data regarding LTV ratios, CLTV ratios, owner-occupancy status, home values, and debt-to-income ratios that it provided to investors in the Offering Documents. The rating agencies then input this false data into their quantitative models to assess the credit risk associated with the RMBS, project likely future defaults, and ultimately determine the ratings on Defendants' RMBS products. By providing data that overestimated the credit quality and value of the underlying mortgages, Defendants inflated credit ratings on its RMBS products. The representations of underwriting-guideline compliance provided to the rating agencies further contributed to inflated ratings, as the rating agencies were not aware that the Originators had abandoned compliance with the guidelines.

577.     Moreover, the credit ratings assigned to senior tranches of the RMBS relied on the level of "credit enhancement" offered through the structure of the RMBS deals themselves. The level of credit enhancement offered is based on the make-up of the loans in the underlying collateral pool. Riskier pools necessarily need higher levels of credit enhancement to ensure payment to senior certificate-holders. By inflating the credit characteristics of the loan pool, Defendants created the false impression that the investment grade tranches of the RMBS deals had meaningful credit

enhancement. In reality, the "cushion" on which the rating agencies relied to issue high ratings for these tranches was illusory, because the collateral mortgages had credit characteristics that offered little or no cushion to support the cash flow to the investment grade tranches.

578.    Defendants thus received and promoted inflated ratings that overstated the actual credit quality of the certificates that CUNA Mutual purchased.

## XI.   CUNA Mutual's RMBS have suffered significant credit rating downgrades.

579.    All of CUNA Mutual's rated certificates initially received investment grade ratings, which have historically represented an expected loss rate of less than 1%.

580.    Predominantly because of high delinquency, foreclosure, and default rates, the ratings given to CUNA Mutual's eleven RMBS certificates have been significantly downgraded. The certificates are currently rated as non-investment grade or as "junk bonds." Table 11 below shows the credit rating history for the eleven certificates.

**Table 11**
**Credit Rating History for CUNA Mutual's RMBS**

| CUSIP | SECURITIZATION | Original Rating S&P | Current Rating S&P | Original Rating MOODY'S | Current Rating MOODY'S | Original Rating FITCH | Current Rating FITCH |
|---|---|---|---|---|---|---|---|
| 46627MFE 2 | JPALT 2006-S1 | **BBB+** | **D** | **Baa2** | **Withdrawn** | **BBB+** | **D** |
| 46627MFF 9 | JPALT 2006-S1 | **BBB-** | **D** | **Baa3** | **Withdrawn** | **BBB** | **D** |

| CUSIP | SECURITIZATION | Original Rating S&P | Current Rating S&P | Original Rating MOODY'S | Current Rating MOODY'S | Original Rating FITCH | Current Rating FITCH |
|-------|----------------|---------------------|--------------------|-------------------------|------------------------|-----------------------|----------------------|
| 86800RAM3 | STALT 2006-1F | NR | NR | **A2** | **C** | **A** | **D** |
| 073879Z84 | BSABS 2005-AC8 | **AAA** | **D** | **Aaa** | **Ca** | NR | NR |
| 92922F6K9 | WAMU 2005-AR15 | **A-** | **D** | **A3** | **Withdrawn** | NR | NR |
| 12668AZE8 | CWALT 2005-57CB | NR | NR | NR | NR | **AA** | **D** |
| 16162WNP0 | CHASE 2005-S3 | NR | NR | **Aaa** | **B3** | **AAA** | **CC** |
| 46627MBJ5 | JPALT 2005-S1 | **A** | **D** | NR | NR | NR | NR |
| 74922GBM5 | RALI 2006-QS14 | NR | NR | NR | NR | **A** | **D** |
| 785778JB8 | SACO 2005-WM1 | NR | NR | **Baa2** | **Withdrawn** | **BBB** | **D** |
| 93935HAH0 | WMALT 2006-7 | **AAA** | **D** | **Aaa** | **Ca** | NR | NR |
| 12667G7M9 | CWALT 2005-46CB | NR | NR | NR | NR | **AA** | **D** |

581.     The poor performance of the loan pools and the deteriorating credit ratings have caused a dramatic decline or a complete collapse in the market values of the certificates. If the loans in the pools collateralizing CUNA Mutual's certificates were properly underwritten and had the represented characteristics, the pools would not have experienced such extensive payment problems and would have substantially lower percentages of defaults, foreclosures, and delinquencies. The rise of default rates, fall of credit ratings, and overall poor performance of the loans reflects the Originators' abandonment of underwriting standards and Defendants' misrepresentation of the Originators' adherence to those standards.

## XII.    CUNA Mutual reliance on Defendants' misrepresentations was justifiable.

582.     In purchasing the certificates, CUNA Mutual justifiably relied on Defendants' false representations and omissions of material fact detailed above. The data Defendants provided to CUNA Mutual concerning the credit quality of the loans in the collateral pool—such as the LTV ratios, CLTV ratios, and owner-occupancy rates—were important to CUNA Mutual when evaluating whether to buy certain certificates offering certain yields at certain prices. Similarly, CUNA Mutual relied on Defendants' representations that the Originators approved loans in accordance with their underwriting standards because they provided comfort that robust criteria were in place for loan issuance. CUNA Mutual also relied on the disclosed ratings for each RMBS as a measure of its credit risk, and for purposes of complying with CUNA Mutual's investment guidelines. Finally, CUNA Mutual relied on Defendants' representations that they conducted due diligence and re-underwriting designed to confirm that the loans backing their RMBS were issued in compliance with the relevant originators' underwriting guidelines.

583.     CUNA Mutual did not and could not have uncovered the falsity of Defendants' representations regarding the credit quality and value of the RMBS because the information necessary to make such an assessment was in the possession of Defendants and the Originators. For

example, the undisclosed criteria Originators used to originate and securitize loans, Defendants'
communications with the rating agencies, and the underlying loan files themselves were all uniquely
in the possession of Defendants and the Originators. CUNA Mutual therefore had to rely on
Defendants to make accurate representations regarding the credit quality and value of its
investments. Similarly, the details of the design, implementation, and efficacy of Defendants' due
diligence were opaque to CUNA Mutual and other investors.

584.    But for the misrepresentations and omissions in the Offering Documents, CUNA
Mutual would not have purchased or acquired the certificates, and those representations and
omissions were material to its decision to acquire the certificates.

## XIII.  Liability of J.P. Morgan for WaMu Capital's misrepresentations.

585.    WaMu Capital was a wholly-owned subsidiary of WaMu Bank. As the sole corporate
parent of WaMu Capital, WaMu Bank had the practical ability to direct and control the actions of
WaMu Capital in issuing and selling the certificates, and in fact, exercised such direction and control
over the activities of WaMu Capital in connection with the issuance and sale of the certificates.

586.    In the Financial Industry Regulatory Authority ("FINRA") BrokerCheck Report on
WaMu Capital, WaMu Bank is affirmatively stated as "direct[ing] the management and policies" of
WaMu Capital, and WaMu Capital is listed as being "directly or indirectly, controlled by" WaMu
Bank.

587.    On September 25, 2008, the OTS closed WaMu Bank and named the FDIC as
receiver. Thereafter, the FDIC, as receiver for WaMu Bank, entered into the PAA with JPM Chase
Bank under which JPM Chase Bank agreed to "purchase substantially all of the assets and assume all
deposit and substantially all other liabilities of" WaMu Bank. *See* PAA.

588.    According to the PAA, JPM Chase Bank purchased the following assets:

3.1 Assets Purchased by Assuming Bank. Subject to Sections 3.5, 3.6 and 4.8, the

146

Assuming Bank hereby purchases from the Receiver, and the Receiver hereby sells, assigns, transfers, conveys, and delivers to the Assuming Bank, all right, title, and interest of the Receiver in and to all of the assets (real, personal and mixed, wherever located and however acquired) *including all subsidiaries, joint ventures, partnerships, and any and all other business combinations or arrangements, whether active, inactive, dissolved or terminated, of the Failed Bank* whether or not reflected on the books of the Failed Bank as of Bank Closing. Assets are purchased hereunder by the Assuming Bank subject to all liabilities for indebtedness collateralized by Liens affecting such Assets to the extent provided in Section 2.1. The subsidiaries, joint ventures, partnerships, and any and all other business combinations or arrangements, whether active, inactive, dissolved or terminated being purchased by the Assuming Bank includes, but is not limited to, the entities listed on Schedule 3.1a. Notwithstanding Section 4.8, the Assuming Bank specifically purchases all mortgage servicing rights and obligations of the Failed Bank.

PAA § 3.1 (emphasis added).

589.    Thus, JPM Chase Bank purchased "all subsidiaries" of WaMu Bank under the PAA, which subsidiaries included WaMu Capital. As such, WaMu Capital became wholly-owned subsidiaries of JPM Chase Bank.

590.    JPM Chase Bank also assumed certain liabilities under the PAA:

2.1 Liabilities Assumed by Assuming Bank. Subject to Sections 2.5 [Borrower Claims] and 4.8 [Agreement with Respect to Certain Existing Agreements], the Assuming Bank expressly assumes at Book Value (subject to adjustment pursuant to Article VIII) and agrees to pay, perform, and discharge, all of the liabilities of the Failed Bank which are reflected on the Books and Records of the Failed Bank as of Bank Closing, including the Assumed Deposits and all liabilities associated with any and all employee benefit plans, except as listed on the attached Schedule 2.1, and as otherwise provided in this Agreement (such liabilities referred to as "Liabilities Assumed"). Notwithstanding Section 4.8, the Assuming Bank specifically assumes all mortgage servicing rights and obligations of the Failed Bank.

PAA § 2.1.

591.    Under the terms of the PAA, the only liability JPM Chase Bank expressly disclaimed was "any liability associated with borrower claims for payment of or liability to any borrower for monetary relief, or that provide for any other form of relief to any borrower . . . related in any way to any loan or commitment to lend made by the Failed Bank prior to failure, or to any loan made by

147

a third party in connection with a loan which is or was held by the Failed Bank, or otherwise arising in connection with the Failed Bank's lending or loan purchase activities." PAA § 2.5.

592.    The Final Report of the Examiner ("Examiner's Report"), submitted by the court appointed Examiner on November 1, 2010 during Washington Mutual, Inc.'s ("WMI") bankruptcy supports that JPM Chase Bank assumed all liabilities associated with claims such as those asserted herein under the PAA. *In re Washington Mutual, Inc.*, No. 08-12229 MFW (Bankr. D. Del. Nov. 1, 2010) (filed publicly with exhibits on Nov. 22, 2010).

593.    For instance, the FDIC posted a "FAQ" for potential acquirers with respect to the WaMu Bank transaction. The FDIC's explicit position was that the mortgage securitization obligations passed to the acquirer:

> 9. Are the off-balance sheet credit card portfolio and mortgage securitizations included in the transaction? Do you expect the acquirer to assume the servicing obligations? If there are pricing issues associated with the contracts (e.g., the pricing is disadvantageous to the assuming institution), can we take advantage of the FDIC's repudiation powers to effect a repricing?
> Answer: The bank's interests and obligations associated with the off-balance sheet credit card portfolio and mortgage securitizations pass to the acquirer. Only contracts and obligations remaining in the receivership are subject to repudiation powers.

Examiner's Report Ex. JPMCD 000001550.00212 – JPMCD 000001550.00213.

594.    In fact, WMI had warned investors in its quarterly 10-Q report for the quarter ending June 30, 2008 that "errors may have been made in the process of originating the loans" in its securitizations, and further cautioned that "representations and warranties made by the Company in connection with" the sales of its RMBS products could be "breached." WMI further explained, if "it is determined that such errors constitute a breach of a representation or warranty made to the investor in connection with the Company's sale of the loan, then if the breach had a material adverse effect on the value of the loan, the Company will be required to either repurchase the loan or indemnify the investor for losses sustained. Reserves established to repurchase loans or indemnify

investors are recorded as a reduction to revenue from sales and servicing of home loans on the Consolidated Statements of Income." Prior to the sale of its assets and liabilities to JPM Chase Bank, WaMu Bank had already "recorded reserves of $375 million and $268 million as of June 30, 2008 and December 31, 2007, to cover its estimated exposure" related to these "aforementioned loss contingencies." WMI Form 10-Q for the Period Ended June 30, 2008, at 10-11.

595.    Thus, JPM Chase Bank was fully aware of the pending claims and potential claims against WaMu Bank and WaMu Capital when it purchased and assumed WaMu Bank's assets and liabilities.

596.    Further, JPMorgan Chase & Co.'s SEC filings specifically recognize the additional liability associated with claims similar to those asserted herein. For instance, in a 424(b)(5) prospectus supplement filed Dec. 12, 2009, for an offering of warrants for the rights to purchase shares of its common stock, JPMorgan Chase & Co. warns potential investors (at S-7) that "repurchase and/or indemnity obligations arising in connection with the sale and securitization of loans . . . by us and certain of our subsidiaries, as well as entities acquired by us as part of the Bear Stearns, Washington Mutual and other transactions, could materially increase our costs and lower our profitability, and could materially and adversely impact our results of operations and financial condition."

597.    JPM Chase Bank is therefore liable as successor-in-interest to WaMu Capital and/or non-party WaMu Bank.

598.    In the alternative, the transaction between JPM Chase Bank and the FDIC resulted in a *de facto* merger of JPM Chase Bank and WaMu Bank, because WaMu Bank was put into receivership and sold to JPM Chase Bank in one day with no interruption of and in fact a continuity of business, JPM Chase Bank discontinued the WaMu brand and converted it to the JPM Chase brand as soon as was possible, and JPM Chase Bank assumed the liabilities of WaMu Bank that were

necessary to continue WaMu Bank's ordinary business. As a result of the *de facto* merger, JPM Chase Bank is liable for WaMu Bank's liability, and also for WaMu Capital's liability.

## CAUSES OF ACTION

### COUNT I
### (Rescission on the Ground of Misrepresentation)

599.    CUNA Mutual realleges each paragraph above as if fully set forth herein.

600.    Before CUNA Mutual decided to purchase the eleven certificates from Defendants, Defendants made various representations about the credit quality of the mortgage pools collateralizing those securities, including representations about LTV ratios, owner-occupancy rates, credit ratings, and the Originators' adherence to their underwriting standards. Defendants also represented that they did due diligence on the RMBS they underwrote and that the due diligence, including re-underwriting, was designed to ensure that the loans in the loan pools complied with the Originators' underwriting guidelines. Each of these representations was false at the time that it was made.

601.    Each of these representations was material to CUNA Mutual, because it was likely to and did induce a reasonable investor to purchase the certificates for the purchase price at the relevant yield.

602.    CUNA Mutual relied on these representations in deciding to purchase the relevant certificates from Defendants. Had CUNA Mutual known that these representations were inaccurate, it would not have purchased any of the certificates.

603.    CUNA Mutual's reliance was justifiable because Defendants' role as an underwriter of publicly offered securities was to provide accurate information about the credit risk associated with the various certificates, and CUNA Mutual did not have access to the kind of information

necessary to independently verify that credit risk—e.g., the loan files that were inaccessible to CUNA Mutual and other investors. Further, Defendants assured CUNA Mutual that they re-underwrote a portion of the mortgage pools backing their securitizations by reviewing actual loan files and the supporting documents contained in them.

604.    As a result of the foregoing, CUNA Mutual has the right to rescind the purchase of all eleven certificates on the grounds of misrepresentation, and to require Defendants to accept the certificates (or their current value) in exchange for their original cost, plus interest. CUNA Mutual hereby tenders all eleven certificates (or their current value) back to Defendants, as well as all income generated by the certificates since the date of purchase.

CUNA Mutual prays for relief as follows:

A.      Rescission of CUNA Mutual's purchases of the eleven certificates from Defendants, or a rescissory measure of damages;

B.      Prejudgment interest;

C.      Such other relief as the Court may deem just and proper.


## COUNT II
### (Rescission on ground of mistake)

605.    CUNA Mutual realleges each paragraph above as if fully set forth herein.

606.    CUNA Mutual entered into each of the RMBS transactions at issue in this case due to a mistake of fact about a basic assumption underlying every transaction: that the RMBS CUNA Mutual was purchasing were backed by loans that had been originated in compliance with the relevant originators' underwriting guidelines.

607.    Compliance with underwriting guidelines was a well-established and ubiquitous representation in the RMBS industry and was made in the Offering Documents of every publicly offered, non-scratch-and-dent RMBS transaction, including each of the RMBS at issue. CUNA

Mutual was an experienced purchaser of RMBS and knew, understood, and expected that every RMBS that it purchased would be accompanied by the representation that the originators of the loans in the loan pools had issued those loans in compliance with their underwriting guidelines, subject to case-by-case exceptions supported by sufficient compensating factors to make the loans an appropriate credit risk consistent with the guidelines.

608.   CUNA Mutual's assumption as to this basic and fundamental underpinning of the RMBS transactions at issue was mistaken. The truth was that the Originators of the loans backing the RMBS had systematically abandoned their underwriting guidelines and issued materially defective loans without regard for any compensating factors. The loan pools backing CUNA Mutual's RMBS were riddled with materially defective loans that were of a much lower credit quality than they were represented to be, meaning that the RMBS structures and credit enhancement were wholly inadequate for the loans that were being securitized. This mistake was material and CUNA Mutual would not have entered into the transactions had it known the truth.

609.   CUNA Mutual did not know or have reason to suspect that it was mistaken about this basic assumption at the time it entered into the transactions. It also did not assume the risk that this basic assumption was incorrect: the base prospectus and final prospectus supplement for every RMBS CUNA Mutual purchased assured investors that the securitizations issued pursuant to that base prospectus would be and were backed by loans that were originated in compliance with underwriting guidelines.

610.   CUNA Mutual's mistake about originator compliance with underwriting guidelines may have been shared with Defendants or unilateral, but in either case, CUNA Mutual is entitled to rescission.

611.    Defendants performed due diligence on the Originators and the loans pools backing the RMBS and purportedly concluded that the loans in the loan pools had been issued in compliance

152

with underwriting guidelines. Indeed, Defendants explicitly made that representation in Offering Documents knowing that they could be strictly liable if that representation was not accurate. Thus, Defendants may also have been mistaken about a basic assumption underlying each of their sales of RMBS to CUNA Mutual.

612.    Alternatively (and, more plausibly), if Defendants knew or had reason to suspect that the Originators had not complied with their underwriting guidelines, then Defendants were obligated to inform CUNA Mutual of that fact before CUNA Mutual committed to purchase the RMBS at issue. Defendants had access to the Originators and the loan files, and they purportedly re-underwrote a sufficient sample of the loans to discover their true qualities.

613.    Defendants knew that CUNA Mutual, like all other investors, believed that the loans backing the RMBS were originated in compliance with underwriting guidelines. If Defendants had information inconsistent with that belief, their failure to correct CUNA Mutual's mistake before they sold CUNA Mutual the certificates amounted to a failure to act in good faith and in accordance with reasonable standards of fair dealing. Defendants' non-disclosure also amounted to a representation that the Originators had in fact complied with their underwriting guidelines when issuing the loans, as CUNA Mutual mistakenly believed.

614.    As a result of the foregoing, CUNA Mutual has the right to rescind the purchase of all eleven certificates on the grounds of mistake, and to require Defendants to accept the certificates in exchange for their original cost, plus interest. CUNA Mutual hereby tenders all eleven certificates (or their current values) back to Defendants, as well as all income generated by the certificates since the date of purchase.

CUNA Mutual prays for relief as follows:

A.    Rescission of CUNA Mutual's purchases of the eleven certificates from Defendants, or a rescissory measure of damages;

B.      Prejudgment interest;

C.      Such other relief as the Court may deem just and proper.

## COUNT III
## (Unjust Enrichment)

615.    CUNA Mutual re-alleges each paragraph above as is if fully set forth herein.

616.    In purchasing the eleven certificates from Defendants, CUNA Mutual conferred onto Defendants a substantial monetary benefit consisting of the certificates' purchase price and further allowed Defendants to continue profiting from their RMBS business.

617.    Defendants accepted and appreciated the benefit conferred by CUNA Mutual.

618.    CUNA Mutual purchased the certificates in reliance on Defendants' misrepresentations about LTV ratios, owner-occupancy rates, the Originators' compliance with their underwriting standards, credit ratings, and their own due diligence, as detailed above. These representations were false at the time they were made. CUNA Mutual also relied on Defendants' representations that they re-underwrote a portion of the mortgage pools backing the RMBS they brought to market. Absent these representations, CUNA Mutual would not have purchased any of the certificates.

619.    In truth, Defendants' due diligence process was deeply flawed and either intentionally or recklessly allowed materially defective loans into the loan pools backing the RMBS.

620.    If the truth had been known about the actual LTV ratios, owner-occupancy rates, the Originators' systematic abandonment of their underwriting standards, and the gross inadequacy of Defendants' due diligence, the certificates that CUNA Mutual purchased would have been worth either far less than what CUNA Mutual paid for them, or they would have been completely worthless.

621.    So while Defendants received the full purchase price of the certificates from CUNA

Mutual, they gave certificates of significantly lower or no value to CUNA Mutual in return. Under the circumstances, it would be inequitable for Defendants to retain the purchase price of the securities and all other benefits that CUNA Mutual conferred without paying for the value of that benefit.

CUNA Mutual prays for relief as follows:

A.    An award of compensatory damages representing the amount by which Defendants were unjustly enriched through the RMBS transactions at issue;

B.    Prejudgment interest;

C.    Such other relief as the Court may deem just and proper.

_/s/ Silvija A. Strikis_____
David C. Frederick (*pro hac vice*)
Silvija A. Strikis (*pro hac vice*)
**Kellogg, Huber, Hansen, Todd,**
**Evans & Figel, PLLC**
1615 M Street, N.W., Suite 400
Washington, DC 20036
(202) 326-7900
dfrederick@khhte.com
sstrikis@khhte.com
sattaway@khhte.com

Peggy A. Lautenschlager
**Bauer & Bach, LLC**
123 East Main Street, Suite 300

155

Madison, Wisconsin 53703
(608) 260-0292
lautenschlager@bauer-bach.com

George A. Zelcs (*pro hac vice*)
**Korein Tillery, LLC**
205 North Michigan,
Suite 1950
Chicago, IL 60601
(312) 641-9750
gzelcs@koreintillery.com

Greg G. Gutzler (*pro hac vice*)
Michael E. Klenov
**Korein Tillery, LLC**
505 North 7th Street, Suite 3600
St. Louis, MO 63101
(314) 241-4844
ggutzler@koreintillery.com
mklenov@koreintillery.com

**Counsel for CUNA Mutual**

156